# EXHIBIT A

# Master Software Development Agreement

This Master Software Development Agreement (this "**Agreement**"), dated as of October 1, 2016 (the "**Effective Date**"), is by and between PointSource, LLC, a Florida limited liability company ("**Developer**"), and Numismatic Guaranty Corporation of America, a Florida corporation ("**NGC**").

WHEREAS, Developer is engaged in the business of providing software development and related services and work product; and

WHEREAS, NGC wishes to retain Developer to provide, for NGC and its current and future Affiliates (collectively, "**Customer**"), the software development and related services and work product described herein and from time to time in separately executed statements of work, and Developer wishes to provide the same to Customer, each on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Customer and Developer agree as follows:

1.  <u>Definitions</u>. For purposes of this Agreement, the following terms have the following meanings:

> "**Acceptance**" has the meaning set forth in Section 10.4.

> "**Acceptance Tests**" means such tests as may be conducted in accordance with Section 10 to determine whether any Software Deliverable meets the requirements of this Agreement and the Specifications and Documentation therefor.

> "**Action**" has the meaning set forth in Section 18.1.

> "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the direct or indirect power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. For the avoidance of doubt, Affiliates of NGC include, but are not limited to, Certified Collectibles Group, LLC, a Florida limited liability company; Certified Guaranty Company LLC, a Florida limited liability company; Paper Money Guaranty, LLC, a Florida limited liability company; Numismatic Conservation Services, LLC, a Florida limited liability company; and Classic Collectible Services, LLC, a Florida limited liability company.

> "**Agreement**" has the meaning set forth in the preamble.

> "**Aggregate Software**" means the Software, as a whole, to be developed or otherwise provided under a particular Statement of Work or a series of Statements of Work. For

avoidance of doubt, if a Statement of Work provides for a single Software Deliverable, such Software Deliverable shall also constitute Aggregate Software.

"**Allegedly Infringing Materials**" has the meaning set forth in Section 18.3(a)(ii).

"**Background Technology**" means all software, data, know-how, ideas, methodologies, specifications, and other technology in which Developer owns such Intellectual Property Rights as are necessary for Developer to grant the rights and licenses set forth in Section 15.1, and for Customer (including its licensees, successors, and assigns) to exercise such rights and licenses, without violating any right of Developer, any Third Party, or any Law or incurring any payment obligation to Developer or any Third Party, solely to the extent such items were or are developed or otherwise acquired by Developer prior to the Effective Date, with respect to the Initial Statement of Work, or the date of Customer's request for additional Services, with respect to any other Statement of Work.

"**Business Day**" means any day other than a Saturday, a Sunday, or a day on which banking institutions in Sarasota, Florida, are authorized or obligated by law or executive order to be closed.

"**Business Requirements Specification**" means the ERP Business Requirements Document attached as Exhibit 1 hereto.

"**Change**" has the meaning set forth in Section 3.4.

"**Change Agreement**" has the meaning set forth in Section 3.4(b).

"**Change Proposal**" has the meaning set forth in Section 3.4(a).

"**Confidential Information**" means (a) any non-public, confidential, or proprietary information of Customer, including, without limitation, trade secrets, technology, and information pertaining to business operations, strategies, customers, pricing, and marketing and (b) Personal Information provided to Developer by Customer. Without limiting the foregoing, Confidential Information of Customer includes the Customer-Owned Work Product, Customer Materials, and the terms and existence of this Agreement. Confidential Information does not include information that Developer can demonstrate by documentation: (i) was already known to Developer without restriction on use or disclosure prior to receipt of such information directly or indirectly from or on behalf of Customer; (ii) was or is independently developed by Developer without reference to or use of any of Customer's Confidential Information; (iii) was or becomes generally known by the public other than by breach of this Agreement by, or other wrongful act of, Developer or any of its Representatives; or (iv) was received by Developer from a Third Party who was not, at the time, under any obligation to Customer or any other Person to maintain the confidentiality of such information.

"**Controlled Technology**" means any software, documentation, technology, or other technical data, or any products that include or use any of the foregoing, the export, re-

export, or release of which to certain jurisdictions or countries is prohibited or requires an export license or other governmental approval, under any Law, including the US Export Administration Act, and its associated regulations.

"**Customer**" has the meaning set forth in the recitals.

"**Customer Materials**" means all materials and information, including documents, data, know-how, ideas, methodologies, specifications, software, content, and technology, in any form or media, directly or indirectly provided or made available to Developer by or on behalf of Customer in connection with this Agreement, regardless of whether such materials and information: (a) are owned by Customer, a Third Party, or in the public domain; or (b) qualify for or are protected by any Intellectual Property Rights.

"**Customer-Owned Work Product**" means all Work Product other than materials expressly identified in a schedule to this Agreement or Statement of Work as Background Technology, Third-Party Materials, or Open-Source Components.

"**Deliverables**" means all Software Deliverables and all other documents, work product, and other materials that Developer is required to or otherwise does provide to Customer or its designee under this Agreement and otherwise in connection with any Services, including any and all items specifically identified as Deliverables in any Statement of Work.

"**Developer**" has the meaning set forth in the preamble.

"**Developer Personnel**" means all employees or subcontractors of Developer involved in the performance of Services or providing Work Product hereunder.

"**Documentation**" means all information, in any form or media, as may be necessary or useful to describe the functionality and technical and other components, features, and requirements of any Software or for the effective installation, testing, use, operation, use, maintenance, and support of any Software by Customer, including the effective configuration, integration, and systems administration of the Software and performance of all other functions set forth in the Specifications. Documentation will include, without limitation, information contained in user manuals, operating manuals, technical manuals, and any other instructions, specifications, documents, and materials.

"**Effective Date**" has the meaning set forth in the preamble.

"**Fees**" has the meaning set forth in Section 12.1.

"**Force Majeure**" has the meaning set forth in Section 23.2.

"**Functional Specification**" means, with respect to any Software, Customer's requirements with respect to such Software's features and functions, as included in the Statement of Work for such Software.

"**Harmful Code**" means any: (a) virus, trojan horse, worm, backdoor, or other software or hardware devices the effect of which is to permit unauthorized access to, or to disable, erase, or otherwise harm, any computer, system, or software; or (b) time bomb, drop dead device, or other software or hardware device designed to disable a computer program automatically with the passage of time or under the positive control of any Person or otherwise deprive Customer of its lawful right to use such Software.

"**Holdback Date**" has the meaning set forth in Section 13.1(a)

"**Implementation Plan**" means the schedule included in the Roadmap and each Statement of Work setting forth the sequence of events for the performance of Services, including the Milestones and Milestone Dates thereunder.

"**Initial Statement of Work**" means the Statement of Work for the initial Software development and related Services hereunder as agreed by the parties, attached as Exhibit 2 hereto.

"**Integration Testing**" has the meaning set forth in Section 10.1(c)

"**Intellectual Property Rights**" means all or any of the following: (a) patents, patent disclosures, and inventions (whether patentable or not); (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, together with all of the goodwill associated therewith; (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data, databases, and database schema; (d) trade secrets, know-how, and other confidential information; and (e) all other intellectual property rights; in each case whether registered or unregistered and including all applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection provided by applicable Law in any jurisdiction throughout the world.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any federal, state, local or foreign government, or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

"**Liquidated Damages**" has the meaning set forth in Section 23.11.

"**Losses**" has the meaning set forth in Section 18.1.

"**Maintenance and Support Services**" means maintenance and support services provided for the Software by Developer, including, without limitation, any maintenance and support services required under Section 17.3.

"**Milestone**" means an event or task described in the Implementation Plan that must be completed by the corresponding Milestone Date set forth therein.

"**Milestone Date**" means the date by which a particular Milestone must be completed as set forth in the Implementation Plan.

"**NGC**" has the meaning set forth in the preamble.

"**Non-Conformity**" means any failure of any (a) Software or Documentation to conform to the requirements of this Agreement (including any Schedules or Exhibits attached hereto and any applicable Statement of Work); or (b) Software to conform to the requirements of the Specifications or Documentation therefor.

"**Open-Source Components**" means any software component that is subject to any open-source copyright license agreement, including any GNU General Public License or GNU Library or Lesser Public License, or other license agreement that substantially conforms to the Open Source Definition as prescribed by the Open Source Initiative or otherwise may require disclosure or licensing to any third party of any source code with which such software component is used or compiled.

"**Open-Source License**" has the meaning set forth in Section 4.4.

"**Operating Environment**" means, collectively, the Customer platform and environment on, in, or under which Software is intended to be installed and operate, as set forth in the Statement of Work for such Software, including such structural, functional, and other features, conditions, and components as hardware, operating software, and system architecture and configuration.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability entity, governmental authority, unincorporated organization, trust, association, or other entity.

"**Personal Information**" means information that (a) relates to an individual person and (b) identifies or can be used to identify, locate, or contact that individual alone or when combined with other personal or identifying information that is or can be associated with that specific individual.

"**Representatives**" means a party's and its Affiliates' employees, officers, directors, consultants, legal advisors, and subcontractors.

"**Roadmap**" means the ERP Roadmap Deliverable document attached as Exhibit 3 hereto.

"**Services**" means any of the services Developer is required to or otherwise does provide under this Agreement or any Statement of Work, as more fully described in this Agreement or such Statement of Work, including, without limitation, software design, development, integration, project management, and consulting services.

"**Site**" means the physical location designated by Customer in, or in accordance with, this Agreement or any Statement of Work for delivery and/or installation of any Software.

"**Software**" means the computer program(s), including programming tools, scripts, routines, and database schema Developer is required to or otherwise does develop or otherwise provide under this Agreement, as described more fully in the Business Requirements Specification, the Roadmap, and each Statement of Work, including all updates, upgrades, new versions, new releases, enhancements, improvements, and other modifications made or provided. As context dictates, Software may refer to one or more Software Deliverables or Aggregate Software.

"**Software Deliverable**" means any Software, together with the Documentation therefor, required to be delivered as a Milestone as set forth in the Implementation Plan for such Software.

"**Source Code**" means the human readable source code of the Software to which it relates, in the programming language in which such Software was written, together with all related flow charts and technical documentation, including a description of the procedure for generating object code, all of a level sufficient to enable a programmer reasonably fluent in such programming language to understand, operate, support, maintain, and develop modifications, upgrades, updates, enhancements, improvements, and new versions of, and to develop computer programs compatible with, such Software.

"**Specifications**" means, for any Software, the specifications collectively set forth in the Business Requirements Specification and the Roadmap together with the Functional Specification and the Technical Specification for such Software.

"**Statement of Work**" means any statement of work entered into by the parties and attached as a schedule to this Agreement. The Initial Statement of Work is attached as Exhibit 2, and subsequent Statements of Work shall be sequentially identified and attached as Exhibits 2-A, 2-B, 2-C, etc.

"**Technical Specification**" means, with respect to any Software, the document setting forth the technical specifications for such Software and included in the Statement of Work for such Software.

"**Term**" has the meaning set forth in Section 16.1.

"**Testing Period**" has the meaning set forth in Section 10.1(b).

"**Third Party**" means any Person other than Customer or Developer. For purposes of this Agreement, Developer's Affiliates are Third Parties.

"**Third-Party Materials**" means any materials and information, including documents, data, know-how, ideas, methodologies, specifications, software, content, and

technology, in any form or media, in which any Person other than Customer or Developer owns any Intellectual Property Right, but specifically excluding Open-Source Components.

"**Work Product**" means all materials, including, without limitation, Software, Documentation, Specifications, database schema, and other documents, work product, and materials related thereto, that Developer is required to, or otherwise does, provide to Customer or its designee hereunder, together with all ideas, concepts, processes, and methodologies developed in connection therewith whether or not embodied therein.

2.      Engagement of Developer; Time of the Essence.

2.1      Engagement of Developer. Customer hereby engages Developer, and Developer hereby accepts such engagement, to develop Software and provide Services related thereto as described herein or otherwise requested by Customer from time to time and described in Statements of Work therefor, all on the terms and conditions set forth in this Agreement and such Statements of Work.

2.2      Relationship Managers. Throughout the Term of this Agreement, each party shall maintain within its organization a relationship manager located in Florida to serve as such party's primary point of contact for day-to-day communications, consultation, and decision making regarding this Agreement. Each party shall ensure its relationship manager has the requisite authority and skill to perform in such capacity. The parties' initial relationship managers are: Max Spiegel (for Customer) and ⎽⎽Ron Reed⎽⎽ (for Developer). Each party shall use commercially reasonable efforts to maintain the same relationship manager in place throughout the Term. If either party's relationship manager ceases to be employed by such party or such party otherwise wishes to replace its relationship manager, such party shall promptly name a new relationship manager by written notice to the other party; provided that Customer will not be responsible for any costs associated with the time or resources required for the new relationship manager to acquire the same knowledge and familiarity with Customer and the transactions contemplated hereby as the prior relationship manager.

2.3      Time of the Essence. Developer acknowledges that time is of the essence with respect to Developer's obligations hereunder and agrees that prompt and timely performance of all such obligations in accordance with this Agreement (including any Schedules or Exhibits attached hereto) and each Statement of Work is strictly required.

3.      Statements of Work. Developer shall provide Services and Work Product pursuant to Statements of Work entered into as set forth herein. No Statement of Work shall be effective unless signed by duly authorized representatives of both parties. The term of each Statement of Work shall be as set forth therein or, if no term is specified, shall commence on the parties' full execution thereof and terminate when the parties have fully performed their obligations thereunder. Unless a Statement of Work expressly states otherwise, Customer shall have the right to terminate such Statement of Work as set forth in Section 16.2.

3.1    <u>Statement of Work Requirements</u>. Each Statement of Work shall include the following:

(a)    names and contact information for the parties' project managers and, if relevant, key personnel of Developer under such Statement of Work;

(b)    a detailed description of the Services to be provided thereunder;

(c)    the intended Operating Environment for the Software Deliverables governed by the Statement of Work;

(d)    a detailed description of the Software and other Work Product to be developed or otherwise provided under such Statement of Work, including a:

(i)    Functional Specification;

(ii)    Technical Specification; and

(iii)    description of the Documentation to be provided;

(e)    an Implementation Plan, including all Milestones, the corresponding Milestone Dates, and the parties' respective responsibilities therefor;

(f)    Fees payable under such Statement of Work, the manner in which such Fees shall be calculated, the due dates for payment thereof including any Milestones on which any such Fees are conditioned, and such other information as the parties deem necessary;

(g)    disclosure of all Background Technology, Third-Party Materials, Open-Source Components, and any Controlled Technology that will be incorporated into any Deliverable, in each case accompanied by such related documents as may be required by this Agreement with respect thereto;

(h)    a detailed description of all Customer Resources required under such Statement of Work; and

(i)    delivery information for all Software Deliverables governed by the Statement of Work, including complete Documentation in compliance with Section 5 and, except to the extent the Statement of Work specifies otherwise, the Source Code therefor in compliance with Section 4.1, including, without limitation:

(i)    the manner of delivery (for example, mail, e-mail, download, or overnight courier);

(ii)    where it is to be delivered, including the recipient's name; and

(iii)    the format and media in which it must be delivered.

3.2    Initial Statement of Work. The Initial Statement of Work is attached as Exhibit 2 hereto.

3.3    Additional Statements of Work. At least 30 days prior to the delivery of the final Software Deliverable under a Statement of Work, Developer shall provide Customer with a proposal for the next Statement of Work as needed for Developer to complete the Services set forth in the Business Requirements Specification and the Roadmap. Upon the parties' agreement with respect to the terms of such proposal, each party shall cause such Statement of Work to be signed by its duly authorized representative. Each fully executed Statement of Work shall be attached as an Exhibit to, and by this reference incorporated in and made a part of, this Agreement.

3.4    Changes to Statements of Work. In the event, for any reason (other than a Customer delay described in Section 7.3), a change to any Statement of Work is required (a "**Change**"), including changes to the Services, Work Product, Implementation Plan, or any Specifications, the parties shall evaluate and implement all Changes in accordance with this Section 3.4.

(a)    As soon as reasonably practicable, Developer shall provide Customer with a written proposal for implementing the requested Change ("**Change Proposal**"), setting forth:

(i)    a written description of the proposed Changes to any Services, Work Product, or Deliverables;

(ii)    an amended Implementation Plan reflecting: (A) the schedule for commencing and completing any additional or modified Services, Work Product, or Deliverables; and (B) the effect of such Changes, if any, on completing any other Services or Work Product under the Statement of Work;

(iii)    any additional Background Technology, Third-Party Materials, Open-Source Components, Controlled Technology, and Customer Resources Developer deems necessary to carry out such Changes; and

(iv)    any increase or decrease in Fees resulting from the proposed Changes, which increase or decrease shall reflect only the increase or decrease in time and expenses Developer requires to carry out the Change; provided that, if the Change was not requested by Customer, there will be no increase in Fees.

(b)    Within five Business Days following Customer's receipt of a Change Proposal, Customer shall by written notice to Developer, approve, reject, or propose modifications to such Change Proposal. If Customer proposes modifications, Developer shall modify and re-deliver the Change Proposal reflecting such modifications, or notify Customer of any disagreement therewith, in which event the parties shall negotiate in good faith to resolve their disagreement. Upon Customer's approval of the Change Proposal or the parties' agreement on all proposed modifications thereto, as the case may be, the parties shall execute a written agreement to the

Change Proposal (a **"Change Agreement"**), which Change Agreement shall constitute an amendment to the Statement of Work to which it relates; and

(c) If the parties fail to enter into a Change Agreement within 10 days following Customer's response to a Change Proposal, Customer shall have the right, in its discretion, to:

(i) require Developer to perform the Services under the Statement of Work without the Change;

(ii) require Developer to continue to negotiate a Change Agreement; or

(iii) notwithstanding any provision to the contrary in such Statement of Work, deem the failure to enter into a Change Agreement a non-curable breach and terminate this Agreement and any or all Statements of Work pursuant to Section 16.2(b)(i).

No Change will be effective until the parties have executed a Change Agreement with respect thereto. Except as Customer may request in writing, Developer shall continue to perform its obligations in accordance with the Statement of Work pending negotiation and execution of a Change Agreement. Developer shall use best efforts to limit any delays or Fee increases from any Change to those necessary to perform the Change in accordance with the applicable Change Agreement. Developer will be responsible for all costs and expenses (including those of Customer) of preparing, evaluating, negotiating, and otherwise processing any Change Proposal and Change Agreement; provided that, if the Change was requested by Customer, each party will be responsible for its own costs and expenses.

4.    Software. Developer shall design, develop, create, test, deliver, install, configure, integrate, customize, and otherwise provide and make fully operational Software as described in the Business Requirements Specification, Roadmap, and each Statement of Work on a timely and professional basis in accordance with all terms, conditions, and Specifications set forth in this Agreement (including all Schedules and Exhibits attached hereto) and such Statement of Work.

4.1    Software Specifications. Developer shall ensure all Software complies with the Specifications therefor. Except to the extent expressly provided otherwise in the Statement of Work for any Software, Developer shall provide all Software to Customer in both object code and Source Code form.

4.2    Background Technology. Developer shall not include in any Software, and operation of all Software in accordance with its Specifications and Documentation shall not require, any Background Technology, other than Background Technology (i) specifically described in Schedule A or the Statement of Work for such Software and (ii) licensed to Customer in accordance with Section 15.1.

4.3    Third-Party Materials.

(a) Developer shall not include in any Software, and operation of all Software in accordance with its Specifications and Documentation shall not require, any Third-Party Materials, other than Third-Party Materials (i) specifically described in Schedule A or the Statement of Work for such Software and (ii) licensed to Customer in accordance with Section 15.3.

(b) Except as provided otherwise in Schedule A or the applicable Statement of Work, Developer shall secure, at its sole cost and expense, all rights, licenses, consents, approvals, and authorizations set forth in Section 15.3.

4.4     Open-Source Components. Developer shall not include in any Software, and operation of all Software in accordance with its Specifications and Documentation shall not require the use of, any Open-Source Components other than Open-Source Components specifically described in Schedule A or the Statement of Work for such Software, and for which the relevant open-source license(s) (each, an **"Open-Source License"**) are attached as exhibits to Schedule A or such Statement of Work. Developer shall provide Customer with a complete, machine-readable copy of the Source Code for Open-Source Components incorporated into any Deliverable in accordance with the terms of the Open-Source License(s) therefor at no cost to the Customer.

4.5     Controlled Technology. Developer shall not include in any Software any Controlled Technology, except to the extent expressly disclosed in Schedule A or the Statement of Work for such Software.

5.     Documentation. Prior to or concurrently with the delivery of any Software hereunder, or by such earlier date as may be specified in the Implementation Plan for such Software, Developer shall provide Customer with complete and accurate Documentation for such Software. Where the applicable Statement of Work requires or permits delivery of Software in two or more phases, Developer shall also provide Customer with integrated Documentation for the Aggregate Software upon its delivery.

5.1     Documentation Specifications. Developer shall provide all Documentation in both hard copy and electronic form, in such formats and media as are set forth in the relevant Statement of Work or as Customer may otherwise request.

5.2     Third-Party Documentation. Other than Documentation for Third-Party Materials and Open-Source Components, no Documentation shall consist of or include Third-Party Materials. To the extent Documentation consists of or includes Third-Party Materials, Developer shall secure, at its sole cost and expense, all rights, licenses, consents, approvals, and authorizations specified in Section 15.3.

6.     Performance of Services. Developer shall provide all Services and Work Product hereunder in a timely, professional, and workmanlike manner and in accordance with the

terms, conditions, and Specifications set forth in this Agreement (including the Schedules and Exhibits hereto) and each Statement of Work.

6.1     Developer Personnel.

(a)  Developer is solely responsible for all Developer Personnel and for the payment of their compensation, including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes, unemployment insurance, workers' compensation insurance payments, and disability benefits.

(b)  Prior to any Developer Personnel performing any Services hereunder, Developer shall:

(i)     ensure that such Developer Personnel have the legal right to work in the United States;

(ii)    require such Developer Personnel to execute written agreements, in form and substance acceptable to Customer, that bind such Developer Personnel to confidentiality provisions that are at least as protective of Customer's information (including all Confidential Information) as those contained in this Agreement and Intellectual Property Rights provisions that grant Customer rights in the Work Product consistent with the provisions of Section 14.1 and, upon Customer's request, provide Customer with a copy of each such executed agreement; and

(iii)   at its sole cost and expense, conduct background checks on such Developer Personnel, which background checks shall comprise, at a minimum, a review of credit history, references, and criminal record, in accordance with applicable Law.

(c)  Developer shall, and shall ensure that all Developer Personnel, comply with all rules, regulations, and policies of Customer that are communicated to Developer in writing, including security procedures concerning systems and data and remote access thereto, building security procedures, and general health and safety practices and procedures.

(d)  In the event any Developer Personnel are replaced for any reason, Customer will not be responsible for any costs associated with the time or resources required for the new Developer Personnel to acquire the same knowledge and familiarity with Customer and the transactions contemplated hereby as the former Developer Personnel.

6.2     Developer Project Managers. Upon the execution of each Statement of Work, Developer shall appoint, and throughout the term of such Statement of Work Developer shall maintain, a Developer employee located in Florida acceptable to Customer to serve as Developer's project manager (each, a "**Developer Project Manager**") under such Statement of Work.

(a)  Each Developer Project Manager shall:

(i) have the requisite authority, and necessary skill, experience, and qualifications, to perform in such capacity;

(ii) be responsible for overall management and supervision of Developer's performance under such Statement of Work; and

(iii) be Customer's primary point of contact for communications with respect to such Statement of Work, including with respect to giving and receiving all day-to-day approvals and consents thereunder.

(b) The Developer Project Manager shall attend all regularly scheduled meetings as set forth in the Business Requirements Specification, the Implementation Plan, and any Statement of Work and all additional meetings scheduled on at least five Business Days' prior notice, and otherwise shall be available as set forth in the Statement of Work.

(c) Developer shall maintain the same Developer Project Manager throughout the term of such Statement of Work, unless:

(i) Customer requests, or consents to, in writing the removal of the Developer Project Manager; or

(ii) the Developer Project Manager ceases to be employed by Developer, whether by resignation, involuntary termination, or otherwise.

(d) Developer shall promptly replace the Developer Project Manager under any Statement of Work on the occurrence of any event set forth in Section 6.2(c). Such replacement shall be subject to Customer's prior written approval. Customer will not be responsible for any costs associated with the time or resources required for the new Developer Project Manager to acquire the same knowledge and familiarity with Customer and the transactions contemplated hereby as the former Developer Project Manager.

6.3     Subcontractors. Developer shall not, without the prior written approval of Customer, which consent may be given or withheld in Customer's sole discretion, engage any Third Party to perform Services (including to create any Work Product) hereunder. Customer's approval of any such Third Party shall not relieve Developer of its representations, warranties, or obligations under the Agreement. Without limiting the foregoing, Developer shall:

(a) be responsible and liable for the acts and omissions of each such subcontractor (including such subcontractor's employees who, to the extent providing Services or creating Work Product, shall be deemed Developer Personnel) to the same extent as if such acts or omissions were by Developer or its employees;

(b) name Customer a third party beneficiary under Developer's agreement with each subcontractor with respect to the Services and Work Product;

(c)  be responsible for all fees and expenses payable to, by, or on behalf of each subcontractor in connection with this Agreement, including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes, unemployment insurance, workers' compensation insurance payments, and disability benefits; and

(d)  prior to the provision of Services or creation of Work Product by any subcontractor:

(i)  obtain from such subcontractor confidentiality, work-for-hire, and Intellectual Property Rights assignment agreements, in form and substance acceptable to Customer, giving Customer rights consistent with those set forth in Section 14.1 and Section 20 and, upon request, provide Customer with a fully-executed copy of each such agreement; and

(ii)  with respect to all subcontractor employees providing Services or Work Product, comply with its obligations under Section 6.1(b).

6.4  Insurance.  Throughout the Term, Developer shall maintain the following policies of insurance, each (other than workers' compensation) with a $1,000,000.00 combined single limit of liability:  workers' compensation (statutory) and employer's liability; comprehensive general liability; and comprehensive automotive liability.  Developer shall, at Customer's request, provide Customer with a certificate of insurance or other satisfactory evidence that such insurance has been obtained and that such policies are maintained in force throughout the Term.

7.  Customer Obligations.

7.1  Customer Resources and Cooperation. Customer shall be responsible, on a timely basis, for:

(a)  performing all obligations identified as "Customer Responsibilities" in a Statement of Work;

(b)  providing the Customer Materials and such other resources as may be specified in a Statement of Work (collectively, "**Customer Resources**");

(c)  providing Developer Personnel with such access to the Sites and Operating Environment as is necessary for Developer to perform its obligations on a timely basis;

(d)  participating with suitably qualified and authorized personnel in all meetings scheduled in, or in accordance with, such Statement of Work and such other meetings as may be scheduled on no less than five Business Days ' prior notice; and

(e)  providing all consents, approvals, exception notices, and other communications specified in such Statement of Work or as otherwise may be required under this Agreement.

Customer also agrees to use reasonable best efforts to induce Megasys, Ltd., a New Jersey corporation ("Megasys"), to cooperate with Customer's transition to Developer's Software. Notwithstanding the foregoing, Customer will not be responsible if Megasys does not offer such cooperation, or rescinds its offer to cooperate; provided that, in such event, Customer will be required to make available to Developer all data in Customer's possession, in such form as it is possessed by Customer, that is reasonably requested by Developer and is required by Developer to fulfill its obligations under this Agreement.

7.2     Customer Project Managers.

(a) Upon the execution of each Statement of Work, Customer shall appoint, and throughout the term of such Statement of Work Customer shall maintain, a Customer employee to serve as Customer's project manager under such Statement of Work (each, a "**Customer Project Manager**"). Each Customer Project Manager shall:

(i)     have the requisite authority, and necessary skill, experience, and qualifications, to perform in such capacity;

(ii)    be responsible for overall management and supervision of Customer's performance under such Statement of Work; and

(iii)   be Developer's primary point of contact for communications with respect to such Statement of Work, including with respect to providing and receiving all day-to-day approvals and consents thereunder.

(b) Each Customer Project Manager shall attend all regularly scheduled meetings as set forth in the Business Requirements Specification, the Implementation Plan, and any Statement of Work and additional meetings scheduled on at least five Business Days' prior notice, and otherwise shall be available as set forth in the Statement of Work.

7.3     Effect of Customer Delays. If, as a result of any failure by Customer or a Customer Project Manager to perform any of its obligations set forth in Section 7.1 or Section 7.2 on a timely basis, Developer is unable to timely meet all or any remaining Milestones under the Implementation Plan either at all or without incurring additional costs, Developer may extend such Milestone Dates for up to the length of Customer's or its Project Manager's delay or, at Customer's option, increase the related Fees solely to recover any such additional costs in accordance with the following:

(a) Developer shall promptly notify Customer in writing, proposing a revised Implementation Plan reflecting new Milestone Dates for each affected Milestone, which Milestone Dates may be extended by no longer than the length of Customer's delay and, if Developer is able to meet the original Milestone Dates by incurring additional costs:

(i)     for fixed-fee Services, its proposed Fee increase for meeting the original Milestone Dates; or

(ii) for time-and-materials Services, the estimated costs of overtime Customer would incur for Developer to meet the original Milestone Dates.

(b) Upon receipt of any notice given under Section 7.3(a), subject to Section 7.3(c), Customer shall promptly notify Developer in writing of its election. Customer's failure to notify Developer within 30 days after such receipt shall be deemed an acceptance of the new Milestone Dates and rejection of all Fee increases.

(c) If Customer disputes Developer's right to extend Milestone Dates or increase Fees, or the extent of any proposed extension or increase, Customer shall promptly notify Developer and the parties shall negotiate in good faith to resolve the dispute.

Notwithstanding anything contained in this Section 7.3 or otherwise in this Agreement, Developer shall (A) notify Customer immediately if Developer has reason to believe that a delay or issue related to Customer's obligations in 7.1 or Section 7.2 or Megasys' cooperation could impact Developer's ability to meet a Milestone and (B) use its best efforts to meet the Milestone Dates specified in the Statement of Work without any extension or Fee increase. Customer shall not be deemed in breach of this Agreement for its or its Project Manager's failure to perform obligations on a timely basis, and the provisions of this Section 7.3 set forth Developer's sole and exclusive remedy, and Customer's sole and exclusive liability, for Customer's or its Project Manager's failure to perform its obligations under this Section 7.

8. Pre-Delivery Testing.

8.1 Testing by Developer. Before delivering and installing any Software Deliverable, Developer shall:

(a) test the Software component of such Software Deliverable to confirm that it is fully operable, meets all applicable Specifications, and will function in accordance with the Specifications and Documentation when properly installed in the Operating Environment;

(b) scan such Software Deliverable using the most up-to-date scanning software and definitions to confirm it is free of Harmful Code;

(c) remedy any Non-Conformity or Harmful Code identified and retest and rescan the Software Deliverable; and

(d) prepare, test, and, as necessary, revise the Documentation component of the Software Deliverable to confirm it is complete and accurate and conforms to all requirements of this Agreement.

8.2 Customer Participation. Customer shall have the right to be present for all pre-installation testing. Developer shall give Customer at least five Business Days ' prior notice of all such testing.

9. <u>Delivery and Installation</u>. Developer shall deliver each Deliverable and install all Software on or prior to the Milestone Date therefor in accordance with the delivery criteria set forth in in the Statement of Work therefor. Developer shall deliver each Software Deliverable, including complete Documentation in compliance with Section 5 and, except to the extent the Statement of Work specifies otherwise, the Source Code therefor in compliance with Section 4.1. No Software Deliverable shall be deemed to have been delivered or installed unless it complies with the preceding sentence.

10. <u>Acceptance Testing; Acceptance</u>.

10.1 <u>Acceptance Testing</u>.

(a) Upon delivery or, if Developer is responsible for installation, installation of each Software Deliverable, Acceptance Tests shall be conducted as set forth in this Section 10.1 to ensure the Software Deliverable, including all Software and Documentation, conforms to the requirements of this Agreement, including the applicable Specifications and, in the case of the Software, the Documentation.

(b) All Acceptance Tests shall take place at the designated Site(s) in the Operating Environment described in the Statement of Work for the Software Deliverable, commence on the Business Day following delivery or installation, as applicable, of such Software Deliverable, and be conducted diligently for up to 30 days, or such other period as may be set forth in the relevant Statement of Work (**"Testing Period"**). Acceptance Tests shall be conducted by the party responsible therefor as set forth in the applicable Statement of Work or, if the Statement of Work does not specify, Customer, provided that:

(i) for Acceptance Tests conducted by Customer, if requested by Customer, Developer shall make suitable Developer Personnel available to observe or participate in such Acceptance Tests; and

(ii) for Acceptance Tests conducted by Developer, Customer shall have the right to observe or participate in all or any part of such Acceptance Tests.

Developer's performance of, participation in, and observation of Acceptance Testing shall be at Developer's sole cost and expense.

(c) Upon delivery and installation of the any Software Deliverable, additional Acceptance Tests shall be performed on the Aggregate Software as a whole to ensure full operability, integration, and compatibility among all elements of the Aggregate Software (**"Integration Testing"**). Integration Testing shall be subject to all procedural and other terms and conditions set forth in this Section 10.1 and Section 10.3.

(d) Customer may suspend Acceptance Tests and the corresponding Testing Period by written notice to Developer if Customer discovers a Non-Conformity in the tested Software Deliverable or part or feature thereof. In such event, Developer shall immediately, and in any

case within five Business Days or such other amount of time agreed upon by the parties, correct such Non-Conformity, whereupon the Acceptance Tests and Testing Period shall resume for the balance of Testing Period.

10.2    Notices of Completion, Non-Conformities, and Acceptance. Immediately upon the completion of any Acceptance Tests, including any Integration Testing, the party responsible for conducting the tests shall prepare and provide to the other party written notice of the completion of the tests. Such notice shall include a report describing in reasonable detail the tests conducted and the results thereof, including any uncorrected Non-Conformity in the tested Software Deliverable(s).

(a) If such notice is provided by either party and identifies any Non-Conformities, the parties' rights, remedies, and obligations will be as set forth in Section 10.3.

(b) If such notice is provided by Customer and identifies no Non-Conformities, such notice shall constitute Customer's Acceptance of such Software Deliverable or Aggregate Software.

(c) If such notice is provided by Developer and identifies no Non-Conformities, Customer shall have 30 days to use such Software Deliverable in the Operating Environment and determine, in the exercise of its sole discretion, whether it is satisfied that such Software Deliverable or Aggregate Software contains no Non-Conformities, on the completion of which Customer shall, as appropriate:

(i)    notify Developer in writing of Non-Conformities Customer has observed in the Software Deliverable or, in the case of Integration Testing, Aggregate Software, and of Customer's non-Acceptance thereof, whereupon the parties' rights, remedies, and obligations will be as set forth in Section 10.3; or

(ii)    provide Developer with a written notice of its Acceptance of such Software Deliverable or Aggregate Software.

10.3    Failure of Acceptance Tests.

(a) If Acceptance Tests identify any Non-Conformities, Developer, at Developer's sole cost and expense, shall remedy all such Non-Conformities and re-deliver the Software Deliverable(s), in accordance with the applicable Specifications and other requirements set forth in this Agreement (including all Schedules and Exhibits attached hereto) and the Statement of Work, as promptly as possible and, in any case, within five Business Days following the delivery of a notice pursuant to Section 10.2(a) or 10.2(c)(i).

(b) Repeated Failure of Acceptance Tests. If Acceptance Tests identify any Non-Conformity in any Software Deliverable after a second or subsequent delivery thereof, or Developer fails to re-deliver the Software Deliverable on a timely basis, Customer may, in its sole discretion, by written notice to Developer:

(i)     continue the process set forth in this Section 10;

(ii)    accept the Software Deliverable as a nonconforming deliverable, in which case the Fees therefor shall be reduced equitably to reflect the value of the Software Deliverable as received relative to the value of the Software Deliverable had it conformed; or

(iii)   deem the failure to be a non-curable material breach of this Agreement and the relevant Statement of Work, terminate this Agreement and any or all Statements of Work in accordance with Section 16.2(b). In the event this Agreement and all Statements of Work are terminated pursuant to this Section 10.3(b)(iii), Customer will also be entitled to recover Liquidated Damages pursuant to Section 23.11.

(c) The remedies set forth in this Section 10.3 are in addition to, and not in lieu of, all other remedies that may be available to Customer under this Agreement or otherwise, including Customer's right to be indemnified for Actions and Customer's right to recover damages (including indirect damages as contemplated by Section 19).

10.4    Acceptance. Acceptance ("**Acceptance**") of each Software Deliverable (subject, where applicable, to Customer's right to Integration Testing) and Aggregate Software shall occur on the date that is the earliest of:

(a) Customer's delivery of a notice accepting such Software Deliverable pursuant to Section 10.2(b) or Section 10.2(c)(ii);

(b) solely if Customer is responsible for performing such Acceptance Tests or Integration Testing, upon the expiration of the Testing Period therefor if Customer has not notified Developer of one or more Non-Conformities prior thereto; or

(c) solely if Developer is responsible for performing such Acceptance Tests or Integration Tests, the number of days specified in Section 10.2(c) after Customer receives Developer's Notice of Completion, if Customer's fails to respond to such Notice of Completion prior to such date.

11.     Maintenance and Support. With respect to all Software, Developer shall provide Customer with Maintenance and Support Services free of charge during the Term, it being acknowledged and agreed by the parties that the Fees include full consideration for such Services during such period.

12.     Fees.

12.1    Subject to all terms and conditions set forth in this Section 12, Developer's performance of Services to Customer's satisfaction, in its sole discretion, and Customer's Acceptance of the applicable Deliverables, Customer shall pay the fees set forth in the applicable Statement of Work ("**Fees**").

12.2    The parties specifically agree that, regardless of whether a Fee quoted in a Statement of Work is described as an estimate, the Fee described in the Statement of Work shall be the Fee unless such Fee is modified in accordance with the terms of this Agreement or as otherwise agreed to by the parties.

12.3    Developer agrees that the pricing in any subsequent Statements of Work will be consistent with the pricing set forth in the Initial Statement of Work.

12.4    Notwithstanding the foregoing, Developer agrees that:

(a)  once Customer's obligation to make the second payment of $125,000 to Megasys becomes due, Developer will provide a credit toward Customer's Fees in the amount of $125,000; and

(b)  Developer has provided a credit in the amount of $100,000 toward Customer's Fees for services provided in September 2016;

provided that, in the event future Statements of Work are not expected to have fees large enough to consume all or any portion of the credits set forth in Sections 12.4(a) and 12.4(b), Developer shall refund such credits or portions of credits to Customer.

13.    Invoices and Payment.

13.1    Invoices.

(a)    Developer shall invoice Customer for Fees as set forth in the applicable Statement of Work; provided that Developer agrees, for all invoices issued prior to the date on which Customer is no longer reliant on the functionality performed by the enterprise resource planning system developed and maintained by Megasys, as determined in Customer's sole, reasonable discretion (the **"Holdback Date"**), only 90% of the Fees earned will be payable, with the remaining 10% of such earned Fees to be payable on or after the Holdback Date.

(b)    Developer shall submit each invoice via such delivery means and to such address as are set forth in Section 23.6 or otherwise specified by Customer in writing from time to time. If more than one Statement of Work is outstanding, Developer shall provide an aggregate invoice for all Fees being invoiced, together with separate invoices for each Statement of Work. Each separate invoice shall:

(i)    clearly identify the Statement of Work to which it relates, in such manner as is required by Customer;

(ii)    list each Fee item separately;

(iii)    include sufficient detail for each line item to enable Customer to verify the calculation thereof;

(iv)     for Fees determined on a time and materials basis, report details of time taken to perform Services, and such other information as Customer requires, on a per-individual basis; and

(v)     include such other information as may be required by Customer as set forth in the applicable Statement of Work.

13.2     <u>Payment</u>.

(a)     Customer shall pay all properly invoiced Fees within 30 days after the later of:

(i)     Customer's receipt of the proper invoice therefor; or

(ii)     the due date for such amounts as set forth in the applicable Statement of Work, which for Fees based on Developer's provision of a specified Deliverable shall not be earlier than Customer's Acceptance of such Deliverable.

(b)     Customer may withhold from payment any amount disputed by Customer in good faith, pending resolution of the dispute. Developer shall continue performing its obligations in accordance with this Agreement notwithstanding any such dispute or actual or alleged nonpayment that is the subject of the dispute, pending its resolution.

(c)     All payments hereunder shall be in US dollars and made, at Customer's option, by check or wire transfer. Payments shall be made to the address or account specified in Section 23.6 or such other address or account as is specified by Developer in writing from time to time, provided that Developer shall give Customer at least 30 days' prior notice of any account, address, or other change in payment instructions. Customer will not be liable for any late or misdirected payment caused by Developer's failure to provide timely notice of any such change.

13.3     <u>Taxes</u>. All fees set forth herein are inclusive of taxes. Developer shall be responsible for all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local governmental entity on any amounts payable by Customer hereunder.

13.4     <u>Right of Set-off</u>. Without prejudice to any other right or remedy it may have, Customer reserves the right to set off at any time any amount owing to it by Developer against any amount payable by Customer to Developer under this Agreement or otherwise.

13.5     <u>Audit Right</u>. During the Term and for five years after, (a) Developer shall maintain complete and accurate books and records regarding its business operations relevant to the calculation of Fees and any other information relevant to Developer's representations, warranties, and covenants under this Agreement, and (b) upon Customer's request, Developer shall make such books and records, and appropriate personnel, available during normal

business hours for inspection or audit by Customer or its authorized representative, provided that Customer shall:

(i)     provide Developer with 10 Business Days' prior notice of any audit; and

(ii)    conduct or cause to be conducted such audit in a manner designed to minimize disruption of Developer's normal business operations.

Customer may take copies and abstracts of materials audited. Customer will pay the cost of such audits unless an audit reveals an overbilling or over-reporting of 5% or more, in which case Developer shall reimburse Customer for the cost of the audit. Developer shall immediately, upon notice from Customer, pay Customer the amount of any overpayment revealed by the audit, together with any reimbursement pursuant to the preceding sentence.

14.     Intellectual Property Rights.

14.1    Customer Ownership of Work Product.

Except as set forth in Section 14.3, Customer is and will be the sole and exclusive owner of all right, title, and interest in and to all Customer-Owned Work Product, including all Intellectual Property Rights therein. In furtherance of the foregoing, subject to Section 14.3:

(a)  Developer shall create all Customer-Owned Work Product as work made for hire as defined in Section 101 of the Copyright Act of 1976; and

(b)  to the extent any Customer-Owned Work Product or Intellectual Property Right therein does not qualify as, or otherwise fails to be, work made for hire, Developer shall, and hereby does:

(i)     assign, transfer, and otherwise convey to Customer, irrevocably and in perpetuity, throughout the universe, all right, title, and interest in and to such Work Product, including all Intellectual Property Rights therein; and

(ii)    irrevocably waive any and all claims Developer may now or hereafter have in any jurisdiction to so-called "moral rights" or rights of *droit moral* with respect to the Work Product.

14.2    Further Actions. Developer shall, and shall cause the Developer Personnel to, take all appropriate action and execute and deliver all documents requested by Customer to effectuate any of the provisions or purposes of Section 14.1 or otherwise as may be necessary or useful for Customer to prosecute, register, perfect, record, or enforce its rights in or to any Customer-Owned Work Product or any Intellectual Property Right therein. Developer hereby appoints Customer as Developer's attorney-in-fact with full irrevocable power and authority to take any such actions and execute any such documents if Developer refuses, or within a period deemed reasonable by Customer otherwise fails, to do so.

14.3     <u>Background Technology, Third-Party Materials, and Open-Source Components</u>.

(a)  Developer is and will remain the sole and exclusive owner of all right, title, and interest in and to the Background Technology, including all Intellectual Property Rights therein, subject to the license granted in Section 15.1.

(b)  Ownership of all Third-Party Materials incorporated into any Software Delieverable, and all Intellectual Property Rights therein, is and will remain with the respective owners thereof, subject to any express licenses or sublicenses granted to Customer pursuant to or in accordance with this Agreement.

(c)  Ownership of all Open-Source Components, and all Intellectual Property Rights therein, is and will remain with the respective owners thereof, subject to Customer's rights under the applicable Open-Source Licenses.

14.4     <u>Customer Materials</u>. Customer and its licensors are and will remain the sole and exclusive owners of all right, title, and interest in and to the Customer Materials, including all Intellectual Property Rights therein. Developer shall have no right or license to, and shall not, use any Customer Materials except solely during the term of the Statement of Work(s) for which they are provided to the extent necessary to perform the Services and provide the Work Product to Customer. All other rights in and to the Customer Materials are expressly reserved by Customer.

15.    <u>Licenses</u>.

15.1     <u>Background Technology License</u>.

Developer hereby grants to Customer such rights and licenses with respect to the Background Technology that will allow Customer to use and otherwise exploit perpetually throughout the universe for all or any purposes whatsoever the Work Product, to the same extent as if Customer owned the Background Technology, without incurring any fees or costs to Developer (other than the Fees set forth herein) or any other Person in respect of the Background Technology. In furtherance of the foregoing, such rights and licenses shall:

(a)  be irrevocable, perpetual, fully paid-up, and royalty-free;

(b)  include the rights to use, reproduce, perform (publicly or otherwise), display (publicly or otherwise), modify, improve, create derivative works of, distribute, import, make, have made, sell, and offer to sell the Background Technology, including all such modifications, improvements, and derivative works thereof; and

(c)  be freely assignable and sublicensable.

Developer reserves all rights in the Background Technology not expressly granted to Customer herein.

15.2     Customer Materials. Customer hereby grants to Developer the limited, royalty-free, non-exclusive right and license to Customer Materials solely as necessary to incorporate such Customer Materials into, or otherwise use such Customer Materials in connection with creating, the Work Product. The term of such license shall commence upon Customer's delivery of the Customer Materials to Developer and shall terminate upon Customer's acceptance or rejection of the Work Product to which the Customer Materials relate. Subject to the foregoing license, Customer reserves all rights in the Customer Materials. Customer Materials shall be deemed Customer's Confidential Information.

15.3     Third-Party Materials. Developer agrees to secure for Customer on or prior to the execution of any Statement of Work incorporating any other Third-Party Materials such rights and licenses with respect to the Third-Party Materials that will allow Customer to use and otherwise exploit perpetually throughout the universe for all or any purposes whatsoever the Work Product, to the same extent as if Customer owned the Third-Party Materials, without incurring any fees or costs to Developer (other than the Fees set forth herein) or any other Person in respect of the Third-Party Materials. In furtherance of the foregoing, such rights and licenses shall:

(a) be irrevocable, perpetual, fully paid-up, and royalty-free;

(b) include the rights to use, reproduce, perform (publicly or otherwise), display (publicly or otherwise), modify, improve, create derivative works of, distribute, import, make, have made, sell, and offer to sell the Third-Party Materials, including all such modifications, improvements, and derivative works thereof; and

(c) be freely assignable and sublicensable.

15.4     Open-Source Components. Any use of the Open-Source Components by the Customer will be governed by, and subject to, the terms and conditions of the applicable Open-Source Licenses.

16.     Term.

16.1     Term. The term ("**Term**") of this Agreement commences as of the Effective Date and, unless this Agreement is terminated earlier pursuant to any of its express provisions, will continue in effect until all Deliverables under this Agreement (including the Schedules and Exhibits attached hereto) and all Statements of Work governed hereby have been Accepted or rejected by Customer.

16.2     Termination. This Agreement, any or all Statements of Work, or any combination of the foregoing, may be terminated:

(a) by Customer, at any time without cause, and without incurring any additional obligation, liability, or penalty, by providing at least 10 days' prior written notice to Developer;

(b)  by either party, effective upon written notice to the other party, if the other party breaches this Agreement or any Statement of Work, and such breach:

(i)    is incapable of cure; or

(ii)    being capable of cure, remains uncured for 10 days after the breaching party receives written notice thereof.

(c)  by either by written notice to the other party if the other party:

(i)    becomes insolvent or admits inability to pay its debts generally as they become due;

(ii)    becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within 10 Business Days or is not dismissed or vacated within 30 days after filing;

(iii)   is dissolved or liquidated or takes any corporate action for such purpose;

(iv)   makes a general assignment for the benefit of creditors; or

(v)    has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

16.3    Effect of Expiration or Termination.

(a)  Termination of this Agreement shall not effectuate a termination of any Statement of Work then in effect and not otherwise expressly terminated, and the terms and conditions set forth herein shall continue in effect with respect to such Statements of Work until their expiration or termination as set forth herein.

(b)  Upon any expiration or termination of this Agreement or any Statement of Work, or any combination thereof:

(i)    Developer shall (A) with respect to termination of a Statement of Work, promptly deliver to Customer all Work Product generated by Developer under such Statement of Work (whether complete or incomplete); (B) provide such cooperation and assistance as requested by Customer, at Developer's sole expense, in transitioning the related Services to an alternate service provider, and (C) on a pro rata basis, repay all amounts, if any, paid in advance for any related Services or Work Product that have not been provided.

(ii)    All licenses granted to Developer in the Customer Materials with respect to this Agreement or such Statement of Work, as applicable, shall immediately and automatically also terminate, and Developer shall promptly return to Customer all Customer Materials not

required by Developer for continuing Maintenance and Support Services or Statements of Work hereunder, if any.

(iii) Developer shall (A) return to Customer all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on Customer's Confidential Information, (B) permanently erase Customer's Confidential Information from its computer systems, and (C) certify in writing to Customer that it has complied with the requirements of this Section 16.3(b)(iii), in each case to the extent such materials are not required by Developer for continuing Maintenance and Support Services or Statements of Work hereunder, if any.

(c) If Customer terminates any Statement of Work pursuant to Section 16.2(b), Customer shall be relieved of any obligation to pay any Fees thereunder, and Developer shall promptly refund to Customer, on a pro rata basis, all amounts, if any, paid in advance for any Services or Work Product that have not been provided.

(d) Except as set forth in Section 16.3(c), if this Agreement terminates early Customer will remain obligated to pay Fees for all Services and Work Product received before the effective date of such termination.

(e) No expiration or termination of this Agreement will affect Customer's rights in any of the Deliverables.

16.4     Survival. The rights and obligations of the parties set forth in this Section 16.4 and Section 1, Section 10.3(c), Section 14, Section 15.1, Section 15.3, Section 15.4, Section 17, Section 18, Section 19, Section 20, and Section 22, and any right or obligation of the parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration.

17.     Representations and Warranties.

17.1     Mutual Representations and Warranties.

Each Party represents and warrants to the other Party that:

(a) it is duly organized, validly existing, and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

(b) it has the full right, power, and authority to enter into this Agreement, to grant the rights and licenses granted hereunder, and to perform its obligations hereunder;

(c) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary action of the party; and

(d) when executed and delivered by both parties, this Agreement will constitute the legal, valid, and binding obligation of such party, enforceable against such party in accordance with its terms.

17.2 <u>Additional Representations and Warranties</u>. Developer represents and warrants to Customer that:

(a) it will perform all Services in a professional and workmanlike manner in accordance with best industry standards and practices for similar services, using personnel with the requisite skill, experience, and qualifications, and shall devote adequate resources to meet its obligations under this Agreement;

(b) it is in compliance with, and will perform all Services in compliance with, all applicable Law;

(c) Customer will receive good and valid title to all Customer-Owned Work Product, free and clear of all encumbrances and liens of any kind;

(d) when delivered or installed by Developer, no Software Deliverable will contain any Harmful Code;

(e) the Software will not contain, or operate in such a way that it is compiled with or linked to any Open-Source Components other than Open-Source Components disclosed on Schedule A or on the Statement of Work for such Software;

(f) except as may be expressly approved by Customer and disclosed in the Statement of Work therefor, the Software will not contain any Controlled Technology;

(g) all Work Product, including all updates, upgrades, new versions, new releases, enhancements, improvements, and other modifications thereof, but excluding (i) Customer Materials and (ii) Third-Party Materials and Open-Source Components disclosed on Schedule A or on the Statement of Work for such Software is or will be the original creation of Developer;

(h) as delivered, installed, specified, or approved by Developer and used by Customer or any Third Party authorized by Customer, the Work Product (excluding Customer Materials): (i) will not infringe, misappropriate, or otherwise violate any Intellectual Property Right or other right of any third party; and (ii) will comply with all applicable Laws;

(i) no expiration or loss of any Intellectual Property Rights or application for Intellectual Property Rights in the work product is pending, or, to Developer's knowledge after reasonable inquiry, threatened, or reasonably foreseeable, and Developer has no reason to believe that any claims of any such Intellectual Property Rights or Intellectual Property Rights application are or will be invalid, unenforceable, fail to issue, or be materially limited or restricted beyond the current claims, except for patent rights expiring at the end of their statutory term; and

(j) it will, and will require its Representatives to, comply with all applicable Laws in the maintenance, disclosure, and use of all Personal Information that is disclosed Developer or its Representatives hereunder.

17.3    Performance Warranty.

(a) Developer warrants that during the Term:

(i)    each Software Deliverable, after its Acceptance, will be, and as installed in the Operating Environment (or any successor thereto) and used in accordance with the Documentation will, function in all respects, in conformity with this Agreement and the Specifications and Documentation therefor; and

(ii)    any media on which any Software Deliverable is delivered will be free of damage or defect in design, material, and workmanship, and will remain so under ordinary use as contemplated by this Agreement and the Specifications and, with respect to the Software component thereof, the Documentation therefor.

(b) If the Developer breaches any of the warranties set forth in Section 17.3(a) Developer shall, upon written notice from Customer and at Developer's sole cost and expense, remedy such breach. In the event Developer fails to remedy such breach on a timely basis, Customer shall be entitled to such remedies as may be available under this Agreement, at law, or in equity. The remedies set forth in this Section 17.3(b) are in addition to, and not in lieu of, all other remedies that may be available to Customer under this Agreement or otherwise, including Customer's right to recover damages caused by Developer's provision of the Allegedly Infringing Materials (including indirect damages as contemplated by Section 19).

18.    Indemnification.

18.1    General Indemnification. Developer shall defend, indemnify, and hold harmless Customer, Customer's Affiliates, and each of their respective officers, directors, employees, agents, successors, and assigns (each, a "**Customer Indemnitee**") from and against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers that are incurred by a Customer Indemnitee ("**Losses**") arising out of or resulting from any third party claim, suit, action, or proceeding (each, an "**Action**") that arises out of or results from:

(a) Developer's breach of any representation, warranty, covenant, or obligation (including any action or failure to act by any subcontractor that, if taken or not taken by Developer, would constitute such a breach by Developer) under this Agreement; or

(b) any action or failure to take a required action, negligence, or more culpable act or omission (including recklessness or willful misconduct) in connection with the performance or

activity required by or conducted in connection with this Agreement by Developer or any subcontractor in connection with performing Services under this Agreement.

18.2     Indemnification Procedure. Customer will promptly notify Developer in writing of any Action for which it seeks to be indemnified pursuant to Section 18.1 and cooperate with Developer at Developer's sole cost and expense. Developer shall immediately take control of the defense and investigation of such Action and shall employ counsel reasonably acceptable to Customer to handle and defend the same, at Developer's sole cost and expense. Developer shall not settle any Action in a manner that adversely affects the rights of Customer or any Customer Indemnitee without Customer's prior written consent. Customer's failure to perform any obligations under this Section 18.2 will not relieve Developer of its obligations under this Section 18.2 except to the extent that Developer can demonstrate that it has been materially prejudiced as a result of such failure. Customer may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

18.3     Infringement Remedy.

(a)  If any Software or any component thereof, other than Customer Materials, is found to be infringing or if any use of any Software or any component thereof is enjoined, threatened to be enjoined, or otherwise the subject of an infringement claim, Developer shall, at Developer's sole cost and expense:

(i)     procure for Customer the right to continue to use such Software or component thereof to the full extent contemplated by this Agreement; or

(ii)    modify or replace the materials that infringe or are alleged to infringe ("**Allegedly Infringing Materials**") to make the Software and all of its components non-infringing while providing fully equivalent features and functionality.

(b)  If neither of the foregoing is possible notwithstanding Developer's best efforts then Developer may direct Customer to cease any use of any materials that have been enjoined or finally adjudicated as infringing, provided that Developer shall:

(i)     refund to Customer all amounts paid by Customer in respect of such Allegedly Infringing Materials and any other aspects of the Aggregate Software that Customer cannot reasonably use as intended under this Agreement; and

(ii)    in any case, at its sole cost and expense, secure the right for Customer to continue using the Allegedly Infringing Materials for a transition period sufficient to allow Customer to replace the affected features of the Software without disruption.

(c)  If developer directs Customer to cease using any Software pursuant to Section 18.3(b), Customer shall have the right to terminate any or all then-outstanding Statements of Work and this Agreement for cause pursuant to Section 16.2(b)(i).

(d) The remedies set forth in this Section 18.3 are in addition to, and not in lieu of, all other remedies that may be available to Customer under this Agreement or otherwise, including Customer's right to be indemnified for such Actions and Customer's right to recover damages caused by Developer's provision of the Allegedly Infringing Materials (including indirect damages as contemplated by Section 19).

19. <u>Inclusion of Indirect Damages</u>. The parties explicitly agree that Developer may be liable under this Agreement, including any Statement of Work, for consequential, incidental, indirect, exemplary, special, or punitive damages.

20. <u>Confidentiality</u>.

20.1 <u>Obligation of Confidentiality</u>. Developer acknowledges that in connection with this Agreement, Developer will gain access to Confidential Information of Customer. As a condition to being furnished with Confidential Information, Developer agrees, during the Term and at all times thereafter, to:

(a) not use the Confidential Information other than as strictly necessary to perform its obligations under this Agreement;

(b) not use any of the Confidential Information, directly or indirectly, in any manner to the detriment of Customer or to obtain any competitive benefit with respect to Customer; and

(c) maintain the Confidential Information in strict confidence and, subject to Section 20.2 below, not disclose the Confidential Information without Customer's prior written consent, provided, however, that Developer may disclose the Confidential Information to its Representatives who: (i) have a "need to know" for purposes of Developer's performance under this Agreement; (ii) have been apprised of this restriction; and (iii) are themselves bound by written nondisclosure agreements at least as restrictive as those set forth in this Section 20.1, provided, further, that Developer shall be responsible for ensuring its Representatives' compliance with, and shall be liable for any breach by its Representatives, of this Section 20.

Developer shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, but in no event less than a commercially reasonable degree of care, to safeguard Confidential Information from use or disclosure other than as permitted hereby.

20.2 <u>Exceptions</u>.

(a) If Developer becomes legally compelled to disclose any Confidential Information, Developer shall:

(i) provide prompt written notice to Customer so that Customer may seek a protective order or other appropriate remedy or waive its rights under this Section 20; and

(ii)    disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or Customer waives compliance, Developer shall, at Developer's sole expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

21.    <u>Non-Piracy of Employees or Contractors</u>. Developer understands and acknowledges that Customer has expended and continues to expend significant time and expense in recruiting and training its employees and contractors and that the loss of employees or contractors would cause significant and irreparable harm to Customer. During the Term and for a period of two years thereafter, Developer agrees and covenants, and agrees and covenants to cause its Representatives, not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment or engagement of any employee or consultant of Customer or any of its Affiliates.

22.    <u>Dispute Resolution</u>

22.1    <u>Exclusive Dispute Resolution Mechanism.</u> The parties shall resolve any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, or invalidity hereof (each, a **"Dispute"**), under the provisions of this Section 22, which shall be the exclusive mechanism for resolving any Dispute that may arise from time to time.

22.2    <u>Negotiations.</u> The parties shall first attempt in good faith to resolve any Dispute by negotiation and consultation between themselves. In the event that such Dispute is not resolved on an informal basis within 10 Business Days after one party provides written notice to the other party of such Dispute (the "**Escalation to Mediation Date**"), either party may initiate mediation under Section 22.3.

22.3    <u>Mediation.</u>

(a)    Subject to Section 22.2, the parties may, at any time after the Escalation to Mediation Date, submit the Dispute to any mutually agreed to mediation service for mediation by providing to the mediation service a joint, written request for mediation, setting forth the subject of the Dispute and the relief requested. The parties shall cooperate with the mediation service and with one another in selecting a neutral mediator and in scheduling the mediation proceedings. The parties covenant that they will use commercially reasonable efforts in participating in the mediation. The parties agree that the mediator's fees and expenses and the costs incidental to the mediation will be shared equally between the parties.

(b)    The parties further agree that all offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts, and attorneys, and by the mediator and any employees of the mediation service, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any litigation, arbitration, or other proceeding involving the parties, provided that evidence

that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

22.4    <u>Litigation as a Final Resort.</u>  If the Parties cannot resolve for any reason, including, but not limited to, the failure of either party to agree to enter into mediation or agree to any settlement proposed by the mediator, any Dispute either Party may file suit in a court of competent jurisdiction in accordance with Section 23.16

23.    <u>Miscellaneous</u>.

23.1    <u>Effect of Developer Bankruptcy</u>. All rights and licenses granted by Developer under this Agreement are and shall be deemed to be rights and licenses to "intellectual property," and all Work Product is and shall be deemed to be "embodiment(s)" of "intellectual property", for purposes of, and as such terms are used in and interpreted under, Section 365(n) of the United States Bankruptcy Code (the "**Code**"). If Developer shall become subject to any bankruptcy or similar proceeding, Customer shall retain and have the right to fully exercise all rights, licenses, elections, and protections under this Agreement, the Code and all other applicable bankruptcy, insolvency, and similar Laws with respect to all Software and other Work Product. Without limiting the generality of the foregoing, Developer acknowledges and agrees that, if Developer or its estate shall become subject to any bankruptcy or similar proceeding:

(a)  all rights and licenses granted to Customer hereunder shall continue subject to the terms and conditions of this Agreement, and shall not be affected, even by Developer's rejection of this Agreement; and

(b)  Customer shall be entitled to a complete duplicate of (or complete access to, as appropriate) all such intellectual property and embodiments of intellectual property comprising or relating to any Software or other Work Product, and the same, if not already in Customer's possession, shall be promptly delivered to Customer, unless Developer elects to and does in fact continue to perform all of its obligations under this Agreement.

23.2    <u>Force Majeure</u>. Neither party shall be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, when and to the extent such failure or delay is caused by:

(a)  acts of God;

(b)  flood, fire, or explosion;

(c)  war, terrorism, invasion, riot, or other civil unrest;

(d)  embargoes or blockades in effect on or after the date of this Agreement; or

(e)  national or regional emergency;

(each of the foregoing, a "**Force Majeure**"), in each case, provided that (i) such event is outside the reasonable control of the affected party; (ii) the affected party provides prompt notice to the other party, stating the period of time the occurrence is expected to continue; and (iii) the affected party uses diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event. Customer may terminate this Agreement if a Force Majeure Event affecting Developer continues substantially uninterrupted for a period of 30 days or more. Unless Customer terminates this Agreement pursuant to the preceding sentence, all Milestone Dates shall automatically be extended for a period up to the duration of the Force Majeure Event.

23.3    Further Assurances. Upon a party's reasonable request, the other party shall, at such other party's sole cost and expense, promptly execute all such further documents and instruments, and take all such further actions, necessary to give full effect to this Agreement.

23.4    Relationship of the Parties. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

23.5    Public Announcements. Neither party shall issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement or, unless expressly permitted under this Agreement, otherwise use the other party's trademarks, services marks, trade names, logos, domain names, or other indicia of source, association, or sponsorship, in each case, without the prior written consent of the other party, which may be amended or revoked at any time.

23.6    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and addressed to the parties as follows (or as otherwise specified by a party in a notice given in accordance with this Section):

| | |
|---|---|
| If to Developer: | Attention:  Contract Governance |
| | P.O. Box 10488, Bradenton, FL  34282 |
| | E-mail: info@pointsource.com |
| | Facsimile:  866.547.6694 |
| If to Customer: | Attention:  Lisa Creisstoff and Max Spiegel |
| | 5501 Communication Parkway, Sarasota, FL 34240 |
| | E-mail: lisa@ngccoin.com and max@ngccoin.com |

Notices sent in accordance with this Section shall be deemed effectively given: (a) when received, if delivered by hand (with written confirmation of receipt); (b) when received, if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by facsimile or e-mail (in each case, with confirmation of transmission), if sent during normal business hours of the recipient, and on the next Business Day, if sent after normal business hours of the recipient.

23.7     Interpretation. For purposes of this Agreement: (a) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole; (d) words denoting the singular have a comparable meaning when used in the plural, and vice-versa; and (e) words denoting any gender include all genders. Unless the context clearly indicates otherwise, references in this Agreement: (w) to this Agreement include references to the Exhibits and Schedules attached hereto, subject to the order of priority set forth in Section 23.9 with regard to any inconsistencies; (x) to Sections, Schedules, and Exhibits refer to the Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The parties intend this Agreement to be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedules and Exhibits referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

23.8     Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

23.9     Entire Agreement. This Agreement, together with all Schedules, Exhibits, and Statements of Work and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements made in the body of this Agreement, the Schedules, Exhibits, Statements of Work, and any other document, the following order of precedence governs: (a) first, any Statement of Work executed after the Effective Date, solely to the extent that (i) the Statement of Work explicitly states that a term is intended to supersede a term of this Agreement (including any Schedules or Exhibits hereto) and (ii) an updated Agreement, Schedule, or Exhibit reflecting such changes is approved by the parties hereto; (a) second, this Agreement, excluding its Exhibits, Schedules, and Statements of Work; (b) third, the Exhibits and Schedules to this Agreement as of the Effective Date; (c) fourth, any Statement of Work executed after the Effective Date to the extent that its terms do not contain language explicitly superseding this Agreement; and (d) fourth, any documents (other than Exhibits or

Schedules to this Agreement (including any Statements of Work)) incorporated herein by reference.

    23.10    <u>Assignment</u>.

    (a)    Developer shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance, under this Agreement, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without (a) the assignee's or transferee's written acceptance of, and agreement to perform, all obligations under this Agreement and (b) Customer's prior written consent, which consent Customer may give or withhold in its sole discretion. For purposes of the preceding sentence, and without limiting its generality, any merger, consolidation, reorganization, or change of control of Developer (regardless of whether Developer is a surviving or disappearing entity) will be deemed to be a transfer of rights, obligations, or performance under this Agreement for which Customer's prior written consent is required. No delegation or other transfer will relieve Developer of any of its obligations or performance under this Agreement. Any purported assignment, delegation, or transfer in violation of this Section 23.10 is void. Customer may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement without Developer's consent. This Agreement is binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

    (b)    Notwithstanding the foregoing, in the event Developer sells its business, Developer will be obligated to have the buyer take assignment of this Agreement.

    23.11    <u>Liquidated Damages</u>. If (a) Developer fails to cause a buyer to take assignment of this Agreement pursuant to Section 23.10(b), (b) Customer deems a repeated failure of Acceptance Tests to be a non-curable material breach and terminates this Agreement and all Statements of Work pursuant to Section 10.3(b)(iii), or (c) Developer fails to deliver all Work Product as contemplated in the Business Requirements Specification and the Roadmap, Developer shall pay to Customer an amount (the "**Liquidated Damages**") equal to the greater of (i) the amount paid to Developer by Customer or (ii) the amount Customer pays, or reasonably estimates it will need to pay, to a third party to create the Work Product so contemplated. The parties intend that the Liquidated Damages constitute compensation and not a penalty. The parties acknowledge and agree that Customer's harm caused by such breach would be impossible or very difficult to accurately estimate as of the Effective Date, and that the Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from such breach. Notwithstanding anything to the contrary herein, Developer's payment of the Liquidated Damages is Developer's sole liability and entire obligation and Customer's exclusive remedy for such breach.

    23.12    <u>No Third-Party Beneficiaries</u>. Except as provided in Section 18.1, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer on any other person or

entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

23.13    Amendment and Modification; Waiver. No amendment to or modification of or rescission, termination, or discharge of this Agreement is effective unless it is in writing and signed by an authorized representative of both parties. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

23.14    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

23.15    Governing Law. This Agreement, and the interpretation of the rights and duties of the parties to this Agreement, shall be governed by the internal laws of the State of Florida (without regard to conflict of laws or similar concepts).

23.16    Jurisdiction. Each party to this Agreement hereby irrevocably:

(a)    submits to the exclusive jurisdiction of the Twelfth Judicial Circuit in and for Sarasota County, Florida, or the United States District Court for the Middle District of Florida, in any action or proceeding arising out of, or relating to, this Agreement, the relations between the parties to this Agreement, and any matter, action or transaction described in this Agreement, whether in contract, tort or otherwise;

(b)    agrees that such courts shall have exclusive jurisdiction over such actions or proceedings;

(c)    waives the defense that Florida is an inconvenient forum to the maintenance and continuation of such action or proceeding;

(d)    consents to the service of any and all process in any such action or proceeding by the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in Section 23.6;

(e) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law; and

(f) agrees in the event that an action or proceeding is initiated in one of the courts referenced in Section 23.16(a) and is pending, for the convenience of the parties and subject to any limitations on subject matter jurisdiction of the court, to initiate any counterclaims or related actions in the same proceeding (as opposed to a separate proceeding in any of the other courts specified above).

23.17   Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

23.18   Equitable Relief. Each party acknowledges that a breach by a party of Section 14 (Intellectual Property Rights; Ownership), Section 20 (Confidentiality), or Section 21 (Non-Piracy of Employees or Contractors) may cause the non-breaching party immediate and irreparable harm, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the non-breaching party will be entitled to equitable relief, including in the form of orders for preliminary or permanent injunction, specific performance, and any other relief that may be available from any court. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available under this Agreement, at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

23.19   Attorneys' Fees. In the event that any action, suit, or other legal or administrative proceeding is instituted or commenced by either party hereto against the other party arising out of or related to this Agreement, the prevailing party shall be entitled to recover its actual attorneys' fees and court costs from the non-prevailing party.

23.20   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (to which a signed PDF copy is attached) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

PointSource, LLC, a Florida limited liability company

By: _Cl Mug/_

    Name: _CHRIS HUGILL_

    Title: _CEO_

Numismatic Guaranty Corporation of America, a Florida corporation

By: _____

    Name: _Steven Eichen Saum_

    Title: _CEO_

# Certified Collectibles Group

ERP Business Requirements Document

## ERP Evaluation

This document is intended as an overview of the high level business requirements for an implementation of an ERP based on the CCG business processes.

Prepared by PointSource
v1.0

# Table of Contents

Executive Summary
    Business Objectives
    In Scope
    Out Of Scope
    Assumptions
Business Requirements
    Core Financials
    Customer Relationship Management
    B2B Order Management
    B2C Order Management
    Product & Services Management
    Business Process Management
    Inventory Management
    Non-Functional Requirements
High Level Process Flow
    Receiving Process Flow
    Verification Process Flow
    Grading Process Flow
    Finalizing Collectible Flow
    Bulk Submission Process Flow
Use Cases
    Roles
    Primary Use Case Definition
Business Process Optimizations

## Executive Summary

The Certified Collectibles Group has realized that they need to invest in the technology they use to run their business and make business decisions.  Overall, each CCG team member at each step of the grading process is well-versed in the entire lifecycle of the invoice process as it relates to his or her role.  Without this knowledge, the user would not be able to use the system itself for guidance through the lifecycle of the process to efficiently service the collectibles.  We want to ensure the system complements the user in a way that will drive continued scale across the different business units of CCG.  The company has begun to grow at a pace that is outgrowing the technology currently used to manage the collectible grading process, perform financial operations, and engage with customers.  This document contains the business requirements that are needed from an ERP system to successfully replace their old ERP system.  Using these business requirements, we will ensure that the new system accomplishes everything necessary to take CCG to the next level.

The two largest benefits we foresee in a new ERP implementation will be around the efficiencies gained with a modernized UI and the configuration driven platforms that allow for quick deployments of changes to the business.  A modernized UI will allow for the users in the grading process to work in the context of a particular task without navigating through multiple complex screens that weren't designed for a specific task.  The employees will be able to quickly access referenced information without the need to search for the same invoice/customer in multiple screens.  A configurable platform will allow for the business to make process changes to fit the needs of their programs without the involvement of a development team.  With these configurations, a business manager will be able to roll out new programs/services without needing to change the software that dictates the process.

The business requirements listed within this document are not necessarily all solvable by solely an ERP.  The totality of this document is to represent the integrated solution across an ERP and other applications to create a system to manage the CCG business.  The ERP is the backbone of this project and is the key to creating a successful system.

## Business Objectives

- Provide more configurable options for the business to manage their processes and services without requiring the assistance of a development team
- Streamline the operations side of the business with an updated UI and a more extensive modularized system
- Enable better business decisions by surfacing business-relevant data in consumable formats
- Enable better management of customers and the communication with them
- Establish core financial capabilities that will drive efficiencies in AP and AR processing
- Lower delivery timelines and cost by surfacing data in easier-to-use formats

## In Scope

| Feature | Description |
| --- | --- |
| Role and Task driven process UI | The CCG process UI needs to be tailor made for the role of the user. The system needs to give the user the right information, in the right places, at the right time. |
| Small Quantity & Bulk Order Management | CCG has created processes to cover both the B2B and B2C sales processes with the two distinct segments of customers. The system needs to handle scenarios from a single collectible to 500 collectibles with a negotiated rate based on the prescreened grades. |
| Flexible Price List Management | CCG has a diverse portfolio of products and services offered to customers. These services tend to create complex submissions and puts the burden on the user to ensure the correct amount is being applied. The system needs to be flexible to handle these complex business rules to calculate the correct price for both the business and the consumer. |
| Invoice & Order Tracking | From receipt to customer service, everyone tracks invoices. It is fundamental for the process that any and all users can find an invoice and tell exactly where that collectible is in the process. |
| Inventory Management (Dropship and Supplies) | CCG has two types of inventory systems that serve two different functions of the business: one for managing supplies and materials for the holders and one for managing the collectibles of their dealers. The system needs to have inventory capabilities that can scale to meet the different scenarios of their in house processing to their shipping on behalf of a customer. |
| Core Financials | AP and AR are fundamental to any business and CCG is no different. Modernized AP and AR functions will help the CCG continue to scale through automation & approval workflows. |
| Reporting & BI Data Accessibility | CCG needs to be in control of their data and the information they are collecting. Whether it's the trends of their customers, the processing time of each step in the process, or the number of labels in house, these answers should be discoverable by a user and not an engineer. |
| Customer Service Issue Tracking | The CCG team takes pride in their customer service and this service has been a differentiator in their industry. Based on that fact, it is recommended to enhance the CSR process to allow more traceability into the call volume and problem areas of the business and add greater collaboration with sales and accounting. |
| Migration of Existing Records | An important part of any ERP project is to ensure legacy information is available for both internal and external users. The system must have the ability to access or import the existing information. |

## Out Of Scope

These items are considered out of scope for the ERP project and not necessarily for PointSource as a whole. While they are important considerations for the CCG business, they are unrelated to the ERP transformation and should be handled and thought of as separate entities.

*ERP-specific:*
- Human Resource Functionality
  - Based on onsite review, it is recommended to keep current HR processes as is for the initial phase. The chosen ERP will have this capability but will not be leveraged out of the gate. This would include features such as benefit enrollment, time tracking, and time off requests.

*Other CCG technology features:*
- Collectible Cataloging (Coin Numbering System)
  - The process and makeup of the data that comprises the modern coin numbering system is separate from re-inventing CCG's ERP systems. The numbering system itself could be built upon any number of technologies (including the recommended Salesforce Force.com platform) to be consumable by separate entities, but the bulk of the work is in designing the numbering system and then migrating the current data to use the new system.
- Label printing
  - Label printing has several challenges within the current system. Most of the challenges have to do with the fact that the text needs to be in a very exact position on the labels themselves, and options like printing the full artwork + text on the label have been discussed to remedy this problem. This problem lives outside of the software solution itself and is independent of the solution selected, so another effort will need to take place in order to make a recommendation here.
- Holder security features
  - The explosion of business in China has increased the number of counterfeit attempts. Using technology, we can come up with enhanced security features for the holders themselves. This piece of work lives outside of the ERP selection and will be treated separately for purposes of this document and project delivery.
- CGC receiving/verification barcode scanning
  - This work would allow CGC to at least double capacity by utilizing barcodes on modern comics to drive receiving and verification. The work would also relieve some of the pressure on graders by removing the cover art curation and variant verification parts of their current duties. This work has synergies with the process component of the ERP replacement and can be used as a springboard to creation of an architecture that works for all collectibles, but specifics are not included within this document.

## Assumptions

- The current ERP solution will provide the support to migrate onto a hybrid solution as the roll out is initiated.

## Business Requirements

### I.    Core Financials

CCG has a unique business but the core financial piece of the business is standard to other businesses. Overall, the majority of the customizations are in the account receivables with account payables being run with a standard module.   The ERP will need to support customization to accounts receivable to ensure the existing processes can be achieved while also providing more automation in their use of accounts receivables. The most unique aspect of accounting at CCG is the intercompany billings which with a proper hierarchy setup in the ERP should alleviate the current processes to manage these relationships.  For account payables, the standard module will be sufficient to ensure processing of purchase orders, payment to vendors, and payment for royalties based on label usage.

Purchasing is a challenge in CCG's process today.  Currently it is a manual process that consumes time from both the owner of the business and the accounting team.  In order to streamline this process, the new ERP must have purchasing capabilities that at a minimum include:

- Inventory level notifications to a specific buying manager
  - Ability to set thresholds for notification or automatic purchase order request
- Purchase order creation
  - Ability for purchase order to be created based on the selected product
- Purchase order workflow
  - Ability for purchasing manager to approve buying manager requests
  - Thresholds for the amount that is required for purchase approval based on buying manager
- Purchase order processing
  - Ability to integrate and send purchase order requests directly to a vendor and tied to accounts payables

### A.   Requirements

| ID | Requirement | Notes/Considerations |
|----|-------------|----------------------|
| I.1 | The system must have standard account receivables | Customizations may be required |
| I.2 | The system must have standard account payables | Calculating and paying on Royalties included |
| I.3 | The system must have a standard general ledger | |
| I.4 | The system must have purchasing capabilities to support buying materials for the business | Detailed POs |
| I.5 | The system must allow for processing payment with | Included credit card number only |

| | credit card or wire transfer | |
|---|---|---|
| I.6 | The system must allow for processing payments with check or cash | |
| I.7 | The system must have integrations with standard payment gateways with multiple payment options | Preference on First Data or Authorize.Net; membership & invoicing should be through the same payment gateway |
| I.8 | The system must support setting up automatic payments based on business rules for accounts with billing already selected | |
| I.9 | The system must accurately track usage of custom labels for calculating royalties payments | |
| I.10 | The system must support the ability to make and set manual credit adjustments | This should be a role with a threshold based on role |
| I.11 | The system must support the ability to create/cancel/suspend recurring invoices | Renewal membership fees (also see II.15) |
| I.12 | The system must keep a history by each vendor for AP | |
| I.13 | The system must allow for the configuration of allowable payment terms to be used in CRM | |
| I.14 | The system must have configurations for creating rules to stop ship based on balance owed | |
| I.15 | The system must allow for accounting to override a stop shipment due to credit threshold being hit | |
| I.16 | The system must send automated statements based on the payment terms for the customer's account | |
| I.17 | The system should have the ability to purge history of a record at a given time interval | |
| I.18 | The system must have the ability to refund specific charges and invoices | |
| I.19 | The system must have a clear description of the breakdown of charges on a invoice | Per company charges, audit of price bumps |
| I.20 | The system should have a dashboard on financials | |

| I.21 | The system must have a report writer for creating specific queries for the business | |
|------|-----------------------------------------------------------------------------------|---|
| I.22 | The system must support the configuration of when billing occurs on an invoices based on service and tiers | Some may bill on receipt others may be on ship back |

B. Observations
- Need to avoid manual reconciliation
- Terms on AP not a large factor to the business
- Vendor type assignment is not accurate and most are general
- Voucher is not being used
- The action of posting to AP and posting to GL should be one in the same
- PO process handled manually today but want to look into more automation/system driven
- Currently Paychex manages payroll with a journal entry booked - look to integrate into AP
- We want the setup of terms and credit limit thresholds.  Then have the ability to set up customers to use those terms or credit limits:
  - If balance over X then hold invoices
  - Currently this is a manual email today - should automate and should send notification when nearing balance X
- Dealers have a service that is setup to auto calculate a fee to the government (need more details)
- Configurable retention policy for document storage
  - Ability to purge these documents on demand - ERP function or separate?
- Reporting needs/wants:
  - Sales report by customer - shows the profit
  - Monthly activity balance is a popular report
  - Dashboard on financials is a nice to have
  - Report writer - ability to build own queries for reporting
    - Currently using Discoverer
- Intercompany interactions are cumbersome today
  - Billed directly from Shanghai business unit to the customers but all invoices are loaded into NGC which then feeds into those subs - the system is putting the numbers in the right place
  - NGC and NCS intercompany transactions to push the revenue to the proper place
  - Issues with credits down the line due to this setup and no single view
- Need to help define and address issues with system calculated payment vs what was thought to be submitted by the user
  - General invoice discrepancies that need manually resolved
  - Daily report to check on true shipping cost vs the amount paid
    - Automatically posting money when losing money on shipping

## II.  Customer Relationship Management

The Customer Relationship Management (CRM) aspect of the ERP is an integral part of this system as it bridges the gap from the front-end consumer to the service being provided by CCG.  The idea is to have a unified view into the customers to allow CCG better access to the services being demanded for each customer and the communication to those customers.

To put it best:

> *"A customer is a customer"* - Lisa Creisstoff

With this mindset, the CRM component can allow for a holistic view into a customer's interaction with CCG whether it is with one coin or across multiple collectible types.  Understanding the tendencies of each customer will allow for a more personalized touch when communicating with these customers.

### A.  Requirements

| ID | Requirement | Notes/Considerations |
|----|-------------|----------------------|
| II.1 | The system must support the ability to set up account levels and associated customers to that tier | Discount pricing capabilities for the customer tiers |
| II.2 | The system must support the ability to have one customer record with access to multiple companies | A customer should manage one account for submissions across all the CCG companies with a single shared account balance |
| II.3 | The system must support special pricing for their account that overrides other pricing | Dealer discounts for all submissions, defined pricing for a customer for each service/product |
| II.4 | The system must support the ability to provide account access from an integrated frontend | Collectors Society with submission and invoice history, need to map statuses from internal to external |
| II.5 | The system must support multiple language outputs | Invoice, email, etc (including double byte) |
| II.6 | The system must allow for searching for customer by (at least) name, phone, zip code, invoice | Modernize search to allow for smart search with one field across all fields |
| II.7 | The system must allow for different account types: collector vs dealer | Ability to expand to more as well |
| II.8 | The system must support the ability to control which notifications get sent to which customer email address | Billing email, grading report email, shipping email, any change of status email |

| II.9 | The system must support the ability to create ship back rules and insurance rules for shipping | |
|------|-----------------------------------------------------------------------------------------------|---|
| II.10 | The system must have the ability to email negotiated invoice to the customer for inclusion in their submission | Linked to B2B order capabilities |
| II.11 | The system must have the ability to set the payment terms for a customer | |
| II.12 | The system must have the ability to set a credit threshold on a customer's account | |
| II.13 | The system must have the ability to send an automated email to the customer when an invoice is stopped due to credit limit being hit | Emailing when balance is close to the threshold would also be important |
| II.14 | The system must support configurable invoice display | Create custom invoice format (see also VI.14) |
| II.15 | The system must support renewal membership management - monthly fees, cancellation, etc. | |
| II.16 | The system must provide the ability to manage multiple customer shipping addresses | |
| II.17 | The system should support the ability to write notes within the customer profile for internal sharing | Permissions on who can view/add |
| II.18 | The system should have a dashboard for customer engagement | New users is an important metric |
| II.19 | The system must support the sharing of grading notes to the customer | See also VI.25 |
| II.20 | The system must support call center functionality for issue tracking and overall client satisfaction | |
| II.21 | The system should be setup with CCG set as the SOR to ensure continuity in payments between accounts and invoices | |

B. Observations
- Dealer signup and approval flow needs vetted
  - Dealer can send collectibles direct to their customer's address
  - They can set up shipping rules on blocking shipping on a given day of the week
  - Insurance rules can be configurable for a dealer that also impact the ship back rules

● Desired Dealer integration with heritage would be nice to have

## III.  B2B Order Management

The B2B order operations generally represent that bulk grading services offered by CCG.  In this scenario, a customer, usually a dealer, that has a long standing relationship with CCG will send several hundreds to thousands of coins to be graded.  With the bulk grading, the goal is to provide a service in which the customer can pay for what they may get on their return.  By providing price based on the grades that are given to the collectible, the customer is not over paying on a coin that will be graded poorly and therefore yielding a poor return on resale.

The B2B process is managed outside the normal flow of collectible processing and gives flexibility to create custom deals for a customer across all their submission or provide a custom deal for a specific submission.  The CCG team allows for negotiated rates to set a tier of pricing per the grades based on their mass submission.  This is a large portion of the CCG business and a core offering that requires flexibility in the tool to ensure customers are getting the level of service they come to expect for their business.

A.  Requirements

| ID | Requirement | Notes/Considerations |
|----|-------------|----------------------|
| III.1 | The system must have the ability to support invoice (override) specific pricing | Negotiated pricing with approval process |
| III.2 | The system must support multiple list prices based on service level | |
| III.3 | The system must support tracking large orders and split into multiple invoices after servicing | |
| III.4 | The system must support approval process of invoice specific pricing | |
| III.5 | The system must support an online bulk order submission process | |
| III.6 | The system must select the correct price table based on the inputs of the invoice | The user will not be selecting the price table.  Only in a price override situation would they need to take action |
| III.7 | The system must have a mechanism for a customer to request the shipment of their collectible to a third party | This would tie into the inventory management piece |

| III.8 | The system must support the ability to assign invoices to a specific event | Tradeshow (aka project code) tracking, also for B2C |
|-------|------------------------------------------------------------------------------|------------------------------------------------------|
| III.9 | The system must support the invoice pricing to be calculated based on the result of the service | Grade specific pricing (see V.3) |

B. Observations
- Many dealers use their own form and needs translated to the CCG invoice
  - Could be solved with online submission? Perhaps have incentive for online submission <- discount on submission type?
  - Dealer portal to create PO on their inventory
- Need to consider the scenario where NGC will give certain coins to a dealer to back fill grades that could not be met with the submission
  - Client expects at least 50 - "70" grades from their coins
  - But their bulk submission only warranted 40, NGC will seed the 10 additional "70" grades to get to that desired amount.
  - Needs to be integrated with the Inventory Management for ease of processing
- Pre-screen capabilities - setup a placeholder invoice that will be calculated based on coin grades

## IV. B2C Order Management

The B2C order process is for tracking the features and capabilities for submissions from standard collectors. Generally these submissions are less than 10 collectibles for a given invoice. The customer has the ability to pick the level of service which is generally to ensure a specific delivery time back to them after grading. Customers are capable of being a part of the collector's society with a specific account tier that gives them discounts into the services provided by CCG. Overall, the B2C order process is straightforward as the collectible itself drives the services and tiers that are available for the submission which keeps processing standard for most invoices.

### A. Requirements

| ID | Requirement | Notes/Considerations |
|---|---|---|
| IV.1 | The system must support an online order submission process | |
| IV.2 | The system must select the correct price table based on the inputs of the invoice | |
| IV.3 | The system must select the proper tier based on the verified collectibles | |
| IV.4 | The system must allow users to modify collectible information against an invoice that may modify the price of the service | Graders can bump the tier if they find the coin is of a specific mint or variety, Approval process may be requested |
| IV.5 | The system must allow users to find an invoice even if it does not have a coin | |
| IV.6 | The system must support the ability to assign invoices to a specific event | Tradeshow (aka project code) tracking |
| IV.7 | The system must support the ability to select between a multitude of ship to options | Ship to multiple customer addresses or to a specific trade show |
| IV.8 | The system must support the option to select customizations to the invoice for the collectible holder design | Label and core color (see V.7) |
| IV.9 | The system must support assigning an invoice to an original employee who generated or opened the submission while also tracking the operator actually receiving the invoice | |

| IV.10 | The system must allow for the customer to easily access their invoice history and current status | See II.4 |
|---|---|---|

B. Observations
- Desire to have Invoice splitting - ability to quickly split invoices when tiers are not met
  - May be a moot point if tier happens at the line level
- In order to process orders the users are required to use exact searching - no wildcard, case sensitive

## V.  Product & Services Management

The ERP will need to have a configurable interface to create and define the products and services offered by CCG.  The definition of these services range from having a grading tier that only allows a collectible from a certain era with a certain level of a defined market value vs the option to include an image or not.  Each of these services need to have a set of rules and criteria that are met in order to use these services.  The price list will require definition with multiple conditions to allow for the system to calculate accurate pricing on each unique submission.  The configuration flexibility given on these services and their tiers will give CCG the flexibility needed to run their unique business.

To call out the most important aspect:

*"Configuration gives you the keys to run your business instead of a developer"* - Mike Tabb

The configuration of product is an interesting pivot to the CCG business as it will allow the continued growth of what CCG is capable of offering its customers.  For example, if the CCG team may want to launch holders with a different hue other than clear; a new product could be created that is included as an additional option as part of the submission with a default value to avoid issues with current invoices in flight.  The power of being able to define new products and services from with the ERP with a guided user interface and business rule structure gives CCG the continued ability to grow at the rate they have been accustomed to for years.

A.  Requirements

| ID | Requirement | Notes/Considerations |
|---|---|---|
| V.1 | The system must support the ability to create services and products for B2C and B2B offerings | Example of Early Bird, Ancient, etc. |
| V.2 | The system must support the ability to create tiers of services | |
| V.3 | The system must support the ability to create price lists for services, products, tiers, grades, and account levels | |
| V.4 | The system must support the ability to create dependency for a service to other services | Certain types of services require another service |

| V.5 | The system must support roles to control who can manage pricing at the multiple levels (account, services, invoice) | Managing prices includes an approval process for price change to services |
|---|---|---|
| V.6 | The system must support the ability to define the collectibles supported and services offered for each | Examples - paper money, world coins, US coins, ancient coins, comics, etc.. |
| V.7 | The system must support the ability to create customization to the specific collectible holder - label and core color | |
| V.8 | The system must have the ability to support multiple shipping method options | Need to review shipping calculations to ensure proper payment |
| V.9 | The system must support setting up and defining shipping insurance by carrier | Customer can also set their shipping insurance using their shipping account |
| V.10 | The system could have a price spider system to help determine fair market value of a collectible type compared to that submitted by the user | |
| V.11 | The system must have the ability for the creation of trade show/project code for event tracking | Needs to be role based (see also IV.6) |

B. Observations
- The customer record can drive the rate table for an invoice (see II.3)
  - allows special pricing at the customer level
  - also can set pricing at the coin type level
  - bulk subs are able to be priced by grade
  - can put price on the invoice
  - security on pricing changes
  - Pricing trail is a pain point - how was this price calculated?

## VI. Business Process Management

The business process management of this ERP document applies to the actual definition of the workflow and business rules of the processing that occurs to bring a collectible through the system. The goal is to have a scalable and flexible platform that allows for the management of business rules and workflow from within the ERP so that the application interfacing with users follow those rules and workflows. The BPM will also highlight the special circumstances that need to be supported in order to keep the services and features that are offered within the current business.

The ERP will be the rule definition guide and the process application will be a consumer of this rule definition guide. This gives the flexibility needed to make a change once in the system and have it applied to multiple segments of the business. The rules could be as simple as blocking shipment on an invoice that has not been paid to complex rules for managing invoices that were submitted and processed at a tradeshow. The platform needs to be flexible to allow for granular rule configuration and workflow setup with a UI that is streamlined based on the role and responsibilities of the user.

### A. Requirements

| ID | Requirement | Notes/Considerations |
|----|-------------|----------------------|
| VI.1 | The system must support workflow capabilities | Transition rules, approval requirements |
| VI.2 | The system must support the ability to configure custom process steps | |
| VI.3 | The system must support the ability to define rules for transition between process steps | Example: to ship it must be imaged, block shipment if payment past due, must be verified before grading |
| VI.4 | The system must handle partial shipments back to the customer | |
| VI.5 | The system must provide operational reporting for time in each step and indicators for a loss in performance | |
| VI.6 | The system must support the ability to modify the data that can be viewed based on a role | Graders can not see PII on the invoice |
| VI.7 | The system must support the ability to group invoices for shipment | Ship with will control the invoices to ship together |
| VI.8 | The system must support the ability to override certain flows based on role | Example: force ship for trade show flow - skips imaging requirement |

| VI.9 | The system must support multiple entries for grading a collectible | Used to validate grades and finalize based on seniority role |
|------|---|---|
| VI.10 | The system should support the ability to remove re-submitted invoices from the pop report | Dependent on pop report capabilities |
| VI.11 | The system must allow either a numeric grade value or a no grade value that describes the reason for no grade - it cannot be both | No grade details will show the coin is genuine |
| VI.12 | The system must support business rules based on the usage of no grade existing for if the coin is to be holdered or not | |
| VI.13 | The system must validate the grade value against a coin max grade value as a grader cannot set a grade above that value | |
| VI.14 | The system should have a built-in form designer for emailing PDFs and label designs | |
| VI.15 | The system must have the ability to put a hold on a collectible at any point in the flow | Customer change request |
| VI.16 | The system must support the ability to print barcodes for invoices | Need to look for quick print options from invoice or status driven printing |
| VI.17 | The system must support the ability to easily generate new invoices for re-grading | See VI.18 for additional processing |
| VI.18 | The system must have the ability to remove re-submitted labels from the population report | During a resubmission, the old invoice should trigger a removal from the pop report |
| VI.19 | The system should have a dashboard on operations | Including real-time trends |
| VI.20 | The system must have a report writer for complex queries for specific operational effectiveness data collection | |
| VI.21 | The system must provide checks against the invoice before shipment - final business rule validation & all collectibles are accounted for based on scanning of labels | |
| VI.22 | The system must support the ability to calculate shipping costs and receive a shipping tracking ID from | |

| | carriers | |
|---|---|---|
| VI.23 | The system must include a quality assurance step to have final validation of the product | |
| VI.24 | The system must support tracking collectibles by imaging the final product before shipping | |
| VI.25 | The system must support the addition of grading notes | |
| VI.26 | The system must support modifying the grade of multiple collectibles from one screen | Bulk grading process used for trade show |

B. Observations
- Desire to optimize shipping receipt and track the incoming mail, use manifest from shipper
    - Know the box made it not the process
- Need to track who received (i.e. opened the box) vs who entered the received invoice in the system (i.e. entered into ERP)
    - Currently may not be the same person, the receiving department could sort the coins and hand the invoice to another user to input into the ERP
- Project code setup is done by only accounting today
- Location assignment and setup
    - Need ability to manage the locations and set which location is processing the invoice (China vs US)
    - Nice to have the physical location set this instead of manual effort
- Pitney Bowes handles the shipping cost calculation and shipping form print out
- The receiving portion of the process does a check on the number of coins submitted vs those on the invoice and stores away, the data entry happens later that day
    - No error checking on receiving
    - Main inputs - customer info, service/tier, number of coins, value
    - After verification, barcoding enables each flip to get a reference barcode
    - The UI needs an easy way to send invoices to a queue and then when user chooses (today the user is required to enter the invoices manually they want printed) - should be a part of workflow
- Need to determine how to make the system do the work to set the tiers rather than the user?
- Coin searching needs to be streamlined
    - Coin variety drives many challenges in setting the right tier
    - Different mints have a different value
    - The system should auto-populate the coin number as typing details
- Send to print queue option would be handy for flip label - complete an invoice and send to flip label printer, pick up later
    - Also ability to select or say print all recently updated invoices
- Need status management from QA - lacking rejection info and where to go next in the current system
- Only graders can set the strike characters
    - Label mapping for strike character to print on label
- Improvements needed for printing of description on the label

- - Desire to have a description field used specifically for the label that is manually entered
- Initials are required for certain services - mint error and VP
- Coin file management
  - Need to review process for changes/additions to the coin file
  - Need ability to bulk edit the sort order of coins
- Better integration with image hosting solution is required - invoice pdfs, image of coins, etc
- Better collectible tracking - hard to find the physical location of a specific invoice
  - Today CCG can only infer based on status that it can be one of three locations
  - RFID in the boxes could help to find invoices
  - Intelligent status movement - if user is printing label then assume blowing is complete
- Current dashboard on Operations
  - Ops screen to see the average invoice per operator and what was processed processed yesterday
  - See total invoices per status
  - See of all productivity - avg recalculated daily
  - No warning signs in real time - can only see yesterday's information
- Many user rely on notes on the invoice paper for updates rather than the system
- Difficult to split invoices at line level as graders have specialties and mixed invoices cause issues for tracking
  - Need to consider for flexibility of submission to allow for multiple services and tiers
  - Today each invoice must have all collectibles with the same service and tier. Customers will multiple services and tiers for their collectible need multiple invoices.
- Need to review how to map which fields to show up on the label and/or override the label with custom info
  - Label and print design needs extended review
- For CGC, the users need to use the shipping field in order to add image service to an invoice
  - Domain knowledge is required and puts the onus on the user to know what to do next
- Lack of imagery for the user in searching comics - easier to match if images were readily available in the UI
- Grade failure is manually enter for comics - this should be a failure selection then opt into "other"
- Order of the books is way too important to the process
  - Perhaps have an ID on the side of the label print that matches to an ID on the flip label
- QA needs reject option - reject details to track stats and current invoice issues
- There are actually two types of bulk grading
  - Bulk submission grading - The B2B use case of submitting hundreds to thousands of coins and paying based on grades received
  - Bulk grading - During a trade show, a user needs to enter the grade for a collectible into the system outside of the normal grading process. The collectibles are graded and then it's just streamlined data entry to get those values in the ERP.

## VII. Inventory Management

CCG has two very different use cases for inventory management. One is the assets and materials used to perform day to day business at CCG. The other is managing client inventory on site with the option to ship to their client's customers as a drop ship model. For asset and materials tracking, a standard inventory module will be sufficient for the needs of the CCG team in tracking these items. By leveraging the power of an ERP with an inventory management system, the tracking of materials would give the CCG team more insights into when purchasing is required and the true cost for a given invoice.

For client inventory management, the combination of an inventory system with a purchase order process would streamline many of the overhead that occurs today. WIthin the current system, the inventory system has limitations that require users to track inventory outside of the software, in spreadsheets, which causes manual overhead in calculating the true inventory available. The drop ship model continues to be a successful segment for CCG and can continue to grow with a better integration between invoice submission and the inventory system. By reducing turnaround times, giving dealers real time access to their inventory levels, and creating a trust into the accuracy of the software; the drop ship segment can scale beyond its current demand.

A. Requirements

| ID | Requirement | Notes/Considerations |
|---|---|---|
| VII.1 | The system must support the ability to track assets that are used by the business | |
| VII.2 | The system must support the ability to monitor materials to be used in the process | I.e. holders, labels, etc. |
| VII.3 | The system must support the ability to create notifications to an admin when inventory of assets and materials needs to be addressed | |
| VII.4 | The system must support storing an inventory of collectibles that are stored on behalf of a customer | Dealer should have access to their inventory numbers |
| VII.5 | The system must have the ability to create allocations from the collectibles that are stored on behalf of a customer | This is to allow for the inventory team to set aside coins until they are dealt to end collectors |
| VII.6 | The system must support re-allocation or transfer of inventory within the warehouse | |
| VII.7 | The system must provide audit history of all inventory | |

| | | |
|---|---|---|
| | transactions | |
| VII.8 | The system should be integrated with the invoice processing system for easy invoice generation for PO requests | See Use Case UC.20 |
| VII.9 | The system should have the ability to tell if the collectible is being held raw or within holders | |
| VII.10 | The system must have standard inventory workflow to track inventory that is allocated for shipment but not yet removed from warehouse | |
| VII.11 | The system must properly calculate the fees between owner of the coin and dealer for the order | |
| VII.12 | The system should support the designation of where in the warehouse the item is stored | |
| VII.13 | The system must support the CCG storage of their own coin inventory to be used to supplement the B2B business | |
| VII.14 | The system must pivot the inventory of items based on the grade of the collectible | Able to tell how many 70's a dealer has in stock |

B. Observations
- Current asset inventory system is WASP
    - Keeps track of actual materials used for the process - i.e. holders
- Need to have the inventory include a pivot on collectible grade - know how many coins and how many coins of a certain grade
- Inventory needs to be a central part of the ecosystem - need same ease of searching invoice/customer within the inventory system

## VIII.    Non-Functional Requirements

The non-functionals provide a baseline of what we expect from our software solutions today.  Many of these requirements are just expected in but it serves as a reminder that CCG requires a first class, globally available, fault tolerant system for their ERP needs..

To add context for why SaaS:

> *"[SaaS implementations] overtly target customers that are ready to switch to SaaS from older*
> *on-premises ERP systems that are often customized and lagging behind on upgrading to the latest*
> *versions."* - Forrester SaaS ERP report 2016

The below describes the items that need to be considered in the full solution in order to roll out a scalable and supportable ERP for CCG to run their business at a high velocity.

A.   Requirements

| ID | Requirement | Notes/Considerations |
|---|---|---|
| VIII.1 | The system must be able to continue processing invoices if no connection to the internet is available | |
| VIII.2 | The system must have out of box native API capabilities to allow flexible development of the collectible process | We need to ensure we can customize the process |
| VIII.4 | The system must have global availability to ensure quick response times globally | China |
| VIII.5 | The system must have failover capabilities to ensure business can ensue if one datacenter is offline | |
| VIII.6 | The system must have disaster recovery process to ensure the ability to quickly resume normal operating levels | |
| VIII.7 | The system must support the ability to integrate with printers and printer templates for labelling | Flip label printing, custom label printing |
| VIII.8 | The system must support the ability to record and report on a full audit history of data CRUD operations | Access grade history |
| VIII.9 | The system must have a modern UI allowing for access to relevant information | Quick reference between invoice and customer - one click, not requiring search |
| VIII.10 | The system must support a single search across all | WIth the ability to filter search and |

| | assets - invoice, customer, etc | results based on a specific asset |
|---|---|---|

B. Observations
- SaaS - releases performed by vendors for keeping up to date
- Defining an invoice structure
  - Should CCG use line items of a submission for flexible service/tier structure?
- Ability to quickly see recently accessed items (ala invoice) would be a bonus
  - Today's solution requires the user to continually search for the invoice as they navigate between screens
- Label printing and assigning label templates to the print is important
- Multi-lingual outputs - invoice/email
- Currency conversion support
- Today requires a user to use many tabs to execute a single search field

# High Level Process Flow



*Note: Each image hyperlinks to the business process document

Receiving Process Flow



Verification Process Flow



Grading Process Flow



Finalizing Collectible Flow



Bulk Submission Process Flow



## Use Cases

### Roles

- Receiving
  - These users are responsible for sorting the collectibles to the proper bins based on tiers and getting the invoice setup in the initial system
  - It is typical for the user sorting the coin to not be the one that enters the invoice into the system
- Verifiers
  - These users have a knowledge of collectibles and verify that the collectibles match the tiers selected on the invoice. They also match the invoice to an existing collectible ID in the system.
- Loopers
  - These users do not access the ERP system but manage getting collectibles from one location to the next.
- Numismatist / Graders
  - These users are trained to identify and set a quantitative value on the collectible they are reviewing.
- Customer service
  - These users assist customers with issue on their invoice. At times, customer service will help receiving with the data entry portion of creating the invoice
- Conservationist
  - These users specialize in the ability to restore collectibles that have been damaged
- Slabbers
  - These users print the final label, blow dirt of the collectible, and seal them in the holder
- QA
  - These users review the final collectible in the holder to ensure it meets the standard of CCG prior to being sent back to the customer
- Imagers
  - These users take a picture of the final collectible that is stored in another solution
- Shipping
  - These users package the final collectibles within an invoice and setup the carrier tracking for the package being sent back to the customer
- Collector
  - These users are the general population and are users that collect items for their own collection
- Dealer
  - These users are brokers in the collectibles world and both buy & sell collectible. The dealers typically deal with large quantity invoices.
- Accounting
  - These users are in charge of collecting and reconciling the payable and receivable funds

## Primary Use Case Definition

| UC.1 | Normal Receiving |
|------|------------------|
| Goal | Sort collectibles according to the tier and setup invoice in the system |
| Actors | Receiving, Customer Service |
| Precondition | Shipment arrives at CCG<br>Less than 100 collectibles<br>Modern collectible(s) |
| Success Criteria | Invoices are successfully generated in the ERP system |
| Failure Conditions | Customer must be contacted to correct submission |

| UC.2 | Bulk Receiving |
|------|----------------|
| Goal | Sort collectibles according to the tier and setup invoice in the system |
| Actors | Receiving, Customer Service |
| Precondition | Shipment arrives at CCG<br>More than 100 collectibles<br>Modern collectibles |
| Success Criteria | Invoices are successfully generated in the ERP system |
| Failure Conditions | Customer must be contacted to correct submission |

| UC.3 | Ancient Receiving |
|------|-------------------|
| Goal | Sort collectibles according to the tier and setup invoice in the system |
| Actors | Receiving, Customer Service |
| Precondition | Shipment arrives at CCG<br>Less than 100 collectibles<br>Ancient collectible(s) |
| Success Criteria | Invoices are successfully generated in the ERP system |

| Failure Conditions | Customer must be contacted to correct submission |
|---|---|

| UC.4 | Verification |
|---|---|
| Goal | Ensure the proper collectible is associated with the invoice and build the line item list for each invoice |
| Actors | Verifier |
| Precondition | Invoice has been received |
| Success Criteria | Each collectible has a corresponding line item on the invoice associated to an existing collectible ID<br>Each collectible is in a flip label with a barcode |
| Failure Conditions | The number or market value of collectibles from receiving is not the same as the number of collectibles verified |

| UC.5 | Grading |
|---|---|
| Goal | Inspect collectible and provide qualitative value based on the expert analysis of the collectible against a set scale to determine the grade value |
| Actors | Numismatist |
| Precondition | Collectible has been verified and barcoded |
| Success Criteria | Each collectible has been assigned an accurate numeric or details grade |
| Failure Conditions | Issue with the coin that blocks the collectible from being graded, no grade is set and the reason for the no grade is set |

| UC.6 | Finalize Grading |
|---|---|
| Goal | Inspect collectible and review previous grading values to determine the final grade of the collectible |
| Actors | Numismatist |
| Precondition | Collectible has gone through normal grading process |

| | |
|---|---|
| Success Criteria | Confirmation that each collectible has been assigned an accurate numeric or details grade. Override a previously assigned grade. |
| Failure Conditions | Issue with the coin that blocks the collectible from being graded, no grade is set and the reason for the no grade is set |

| UC.7 | Prescreen Grading |
|---|---|
| Goal | Inspect the collectible to ensure it meets a minimum requested grading value |
| Actors | Numismatist |
| Precondition | Collectible has been received, verified and barcoded. |
| Success Criteria | If the minimum requested value is met, that is the grade set on the collectible |
| Failure Conditions | If the minimum requested value is not met, a grade is not set |

| UC.8 | Bulk Grading |
|---|---|
| Goal | Inspect the collectible to quickly determine the grade value and segment bulk submission based on like grade values |
| Actors | Receiving, Verifier, Numismatist |
| Precondition | Submission has been received |
| Success Criteria | Coins are successfully given a grade value and divided according to like grade values. |
| Failure Conditions | Issue with the coins that blocks the collectibles from being graded, no grade value is set and the reason for the no grade is set |

| UC.9 | Resubmits |
|---|---|
| Goal | Ensure the population report no longer reflects the old submission (label destruction) and the collectible is processed as a new submission. |
| Actors | Receiving |
| Precondition | Collectible has been received |

| Success Criteria | A new submission is created after the collectible is removed from the case.  The old invoice is removed from population. |
| Failure Conditions | Old submission still remains in the pop<br>Collectible cannot be re-processed as a new submission |

| UC.10 | Conservations |
| --- | --- |
| Goal | Preserve and protect the collectible by removing harmful surface contaminants with a proprietary process |
| Actors | Conservationist |
| Precondition | The collectible has been received, verified, and barcoded |
| Success Criteria | All harmful residues have been removed and the coin has been conserved |
| Failure Conditions | The collectible has not been properly restored. |

| UC.11 | Labeling |
| --- | --- |
| Goal | Print the correct label based on the invoice<br>Allow customization of labels for particular dealers or selection by the collector |
| Actors | Slabbers |
| Precondition | The collectible has been received, verified, barcoded and graded |
| Success Criteria | The correct label is printed and placed on the collectible |
| Failure Conditions | An incorrect label is placed on the holder or a label is not placed on a collectible. |

| UC.12 | Slabbing |
| --- | --- |
| Goal | Seal the collectible and label within the containment unit |
| Actors | Slabbers |
| Precondition | The collectible has been received, verified, barcoded, graded and labeled |
| Success Criteria | Collectible was blown for dust and correctly sealed in holder |

![PointSource]

| Failure Conditions | Collectible was improperly sealed within the holder or not sealed at all.<br>There are also business rules for no grading that can drive the coin to not be holdered which is a valid failure condition. |
|---|---|

| UC.13 | QA |
|---|---|
| Goal | Ensure the collectible is properly aligned within the holder, the contents of the label are correct and no misspellings |
| Actors | QA |
| Precondition | The collectible has been received, verified, barcoded, graded and labeled |
| Success Criteria | Collectible was correctly aligned in the holder and the description on the label is accurate and correctly spelled |
| Failure Conditions | Collectible was improperly aligned within the holder<br>The label is incorrect or had misspellings |

| UC.14 | imaging |
|---|---|
| Goal | Collect low resolution photographs of the collectible within their holder for record keeping of the invoices processed |
| Actors | Imagers |
| Precondition | Collectible has been received, verified, barcoded, graded (or conserved), labeled, slabbed grading has been finalized |
| Success Criteria | Photographs of the collectible have been taken, saved to the cloud and available for viewing from both the ERP and the Collector's Society screen |
| Failure Conditions | A collectible is not photographed |

| UC.15 | Shipping |
|---|---|
| Goal | Ensure the invoice is complete, package the collectibles, print/receive tracking label, and sort to the proper shipping carrier |
| Actors | Shipping |

| Precondition | The collectible has been received, verified, barcoded, graded and labeled |
|---|---|
| Success Criteria | The collectible is received by the owner/dealer with all the accurate information |
| Failure Conditions | The collectible is shipped under the wrong shipping carrier<br>The collectible is shipped without a complete invoice or without the correct tracking label |

| UC.16 | Collect Payment |
|---|---|
| Goal | Ensure the invoice is properly accounted for in the customer billing, whether taking the payment at that time or apply to monthly term billing amount |
| Actors | Accounting |
| Precondition | The items has been received and invoice has been created |
| Success Criteria | The accurate payment has been collected |
| Failure Conditions | A customer's payment is rejected or not processed |

| UC.17 | High Res Imaging |
|---|---|
| Goal | To collect high resolution images of collectibles that have not been previously graded |
| Actors | Imagers |
| Precondition | A collectible has not been graded previously |
| Success Criteria | A collectible has high resolution photos taken and hosted in the image cloud solution |
| Failure Conditions | A collectible that has not been graded is not imaged |

| UC.18 | Collectors |
|---|---|
| Goal | Providing collectors with information on their past and current submissions. |
| Actors | Collector |
| Precondition | Created a Collector Society account |

| Success Criteria | Collectors can view accurate information needed on any of their submissions, both active and past. Collectors are informed of changes to the status of invoices through email. |
|---|---|
| Failure Conditions | Collectors are unable to view information on their submission |

| UC.19 | Dealers |
|---|---|
| Goal | Providing dealers with information on their past and current submissions. |
| Actors | Dealers |
| Precondition | Approved to be a dealer within CCG |
| Success Criteria | A dealer is able to submit invoices on behalf of their buyers<br>A dealer is billed based on a monthly term with their revolving credit line |
| Failure Conditions | A dealer receives incorrect or inadequate information about the collectibles they have submitted |

| UC.20 | Dealers Storage |
|---|---|
| Goal | Provide the ability to securely store dealer's collectibles and process shipment of those collectibles to other parties. |
| Actors | Dealers, CCG |
| Precondition | Dealer requested collectibles stored at CCG |
| Success Criteria | A dealer is able to request their graded inventory to be shipped |
| Failure Conditions | A dealer's inventory is not accurately account for |

| UC.21 | Managing Products/Services |
|---|---|
| Goal | Ability for a CCG employee to create or edit a product/service offering and configure business rules & pricing around that new offering that are applied in the process flow without requiring development |
| Actors | CCG employee |

| Precondition | The employee has the proper role to manage products/services |
|---|---|
| Success Criteria | A CCG employee is able to modify a price for a given tier of service<br>A CCG employee is able to define rules for when a tier of service can be applied<br>A CCG employee is able to create a product that is added to the invoice submission screen |
| Failure Conditions | A CCG employee is not able to run their business! |

## Business Process Optimizations

The below is a list of optimizations based on our observations that should be considered both from a system standpoint and a business process standpoint.

| Concept | Description | Value |
|---|---|---|
| Receiving Services/Tiers Selection | Put less emphasis on the tier selection within the receiving process. Let the coin details supplied by the verifiers set the tier of service. Too much business logic is being performed by the receiving team. | 10 |
| Barcode scanning comic receiving/verification | 90% of submissions have barcodes on them that comic book stores can use to quickly identify a comic. Utilizing these barcodes increases efficiency and data integrity simultaneously and would likely at least double potential comic throughput while reducing labor costs. | 8 |
| Secondary Sort Maintenance | Hard to edit a larger group of a search--would like to be able to export | 6 |
| Accounting- General Ledger | Update so that user does not have to manually calculate how much of purchase order has been billed/is outstanding | 6 |
| Label Printing | At the label invoice station the user has to select the label then input the invoice number rather than being driven by the invoice. Printing screen gives no indication of what needs printed. | 6 |
| Flip Label Print | The flip label for comics and coins should have more pertinent details like the prescreen value on the label to avoid needing to write it out on the box or label itself. | 6 |
| Send to Print Queue | Allow the ability to send an invoice to print queue to avoid needing to manually enter invoice at printer terminal | 5 |
| Collector's Society Refunds/Cancellation | Refunds should not have to be entered manually or reconciled across two payment systems. | 5 |
| RFID in the Boxes | In order to find collectibles within boxes more easily, a RFID system could help locate items more quickly. | 5 |

| | | |
|---|---|---|
| Quick View into Pertinent Data | When looking at customer, you should be able to easily see invoices. A user should be able to see the invoice details, click to see the shipping details, and then back to invoice without searching but instead navigating with links. | 5 |
| Default Label Printer | The ability to reserve one printer for only default label printing. If 80% (number unknown) of submissions use the default label, then keep one printer for default only to avoid needing to shift paper. | 4 |
| Better coding for Tradeshows | Ability to print show specific invoices so the receiving team does not need to input the same trade show for like submissions | 4 |
| Prescreen Grading | The prescreen grading should have quick options for graders to say yes or no or select the grade tiers that were set forth rather than entering the number every time or nulling values | 4 |
| Better visibility into status tracking | On the invoice tracking system, we need to show a progression bar of next steps and use operation data to show potential time for next step | 4 |
| Barcode scanners | The teams do not seem inclined to use the scanners often based on our observation, perhaps the need to select the field and then use a trigger to scan??? Could potentially have the scanners always "triggered" and then when anything is scanned it takes the appropriate action. | 2 |



# PointSource

**Numismatic Guaranty Corporation**

Proposal  - Ops ERP M1: NGC Grading Screen and Integration Layer
Salesforce M1: Discovery, CRM, and Pricing

PS-1600517, A Customer Care with Mobile solution

Version 1.2
10/10/2016

Prepared by:
Aaron Shook
Lab Technology Officer
PointSource, LLC

Presented by:
Chris Hugill
CEO
PointSource, LLC

PointSource, LLC ("PointSource") is pleased to present Numismatic Guaranty Corporation ("Client" or "NGC") with the following proposal for an online invoicing solution, which authorizes the preparation and provision of the services and/or deliverables described and in accordance with the terms and schedule specified below.

This proposal is valid for 30 days.

# 1. Scope and Goals

PointSource will deliver the minimum viable product (MVP) for the Client below, established by both the Client and PointSource on an agile basis. The high-level goals of this scope of work are to simultaneously lay the groundwork and plumbing for the entire solution while delivering a grading screen capable of helping with China and grading in the US.

The following describes the key roles who will play a part in delivering the solution:

### Delivery 1 - Project Management
- Day to day project responsibilities including scrums, meeting coordination and project tracking
- Coordination of meetings and follow ups between the Client and PointSource
- Management of the task breakdown and backlog into sprints
- Sprint planning and containment
- Ownership of sign-offs, scope changes, invoicing, resource management and projections

### Delivery 2 - Business Analysis
- Create and establish timelines for requirements needed to accomplish the established delivery roadmap
- Confirm "Stories" set by the Client requirements
- Confirm and establish design timelines and requirements

### Delivery 3 - User Experience (UX) and Visual Design
- Provide strategic design direction
- Define audiences and competition
- Create a new information architecture
- Design grading user experience and visuals based on a marriage of design expertise, business requirements, direct user feedback, and NGC stakeholder direction.

### Delivery 4 - Development, Architecture and Engineering
- Implement the stories set by the BA per the Client requirements
- Provide leadership and best practices
  - Integration layer architecture definition and implementation
  - Define Integration strategy between integration layer and SFDC/PROIV
  - JavaScript framework and application architecture
  - JavaScript optimization
  - Unit testing
- Automated cloud and application build mechanisms
- Oversight, education and recommendations for additional project phases
- Recommendations and solution evaluations for technical solutions

### Delivery 5 - Quality Assurance
- Create a test plan that will span all delivery channels including:

- o Test case development and automation
- o Test execution
- o Test reporting, bug reports and defect burn down in support of go live

# 2. Goals, Deliverables, Testing and Key Assumptions

The following list itemizes the layouts that were identified by PointSource and the Client as being essential to the MVP. This SOW includes resources to plan, design, develop and test an initial version of the MVP launch.

Since work will be completed on an agile, sprint-by-sprint basis, priorities may shift these deliverables. Items may be added or removed as long as the effort to complete them remains the same. This gives the project team flexibility to react to shifting priorities without shifting the deadline or adding additional resources. If priorities are identified that are beyond the team's ability to execute, new resources can be added to the project as part of a change order. If non-priority pages or features are identified, they can be added to a backlog that can be designed and built in a future engagement.

## Solution MVP (US and World Coin Grading)

*Business requirements*
- Handle entry of a grade for a specific coin that has already been entered into the system by verification
- Grading entry MVP is defined as:
  - Retrieving invoice and invoice line item details from user inputting invoice number
  - Viewing coin number details associated to the invoice
  - Modifying coin number of the invoice through coin number lookup or modification of details
    - Flag user if coin number is not found based on user input
    - Coin number dynamically changes based on the uniqueness of the coin (Denom, Proof Mint, Year, Mint Mark)
  - Input grade or no grade values
  - Input Variety, Second Variety, and Top Line
  - Input no grade comments for no grade scenario
  - Input grade details for grade scenario
  - Support both initial grade and finalizer experiences - multiple grades for an invoice
  - Input Strike Character for initial grade and finalizer scenarios
  - View number of coin(s) for the invoice and number graded for that invoice
  - Provide the ability to quickly move to the next or back to previous coin on invoice
  - Ability to select a theme for the grading screen to provide dark vs light background
  - Viewing population report for coin number
  - View ERP users initials for ME and VP entry
  - Ability to flag coin as Plus
    - Business rules to defined on when a Plus designation can be applied
  - Ability to flag coin as Star
    - Business rules to define on when a Star can be applied (70 cannot have a Star)
  - Flag coin as NCS candidate or send to NCS
  - Support for hot key use of key functions of the application
  - Ability to set a Mint Error
    - Business rules on who can access and when to display
  - Ability to set Variety Plus (aka Variety Check)
    - Business rules on who can access and when to display
  - Input the Pedigree
  - Input grader notes for internal sharing

- Modifying the invoice tier through bumping charge
  - Business rules to determine appropriate tier bumping options
- Ability to include as a multi holder set
- Searching/viewing coin maintenance file (not associated with invoice)
- Viewing coin grade history for current invoice
  - Finalizers seeing initial grader options
- Searching coin number grade history
- Viewing coin grade audit of changes from original value to new value
- Low Res and Hi Res Image searching based on coin number/invoice
  - Streamlined interface to get coin images to the user faster
- Full Bulk Grade capabilities
  - Ability to define and assign all fields to be applied to the specified line items in the invoice
- Ability for the Grader to contact the customer through a controlled mechanism
- Viewing Today's Stats - show/hide the number of coins the user has graded today
- Viewing a label preview based on the current grade information
- Ability to have a QC function to validate the holdered coins are ready for shipment

*Design*
- Full UX/design documents created to drive the design of the interface

*Technical Architecture & Development*
- Evaluate co-locating data and services to remove performance bottlenecks
- Determine if extra infrastructure in China is needed for adequate performance
  - If extra infrastructure is needed, then extra infrastructure and services costs will apply to stand up and maintain infrastructure and we will size/scope those costs at that time
- Stand up integration layer architecture
- Create full audit and logging infrastructure (grader, time, etc.)
- Create initial security roles/responsibilities infrastructure
- Read from Oracle for invoice, coin file, coin maintenance file, and other necessary data
- Write grades on a specific invoice to Oracle tables

*Visual Representation*



- Current Swimlane
  - ProIV reads & writes directly to the invoice/operation portion of the ERP from the Grading GUI Screen
- PointSource - Grading Screen Swimlane
  - PointSource will have the framework for the new process app
  - PointSource will have developed the grading screen within the process app (for US & World Coins)
  - PointSource will have integrated the grading screen within the process app with the integration tier which reads & writes from ProIV as the system of record

**Stretch Goals for this Milestone**
- Ancient Coin Grading Screen(s)
  - Solution MVP definition
    - Includes business requirements & design
- Comics Grading Screen(s) (CGC)
  - Solution MVP definition
    - Includes business requirements & design
- Paper Money Grading Screen(s) (PMG)
  - Solution MVP definition
    - Includes business requirements & design

**Out of Scope for this Milestone (Grading)**
- Creating new or maintaining coin number details
- Coin Receiving

- Coin Verification
- Ancient Coin Grading
- Anything not directly called out in the Solution MVP

## Solution MVP (Salesforce)

*Business requirements*
- Baseline Salesforce setup:
  - Define user account structure for business users
    - Ensure account structure represents the child company access appropriately (ex. user with access to NGC & NCS but not CGC)
    - Ensure general account details are defined to identify users by contact details
  - Define user roles for business users
    - User roles will be used to define the permission structure and access controls within SFDC (ex. users that can modify pricing vs users that can view only)
  - Setup CCG employees with SFDC accounts based on account structure & defined roles
- B2C and Account Tiered NGC Pricing
  - Utilize price books and products to reflect current CCG pricing needs
    - Ensure a flexible product pricing model is defined to meet the current pricing structure within ProIV
    - Ensure the pricing structure is able to allow for the addition of new products
    - Ensure the pricing structure is flexible for other companies under the CCG umbrella
    - Migrate all existing pricing into the new pricing structure
  - Enable the ability to override pricing for a specific account
  - Create integration layer that will allow MegaSys to pull pricing rules from our system
- Accounts
  - Define a customer account structure for CCG customer accounts
    - Ensure the account structure represents the child company access appropriately
    - Ensure all account details are defined to capture all necessary contact details
  - Migrate dealer accounts from PROIV to the new customer account structure into SFDC
  - Migrate CS accounts from PROIV/MXG user store (will require input from MXG) to the new customer account structure into SFDC
  - Ensure account identifier is backwards compatible with existing account number
    - Utilize and external reference ID to allow for the use of existing account number
  - Create integration layer that will allow MXG/ProIV access to customer accounts (read, write, and update)
    - MXG has the ability to consume CS accounts
    - ProIV has the ability to consume CS and dealer accounts
- Reporting
  - Integrate with Oracle to surface some level of operational metrics (best effort for now)
    - Determine P1 dashboard needs for the business
    - Leverage ProIV Oracle as the system of record for P1 dashboards in SFDC
  - Transform Oracle data into Salesforce data to be leveraged in dashboard reporting

## Stretch Goals for this Milestone

- Bulk Submission Pricing
  - Solution MVP definition
    - Includes business requirements & implementation details
- Special Pricing Scenarios
  - Solution MVP definition
    - Includes business requirements & implementation details

*Visual Representation*



- Current ProIV ERP Swimlane
    - Represents the current modules supported by ProIV for CCG business.
- PointSource - SFDC Pricing & CRM Swimlane
    - Represents the delivery for this phase of the project. PointSource will have an integration tier setup to handle requests for customer account details and invoice pricing that uses SFDC as the source of record for these items.
- ProIV Integration Swimlane
    - Represents the external work required by ProIV in order to leverage the new SFDC source of record for account details and invoice pricing.
    - There is also another external dependency on MXG to also integrate with the new integration tier to leverage SFDC as the source of record for account details.

*Technical Architecture & Development*
- Stand up integration layer architecture for this functionality to allow MXG and MegaSys to plug into new system.
- Documentation site for vendors to understand and consume the integration layer APIs

## Out of Scope for this Milestone (Salesforce)
- Accounting reporting metrics
- Other data migration to Salesforce outside of accounts and pricing (coin file, accounting data, etc.)
- Integration layer will be made available for consumption of MXG and PROIV vendors but it will be the Client's responsibility to manage those vendors to integrate with the integration layer.

- Dealer portal for managing collectible inventory & submitting POs

## Key Assumptions:

PointSource assumes that the Client is responsible for the following items. Any failure to deliver these items during the specified timelines may cause delays and additional cost to the final deliverable. The PointSource Architect and/or PM will escalate late deliverables expeditiously to the Client project stakeholders.

### Content and Design

The client will provide direction, guidance, and approvals of copy and content for all screens according to the following process:
- One round of review/augmentation of design by CCG stakeholders prior to sign off.
- One-week turnaround time expected on review. Delays here will cause delays to the project timeline and cost.
- After review, new designs created to address stakeholder comments are considered development ready. Development will start on these designs, and any changes thereafter will affect the project timeline and cost.

### Development and Environment

In order to develop in a speedy, cost effective manner, the following assumptions are made in determining the cost of this proposal:
- Full access to the existing Client's Oracle database is required. Due to a table structure that has been developed over a few decades, PointSource will also have questions about the data structure and purposes behind it. One business day turnaround time on questions is required here to avoid development delays that will cause project timeline delays and cost.
- Resources assigned to this project (PointSource and NGC) are available during normal business hours. Any request for availability outside of these timeframes will be mutually agreed upon by PointSource and the Client.

## Testing

### Early Stage User Testing

PointSource highly recommends user testing for projects critical to client success. Testing provides insights needed to create the best possible experience for the Client's audience.

The early-stage test will use prototypes. PointSource will handle the creation of both protocol and test materials. This testing will be conducted by the client's graders who will be using the software. In order to account for their feedback, this testing will need to take place no later than six weeks into the project. User feedback will be prioritized, sized, and accounted for. Please note that large design changes as a result of the user testing may require additional time and cost depending on the scale of the change. PointSource will work with NGC on prioritization and sizing of any changes that come out of user testing.

### Functional Testing

Functional testing focuses on finding and fixing any defects within the software. The functional tester will create a test plan based on the functionality delivered within the sprint in order to make sure the new functionality works as expected in the business requirements. Additionally, the functional tester will run regression tests to ensure that changes did not have a large impact on previously-delivered functionality.

PointSource will focus on functional testing using the same operating system as will be used by the graders at NGC. PointSource will work with the NGC team to determine the desired browser and operating system to use for this test effort. Since NGC has full control of the environment and can dictate operating system and browser, only a single operating system/browser combination will be used for testing.

# 3. Development process and tools

PointSource follows an Agile development model. PointSource and the Client will use PointSource's JIRA environment for collaborative project tracking to facilitate communication and transparency into the project of the Client's project plans, development tasks, and defects.

The creative team uses Axure for UX deliverables, Illustrator and Photoshop for creating visual mockups and assets, and InVision for visual prototypes.

# 4. Project schedule and communications

The project will commence on a mutually agreeable date established by the Client and PointSource, subject to resource availability. At the end of each month of the project, the project stakeholders named below will meet to review the project milestone progress, budget and scope. In addition, remaining project estimates will be validated to ensure deliverables are completed on schedule.

Required Stakeholders:
**NGC**
Lisa Creistoff, COO
Sam Yochem, Director of International Operations
Mike Browne, Vice President, CGC
Max Spiegel, VP of Sales and Marketing
Steve Eichenbaum, CEO (optional)

**PointSource**
Aaron Shook, Lab Technology Officer
Katie Winders, Senior Project Manager
Ron Reed, Principal Business Analyst
Mike Tabb, Senior Software Architect
Chris Hugill, CEO (optional)

**Table 4.1: Start and Duration**

| Project Est. Start Date | Sept. 1, 2016 |
|---|---|
| Total Project Duration | 4 months |

## Communication
Communication will be handled via daily scrums. If there is a requirement for the PointSource resource to be onsite (meetings, discovery, etc.) both parties will mutually agree on the dates/times.

In order to meet the project schedule, it's important that client feedback is delivered promptly. Work in progress will be presented to the Client's stakeholders during cadence calls, where there will be the opportunity to provide feedback. Final screens and patterns will be delivered in demos at the end of each sprint. At the end of each sprint, the work completed in the sprint will be considered complete. The PointSource team will assume that sprint's deliverables to be complete and the PM will confirm sign off with the Client.

**Project Management**

PointSource will provide Project Management (PM) support to help ensure the success of this project.

# 5. Project roles and rates

The services for this project are estimated man-months of effort, broken down on a monthly phased basis. Should additional resource be requested they will be billed on Time and Materials basis.

**Table 5.1: Resources and allocated blend, Kickoff/Planning phase (Months 1)**

| Service/Resource | Resource Allotment | |
| --- | --- | --- |
| Architecture (Ops) | 50.00% | |
| Architecture (Salesforce) | 50.00% | **Est. monthly total = $77,000** |
| Business Analyst | 50.00% | |
| Project Management | 50.00% | |

**Table 5.2: Resources and allocated blend, Kickoff/Planning phase (Months 2-4)**

| Service/Resource | Resource Allotment | |
| --- | --- | --- |
| Architecture (Solution, SFDC, CIOaaS) | 100.00% | |
| Architecture (Process) | 50.00% | |
| Software Engineer | 100.00% | **Est. monthly total = $202,700** |
| Senior Software Engineer | 100.00% | |
| UX/Visual Design | 50.00% | |

| | | |
|---|---|---|
| Business Analyst | 50.00% | |
| QA | 50.00% | |
| Project Management | 50.00% | |
| System Integration | 20 hrs | |

## Total estimated project = $685,100.00

The first invoice will be issued one month after the project start date and at the completion of each month thereafter. Table 5.2 outlines the invoice schedule, assuming a 9/01/16 start date.

**Table 5.2: Invoice Schedule**

| Invoice | Date | Amount | Comments |
|---|---|---|---|
| Invoice #1 | 10/01/16 | $77,000.00 | |
| Invoice #2 | 11/01/16 | $202,700.00 | |
| Invoice #3 | 12/01/16 | $202,700.00 | |
| Invoice #4 | 1/01/17 | $202,700.00 | |
| | | | |
| **Project Net Cost** | | **$685,100** | |

# 6. General terms

The Time and Materials estimates provided in Section 5 are based on information known to PointSource at the time when the project scope was set. Any changes by the Client or unforeseen circumstances or events could impact delivery schedule and costs.

## Invoice and payment schedule

PointSource will invoice the Client for services on a monthly basis. The first invoice will be issued one month after the project start date. All invoices are due upon receipt of invoice and payable within 30-days.

## Travel terms

Any associated travel expenses will be invoiced at cost (zero markup) and will be approved by Client prior to travel.

## Signatures

IN WITNESS WHEREOF, the parties hereto have caused this proposal to be executed by their duly authorized representatives as described set forth above.

**PointSource, LLC** ("PointSource")

Signature: _____

Print Name: _Christoph L Hugill_

Title: _CEO_

Date: _____

**Numismatic Guaranty Corporation** ("Client")

Signature: _____

Print Name: _STEVEN EICHENBAUM_

Title: _CEO_

Date: _____



# Certified Collectibles Group

## ERP Roadmap Deliverable

### Roadmap Document

This document is intended as an overview to the ERP migration project and provide direction on the timeline with the deliverables based on system dependencies.

Prepared by PointSource
v1.1



# Section 1: Intro and Purpose of this Document

The following living document serves as the baseline for overall scope, scheduling, estimates, and timelines for the CCG ERP replacement project. As with any project of this magnitude with this many unknowns, the schedule and scope will need to be flexible in order to accommodate the unforeseen challenges that always pop up when implementing long-term strategic technical investments.

The roadmap is broken into three functional areas, each with multiple milestones and running in parallel. During this time, functional areas of the PROIV system will be taken offline in a surgical manner to avoid disruptions to day-to-day business and to deliver continuous value to CCG. The selected architecture allows us flexibility in dealing with legacy data and with mixed-mode operation (partial PROIV, partial SFDC, partial new custom application), making everything but the user interface seamless to the CCG stakeholders. This approach also minimizes the workload of MegaSys, LTD. by giving them simple, easy-to-use interfaces with which to integrate with the newly built functionality.

# Section 2: High-level Scope

The high-level scope for this project has been broken into three distinct functional areas, each with associated deliverables and milestones. The first two areas of functionality address the needs of the business user (executives, marketing, sales, operational management, warehouse management, customer support), while the third item addresses the needs of the workers in the CCG assembly line production process (receiver, verifier, grader, shipper, looper).

The schedule and milestones have been built with a few goals in mind:
- Deliver fast value and quick wins
- Target "foundational" areas like accounts, integration layer, and microservice API "plumbing" right out of the gate since these are needed in all areas
- Minimize disruption to core CCG business

*High-level Scope description*
1. Salesforce functionality
    1.1. Initial implementation, CRM setup, Accounts, Pricing, (some) Reporting capability enabled, Migration integration layer
    1.2. Customer Support
    1.3. Full Data Migration
2. FinancialForce functionality
    2.1. Accounting and Purchase Orders
    2.2. Warehouse management
3. CCG Production Process functionality
    3.1. Discovery and technical design, grading happy path, microservices infrastructure, auditing, logging
    3.2. General grading, including US, tier bumps, and other complex edge scenarios
    3.3. Invoice tracking
    3.4. Verification
    3.5. Receiving
    3.6. Shipping & remaining process management tasks

*Functionality considered out of scope for the project*
The following functionality was not considered when determining high-level timeline and cost information. This or any other functionality can be added at the request of the CCG team, but schedule and/or cost alternations will need to be made:
- Modification to current label printing process
- Customer-facing function on the website and/or dealer portals
    - MXG will remain the customer facing portal but will require modifications to leverage the new ERP
- Online ordering
- Modifications to structure/format of data (e.g. new coin numbering system)

*3rd Party Vendor Integration Process*

As part of this project, there will be several milestones which will be completed by PointSource which will then require work from another vendor (either MegaSys, LTD or MX Group) to be fully operational. Below is the proposed process for allowing the other two vendors to integrate with the new system in the most efficient way possible:

1. Identify all needed areas of integration as part of the discovery phase of a particular milestone.
2. Define our proposed integration APIs for all needed vendor integrations as part of the architecture phase of each milestone.
3. Collaborate with MegaSys and/or MXG on the proposed API. Get sign-off on the API from MegaSys/MXG and a rough sizing of effort from them to implement on their side.
4. Implement the integration service and deliver all functionality within the given milestone.
5. Document the integration service so that MegaSys/MXG can understand how the integration works.
6. Deliver a test client demonstrating the integration functionality that has been delivered with the milestone.
7. Coordinate with CCG/MegaSys/MXG on a rollout plan to activate the new functionality in production.

*Open issues that could impact pricing and timeline*

As with any project of this magnitude, there are many black boxes, unknowns, and questions about scope that will have further clarity as the project progresses. For that reason, this roadmap is a best-case estimate at time of writing and is a living document. All changes and deviations will be approved by the CCG team, and the team will also be notified of any updated estimates as soon as possible so that they can be accounted for.

This section is intended to track open issues that can impact the timeline, and thus the pricing, of the project. Below are the current issues, ranked in order of potential impact:

- Additional scope not committed to in this document
- Assumption that MegaSys will integrate with PS for account and address details for use in the current ERP
  - If it is required for PointSource to sync data to ProIV, this will extend the timeline
- Delay in approvals or requested updates of approved design, business requirements
- Outages to servers and services that are outside of PointSource control (Oracle, MXG user store, etc.)
- Resolving domain knowledge of current ERP solution data model
  - It is required to have clear understanding of the data in ProIV in order to provide seamless integration between the two systems

# Section 3: Detailed Milestones and Scope (Salesforce)


This section provides a detailed look into the milestones and scope for the Salesforce functional area of the project. Target dates to complete development and roll functionality into production are included for each milestone.

*Milestone 1: Discovery, CRM & Pricing **(4 months)***
In scope:
- Setup Sales Cloud instance
    - Configure account structure
    - Configure internal CCG user accounts
- Configure products & price books to reflect current CCG business needs
- Create integration layer that will allow PROIV to connect to Salesforce when ready to go live
    - MegaSys to integrate with us for pricing + account access
    - MX to integrate with us when new CS accounts are added or modified
- Integrate with Oracle database to begin effort to allow surfacing of operational metrics for reporting
    - Data normalization exercise
    - Utilize SFDC tooling to map data into the right locations in Salesforce
    - Migrate all dealer accounts (PROIV)
    - Migrate all CS accounts (PROIV and MXG)

Full Business requirements of in-scope functionality:

| ID | Requirement | Notes/Considerations |
|---|---|---|
| II.1 | The system must support the ability to set up account levels and associated customers to that tier | Discount pricing capabilities for the customer tiers |
| II.2 | The system must support the ability to have one customer record with access to multiple companies | A customer should manage one account for submissions across all the CCG companies with a single shared account balance but able to see details for each company |
| II.3 | The system must support special pricing for their account that overrides other pricing | Dealer discounts for all submissions, defined pricing for a customer for each service/product |
| II.4 | The system must support the ability to provide account access from an integrated frontend | System will support this capability in the future, but the capability will not be implemented as part of this body of work. |

| II.5 | The system must support multiple language outputs | Invoice, email, etc (including double byte), includes collectible details (i.e. coin number file, if available) |
|------|---------------------------------------------------|-------------------------------------------------------------------------------------------------------------------|
| II.6 | The system must allow for searching for customer by (at least) name, phone, zip code, invoice | Modernize search to allow for smart search with one field across all fields |
| II.7 | The system must allow for different account types: collector vs dealer vs [custom type] | Ability to expand to more as well, capabilities must extend to any account type |
| II.9 | The system must support the ability to create ship back rules and insurance rules for shipping | |
| II.10 | The system must have the ability to email negotiated invoice to the customer for inclusion in their submission | System must have this capability, but its implementation will not be part of this milestone. |
| II.11 | The system must have the ability to set the payment terms for a customer | |
| II.12 | The system must have the ability to set a credit threshold on a customer's account | |
| II.15 | The system must support renewal membership management - monthly fees, cancellation, etc. | System must have support for this capability, but implementation will not be part of this milestone. |
| II.16 | The system must provide the ability to manage multiple customer shipping addresses | |
| II.17 | The system should support the ability to write notes within the customer profile for internal sharing | Permissions on who can view/add, includes flagging invoice for issue resolution |
| II.22 | The system must support the concept of "Submission Center", where the customer receives a commission based on the invoices generated for their customers | Commission structure for specific customers or type of customers |

| II.23 | The system should support the ability to allow customers to manage account access | System must support this, but it will not be implemented as part of this body of work. |
|---|---|---|
| V.1 | The system must support the ability to create services and products for B2C and B2B offerings | Example of Early Bird, Ancient, etc. |
| V.2 | The system must support the ability to create tiers of services | Includes the ability for discount pricing for these tiers (see V.5) |
| V.3 | The system must support the ability to create price lists for services, products, tiers, grades, and account levels | Includes the ability to set expiration on pricing |
| V.4 | The system must support the ability to create dependency for a service to other services | Certain types of services require another service |
| V.5 | The system must support roles to control who can manage pricing at the multiple levels (account, services, invoice) | Managing prices includes an approval process for price change to services |
| V.6 | The system must support the ability to define the collectibles supported and services offered for each | Examples - paper money, world coins, US coins, ancient coins, comics, etc.. |
| V.7 | The system must support the ability to create add on services | Include customization to the specific collectible holder - label and core color |
| V.12 | The system must support flexible pricing model based on the combination of the specific customer, the specific type of collectible (type of coin), quantity of submission, and the grade that was received | Including rejection fee (if a certain quantity is not meeting the grading minimum) |
| V.13 | The system must support the ability to create exclusive product offers for a specific customer | Rules to govern who can receive this special product offer, includes custom labels. Implementation of specific functionality is not included as part of this body of work. |

Unknown/run-at:
- MXG integration with authentication store in SFDC

Out of Scope for this milestone:
- CRM driven email messaging for invoice details - stays in ProIV
- Managing payment method/account
- Invoice tracking - stays in ProIV


## Milestone 2: Customer Support *(3 months)*

In scope:
- Setup Service Cloud instance
    - Configure roles and permissions
    - Configure basic case management: 360-degree customer view, customized for customer service needs
- Call tracking
    - Call times and durations
    - Call-out to service rep to update call topic and add notes
    - Important Note: Does not include any work on in-house phone systems to enable functionality. This needs to be handled by CCG IT team.
- Knowledge base
    - Enable creation of a knowledge base for customer service for frequently asked questions to guide them through resolution
    - Enable CCG management team to populate knowledge base with common issues
- Create integration layer that will allow PROIV to connect to Salesforce when ready to go live
    - Surface any necessary MegaSys integrations that come out during discovery
    - Add call-out to customized "invoice tracker" view from Milestone 3.2.

Unknown/run-at:
- MXG website integration with Service Cloud "live agent" feature to enable live chat on website. This will require discovery/sizing from MXG to determine the work on their side to enable on the CCG websites. See the following video for a great overview of the feature: https://www.youtube.com/watch?v=Q5eXzHXUBcg


Out of Scope for this milestone:
- Social service cloud functionality to enable service directly from social media.
- Replacement of the "login as a user" website functionality provided by the MXGroup-created website

## Milestone 3: Full Data Migration *(4 months)*

In-scope:

- Coin, comic, paper money identification data migrated
  - Data to live on SFDC
  - Data is the "coin maintenance" data that identifies all possible coins. It is not the data that is used in the pop report.
- User interface creation on SFDC platform to allow modification of data
  - Depending on the users we need to give access to this functionality, additional Force.com licenses (roughly 80% less costly than Sales or Service cloud licenses) may need to be purchased for these users who need to edit the coin, paper money, and comic "files."
- Integration API to new functionality created
  - Enable PROIV to integrate with new API to perform coin/comic/paper money lookups as needed by remaining functionality on PROIV.


## Section 4: Detailed Milestones and Scope (FinancialForce)

This section includes the following high-level functionality and milestones from the high-level scope:

- Accounting and Purchase Orders
- Warehouse management

These milestones require a more detailed discovery and scoping exercise with the FinancialForce team and a FinancialForce partner. The recommendation from FinancialForce is to implement the core CRM functionality prior to starting on this piece of work. PointSource will work with FinancialForce and CCG to select the appropriate partner to perform this implementation.

*Milestone 1: Accounting and Purchase Orders*

| ID | Requirement | Notes/Considerations |
|----|-------------|----------------------|
| I.1 | The system must have standard account receivables | Customizations may be required |
| I.2 | The system must have standard account payables | Calculating and paying on Royalties included |
| I.3 | The system must have a standard general ledger | |
| I.4 | The system must have purchasing capabilities to support buying materials for the business | Detailed POs |
| I.5 | The system must allow for processing payment with credit card or wire transfer | Included credit card number only |
| I.6 | The system must allow for processing payments with check or cash | |
| I.7 | The system must have integrations with standard payment gateways with multiple payment options | Preference on First Data or Authorize.Net; membership & invoicing should be through the same payment gateway |
| I.8 | The system must support setting up automatic payments based on business rules for accounts with billing already selected | |

| I.9 | The system must accurately track usage of custom labels for calculating royalties payments | |
|---|---|---|
| I.10 | The system must support the ability to make and set manual credit adjustments | This should be a role with a threshold based on role |
| I.11 | The system must support the ability to create/cancel/suspend recurring invoices | Renewal membership fees (also see II.15) |
| I.12 | The system must keep a history by each vendor for AP | |
| I.13 | The system must allow for the configuration of allowable payment terms to be used in CRM | |
| I.14 | The system must have configurations for creating rules to stop ship based on balance owed | |
| I.15 | The system must allow for accounting to override a stop shipment due to credit threshold being hit | |
| I.16 | The system must send automated statements based on the payment terms for the customer's account | |
| I.17 | The system should have the ability to purge history of a record at a given time interval | |
| I.18 | The system must have the ability to refund specific charges and invoices | |
| I.19 | The system must have a clear description of the breakdown of charges on a invoice | Per company charges, audit of price bumps |
| I.20 | The system should have a dashboard on financials | |
| I.21 | The system must have a report writer for creating specific queries for the business | |

| I.22 | The system must support the configuration of when billing occurs on an invoices based on service and tiers | Some may bill on receipt others may be on ship back |
|------|--------------|--------------|

*Milestone 2: Warehouse Management*

| ID | Requirement | Notes/Considerations |
|------|--------------|--------------|
| VII.1 | The system must support the ability to track assets that are used by the business | |
| VII.2 | The system must support the ability to monitor materials to be used in the process | I.e. holders, labels, etc. |
| VII.3 | The system must support the ability to create notifications to an admin when inventory of assets and materials needs to be addressed | |
| VII.4 | The system must support storing an inventory of collectibles that are stored on behalf of a customer | Dealer should have access to their inventory numbers |
| VII.5 | The system must have the ability to create allocations from the collectibles that are stored on behalf of a customer | This is to allow for the inventory team to set aside coins until they are dealt to end collectors |
| VII.6 | The system must support re-allocation or transfer of inventory within the warehouse | |
| VII.7 | The system must provide audit history of all inventory transactions | |
| VII.8 | The system should be integrated with the invoice processing system for easy invoice generation for PO requests | See Use Case UC.20 |
| VII.9 | The system should have the ability to tell if the collectible is being held raw or within holders | |

| | | |
|---|---|---|
| VII. 10 | The system must have standard inventory workflow to track inventory that is allocated for shipment but not yet removed from warehouse | |
| VII. 11 | The system must properly calculate the fees between owner of the coin and dealer for the order | |
| VII. 12 | The system should support the designation of where in the warehouse the item is stored | |
| VII. 13 | The system must support the CCG storage of their own coin inventory to be used to supplement the B2B business | |
| VII. 14 | The system must pivot the inventory of items based on the grade of the collectible | Able to tell how many 70's a dealer has in stock |


## Section 5: Detailed Milestones and Scope (CCG Production Process)

This section provides a detailed look into the milestones and scope for the CCG Production Process functional area of the project. This solution targets the workers in the assembly line production process of CCG: receivers, verifiers, graders, shippers, and loopers. For this reason, we are internally referring to this solution as "The People's ERP."

This portion of the work will be the most heavyweight in terms of software development by a significant margin. It includes all functionality related to temporary "bridge" integration to PROIV and the CCG websites, data migration, and all components of pure custom software being developed to drive the in-house CCG processes related to collectibles. Target dates to complete development and roll functionality into production are included for each milestone.

*Milestone 1: Discovery, US & World Grading, and Microservices* **(4 Months)**
In scope:
- Full UX/design documents created to drive the design of the interface
  - One round of review/augmentation by CCG stakeholders prior to sign off
  - One-week turnaround time expected on review.
  - After review, new designs created to address stakeholder comments are considered development ready
- Business requirements
  - Handled grade-entry entry of grade for a specific coin that has already been entered into the system by verification.
    - Initial grade and finalizer experiences accounted for
    - Strike character designation
  - Evaluate co-locating data and services to remove performance bottlenecks
    - Determine if extra infrastructure in China is needed for adequate performance
    - If extra infrastructure is needed, then extra infrastructure and services costs will apply to stand up and maintain infrastructure and we will size/ scope those costs at that time
- Technical requirements
  - Stand up microservices architecture
  - Create full audit and logging infrastructure (grader, time, etc.)
  - Create initial security roles/responsibilities infrastructure
  - Read from Oracle for invoice, coin file, and other necessary data
  - Write grades on a specific invoice to Oracle tables

Stretch Goals:
- Ancient coin grading
- Comic grading happy path
- Paper money grading happy path

Out of scope:
- Complex comic and paper money grading scenarios (ex. Comic defect assignment)

*Remaining Milestones*
In the interest of not bloating the document, the remaining milestones here have been condensed in this document. Their requirements can be found in the [Business Requirements Document](#).

*Milestone 2: All Grading Scenarios* **(4 months)**
In scope:
- Complete complex Coin Grading scenarios
- Comic grading
- Paper Money Grading
- Other collectible grading scenarios (lobby card,

*Milestone 2: Verification* **(4 months)**

*Milestone 3: Invoice Tracking* **(Dates TBD)**

*Milestone 3: Receiving* **(Dates TBD)**

*Milestone 4-6: Shipping & Remaining Process Management* **(Dates TBD)**

# Section 6: Proposed Roadmap

| Project Milestone 1 | Project Milestone 2 | Project Milestone 3 | Project Milestone 4 | Project Milestone 5 | Project Milestone 6 |
|---|---|---|---|---|---|
| US & World Grading (Section 5, Milestone 1) | Invoice Tracking / Communities/Dealer Portal (Section 5, Milestone 2) | Receiving & Verification / All Grading Scenarios (Section 5, Milestone 3) | Shipping & QC & Conservation (Section 5) | Reporting & Remaining Ops App (Section 5) | Production Roll Out (Section 5) |
| Salesforce Setup / CRM Migration / Product Pricing (Section 3, Milestone 1) | Bulk Pricing & Special Deals (Section 3, Milestone 1) | FinancialForce SCM Setup - Warehouse & Inventory (Section 4) | Collectible Data Management (Section 3, Milestone 3) | Collectible Data Integration (Section 6.1.2) | |
| | Customer Support – ServiceCloud (Section 3, Milestone 2) | ProIV Pricing Integration (Section 6.1.1) | FinancialForce Accounting & PO Setup (Section 4) | Customer Portal Integration (Section 6.1.2) | |
| | Collector's Society Account Integration (Section 6.1.2) | | | | **Needs Planned** <br><br> Labels Setup & Tracking |
| | ProIV Account Integration (Section 6.1.1) | | | | |

**Legend**

| | |
|---|---|
| PointSource | |
| MX Group | |
| FinancialForce | |
| MegaSys | |

## 6.1: Vendor Dependencies

Below is a high level list of the integrations required by the other vendors in order to ensure a smooth transition.

- **6.1.1 MegaSys**
  - *ProIV Account Integration*
    In this integration, the desire is to ensure that SFDC is the system of record for all account details including address information. The ask is for the ProIV system to request account details from the integration layer and present those in the existing ProIV application screens. The system will also need to request account updates if a user is to modify an account record from ProIV. This will allow for business user to manage the account in SFDC and have information accurately reflected in both systems.

- o *ProIV Pricing Integration*

  Similar to the account integration, the ask is to have the ProIV system updated to request pricing from the integration tier when processing an invoice.  The Pricing integration will not require an update mechanism from ProIV, all pricing will live in SFDC and be managed from that application.  The ProIV system will send details of the invoice and based on those details the service will return the price for the invoice.
- **6.1.2 MX Group**
  - o *Collector's Society Account Integration*

    In this integration, the MX Group collector's society portal will need to integrate with the integration layer in order authenticate and allow a user to manage their account details.  This includes address information and general account information.
  - o *Collectible Data Integration*

    After the collectible data is migrated, it is required fro MX Group to update their integration to retrieve the collectible details that are shown across the various marketing sites across CCG companies.
  - o *Customer Portal Integration*

    The final integration for MX Group will be to integrate the invoice tracking mechanism into the custom portal so a customer will be able to retrieve the latest and greatest information on their submission.

# Section 7: Architecture

*7.1: High-Level Architecture*





**Operational Application Architecture**
This will come in 2 flavors.
1) On premise.  This was a requirement for at least Sarasota.  It is optional for China, and/or other locations.
2) We will deploy the exact same application in a hosted AWS instance.  This will be reachable for all locations not using their own on-premise solution

**Data Synchronization Architecture**
This solution will be deployed in a hosted cloud environment.  This is responsible for getting changes made in the couchDB and synching them into the ProIV Oracle instance, and vice versa.  What this means is, if a user makes a change in the new grading app, such as sets a grade on an invoice line item, that change that is made in couchdb, must also be made in pro4.  This synchronization process will also update the same record in pro4.  This way you can have users in ProIV and the new application.  This allows you to slowly deprecate and sunset pro4 gracefully with minimum disruption.  The sync code will only listen to the hosted couchDB instance.  All other on-prem instances replicate with this.

Note: This was changed to reflect the latest approach to poll for proIV changes using change tables.  The previous approach had a process listening on change notifications from the Oracle system.  I found this not to be fault tolerant.  If our listening application were to go down, we would not get the notifications from oracle.  Oracle will try to send the notifications, but if it fails, that's it.  If the listening application were to go down for say an hour, that would be catastrophic

because we would never be able to accurately get the changes that occurred within that hour and the db's would become out of sync.  With the change tables approach, the changes in pro4 are persisted to a change table and are always there, so the sync app can always pickup where it left off in the event that a failure occurred.  This is as bulletproof as you can get.

*7.2: Microservices Architecture: High Level View*



The diagram above displays the separation of concerns that is achieved architecturally by utilizing Microservices. Microservices is an approach to architecture that decomposes the application along domain boundaries.  At a high-level in terms of benefits to the business, this will achieve the following:

- Allows us to migrate off of PROIV/Oracle seamlessly by separating functionality at a micro-level
- Each domain operates independently, and is able to integrate when it's ready.  This allows the developers to replace pieces of the business that run on PROIV incrementally.
- Each service is fronted by http services.  This is a huge win and allows 3rd party vendors or applications to integrate seamlessly.  (Think shipping and image service(s)).
- If an external application is required to provide functionality, it is easy to rip and replace it in the future if it does not work out or simply does not age with the growing business.

- Future proofs the technology as it uses the tried and true http protocol for API communication and is language agnostic.  You will not be locked into a language like PROIV.

*7.3: Microservices Architecture: Detail View*

