# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| CERTIFIED COLLECTIBLES GROUP, LLC, NUMISMATIC GUARANTY CORPORATION OF AMERICA, CERTIFIED GUARANTY COMPANY LLC and PAPER MONEY GUARANTY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> GLOBANT, LLC, GLOBANT S.A., and JOHN DOE ENTITIES 1 THROUGH 5, <br><br> Defendants. | **Civil Action No. 19-CV-1962-SDM-AEP** |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Certified Collectibles Group, LLC, Numismatic Guaranty Corporation of America, Certified Guaranty Company LLC, and Paper Money Guaranty, LLC (collectively, "CCG"), for their complaint against defendants Globant, LLC, Globant S.A., and John Doe Entities 1 through 5, allege as follows:

## PRELIMINARY STATEMENT

1.      This action arises from the misconduct of international technology firm Globant S.A., its U.S. subsidiary Globant, LLC, its affiliates John Doe Entities 1 through 5 (the "John Doe Defendants"), and a technology firm Globant S.A. acquired, PointSource, LLC ("PointSource," and, together with Globant S.A., Globant, LLC, and the John Doe Defendants, "Globant"), in botching and then lying about a project to design and implement a new enterprise resource planning ("ERP") software system for CCG, a leader in the collectibles industry.

2.     Sarasota-based CCG specializes in the certification, grading, and conservation of coins, stamps, paper money, comic books, and other collectibles for individual collectors, collectibles dealers, and not-for-profit institutions.  Over the last decade, CCG has experienced substantial growth, developing a loyal international clientele in the burgeoning collectibles market through extraordinary customer service and innovative product offerings.

3.     To increase its efficiencies, support the rapid growth in its domestic and overseas operations, and generally move its business to the next level, CCG decided in January 2016 to replace its aging legacy computer system with a new ERP solution.  CCG's ERP initiative, which was supposed to deliver enhanced automation and operational flexibility, was a central component of its growth strategy.

4.     Recognizing that the demands of its expanding global customer base would soon outpace the capabilities of its current technology -- and given the operational risks inherent in replacing its core software system -- CCG knew that it had to rely on an appropriately skilled and experienced consulting firm to design and implement its new software solution.  CCG further knew that its new software system would have to be customized to support the unique business processes that enable it to provide state-of-the-art certification, grading, and conservation services.

5.     At this time, PointSource, a software technology firm, was engaged by CCG's affiliated company, Certified Guaranty Company, to develop an online order form solution for its comic book grading business.

6.     Seizing upon CCG's decision to replace its ERP system -- and fully aware that a timely and successful ERP implementation was critical to CCG's strategic business plan --

PointSource represented that it had the requisite skills and experience to implement a custom business solution for CCG that would not only deliver 100% of the functionality of CCG's legacy system, but also provide enhanced functions, improved performance, and scalability to support CCG's expanding business requirements.

7.    PointSource then spent five months examining CCG's business and purportedly determining the scope of the project, for which CCG paid it $500,000 in fees.  Thereafter, PointSource represented that it could design and implement the new ERP system within two years, with a "go-live" date of July 2017, for an estimated cost of $1.8 million.  Based on those representations, CCG hired PointSource for the project, which began in October 2016.

8.    PointSource floundered, coming nowhere close to designing and implementing the new ERP system.  Then, on June 1, 2017, ten months into the project, and one month before the go-live date -- with less than 10% of the system partially built -- PointSource sold itself to Globant in a $28 million transaction.  By the time of that sale, CCG had already paid PointSource nearly $1.2 million, or more than 66%, of the $1.8 million that PointSource had stated the entire project would cost.  Globant thereupon expressly assumed all of PointSource's customer engagements and contractual obligations, including its agreements with CCG.

9.    In the months that followed, Globant assured CCG that the implementation was on track to deliver a fully functional ERP system.  By November 2017, CCG had paid and committed to pay all of PointSource's estimated fees and nearly $500,000 more, for a project that was more than a year behind schedule.  Acknowledging CCG's frustration with the

budget overrun, Globant agreed to complete the project for a "fixed-price" pursuant to a statement of work that set a firm go-live deadline.

10.   The new statement of work required Globant to implement a fully functional ERP system for a fixed additional cost of almost $1.5 million, which was later amended to $1.8 million.  As to the deadline, Globant advised that it needed almost two more years to complete the project, and committed to a new go-live date of October 31, 2019.

11.   CCG agreed to pay Globant these additional fees, and to delay the go-live for another two years, based on Globant's assurances that the project was on track to meet the new go-live date for the fixed-fee amount.  At no time during the negotiation of the fixed-fee agreement did Globant disclose that the ERP solution it inherited from PointSource was defectively designed and unable to meet CCG's requirements, much less deliver the heightened efficiencies and automation central to CCG's strategic plan.

12.   In fact, at the time it entered into the fixed-fee agreement, Globant knew or should have known that it would have to start the project over from scratch because PointSource had failed to prepare core design documentation and complete other essential deliverables.  But Globant concealed that fact, falsely assuring CCG, for months on end, that the project was on track for an on-time and on-budget go-live.  Stringing CCG along with these lies, Globant was able to collect nearly $2.7 million in additional fees, consisting of an additional $1.1 million paid to PointSource as a Globant company, and almost $1.6 million in additional fees paid to Globant.

13.   Only after it pocketed the last payment from CCG did Globant finally come clean about the true state of the project, demanding *another $5 million* and insisting it would

need to move the go-live by almost *two more years*, to August 2021.  Amazingly, since entering into the fixed-fee agreement, effective November 2017, Globant has accomplished nothing, and has admitted that the project cannot even proceed without basic design documents that should have been prepared years ago.

14.    Had Globant disclosed to CCG in November 2017 that the project would in fact cost *$8 million in additional fees* and take an *additional four years* to complete, CCG would have cancelled the project and proceeded with a different vendor.  Instead, Globant remained silent, inducing CCG to enter into the contract and to pay nearly $2.7 million in additional fees, all the while concealing that it would have to start the project over from scratch.

15.    As a result of Globant's fraud, a project that CCG was told would take a year and cost $1.8 million in fees will ultimately take five years and cost almost $10 million in fees -- *a price increase of 455 percent*.  In the meantime, CCG is now in the process of uncovering the full extent of Globant's performance failures, which include a host of deficient project management practices and a defective system design.

16.    CCG brings this action to recover the tens of millions of dollars in damages caused by Globant's extortionate bait-and-switch.  Globant's scheme -- which was approved at the highest levels of Globant's management -- induced CCG to enter into a contract with a fixed-price and a firm deadline, both of which Globant knew full well it could not and would not meet.  Those damages include not only the fees CCG paid to PointSource, Globant, and other third-parties, but also CCG's internal spend and the loss of critical business opportunities foreclosed by Globant's failure to implement the new ERP system.

## PARTIES

17.     Plaintiff Certified Collectibles Group, LLC is a privately-owned Florida limited liability company with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

18.     Plaintiff Numismatic Guaranty Corporation of America ("NGC") is a privately-owned Florida S-corporation with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

19.     Plaintiff Certified Guaranty Company LLC ("CGC") is a privately-owned Florida limited liability company with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

20.     Plaintiff Paper Money Guaranty, LLC ("PMG") is a privately-owned Florida limited liability company with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

21.     Upon information and belief, Globant, LLC is a Delaware limited liability company, with its principal place of business in San Francisco, California.  Globant, LLC is registered to do business in the State of Florida and is a wholly-owned subsidiary of Globant España S.A., which is a wholly owned subsidiary of Globant S.A.

22.     Upon information and belief, Globant S.A. is a global information technology and software development firm founded in Argentina and now based in Luxembourg, with its headquarters located at 37A, Avenue J.F. Kennedy, L-1855.  Globant S.A. has offices in eight cities across the United States, including an office located at 1001 Brickell Bay Drive in

Miami, Florida.  Globant S.A. is publicly traded on the New York Stock Exchange under the symbol GLOB.

23.    Upon information and belief, defendants John Doe Entities 1 through 5 (the "John Doe Defendants") are affiliates of Globant, LLC and Globant S.A., the names and addresses of residences of which are unknown.  Also upon information and belief, the John Doe Defendants are employers of the following senior officials who played an active role in the fraud alleged herein:  Alejandro Scannapieco (Executive Vice President & General Manager of the U.S. East Region), Maximiliano Herrera (Vice President of Technology), Gabriel Dominguez (Senior Technology Director), and Javi Rodriguez (Senior Delivery Director).

24.    At all relevant times, each of the defendants was the agent of the other with respect to the misconduct alleged herein.

25.    Upon information and belief, at all relevant times, Globant, LLC, Globant S.A., and the John Doe Defendants were each an alter ego of the other insofar as there was a unity of interest between them -- *i.e.*, they commingled resources, work product, and employees freely, and failed to maintain arm's length relationships, such that they constituted a single business enterprise for purposes of providing services to CCG.  The commingling of resources included the participation of the senior leadership team of GSA and the John Doe Defendants in providing CCG with false assurances about Globant's work and in managing Globant's overall engagement with CCG.  Additional jurisdictional contacts are alleged below.

26.    On or about June 1, 2017, Globant S.A. entered into a definitive stock purchase agreement to purchase 100% of the membership interests of PointSource.  Pursuant to the stock purchase agreement, 100% of the issued and outstanding membership interests of PointSource were transferred to Globant S.A.

27.    By letter dated October 3, 2017, PointSource informed CCG that months earlier, in June 2017, PointSource had been acquired by Globant S.A. and that Globant S.A. intended to merge PointSource with Globant, LLC.  The letter stated that Globant, LLC would "assume all of PointSource's customer and vendor arrangements" and that "[t]he terms of the relevant agreements [would] not be impacted. . . ."  Additionally, Globant sought and received CCG's written consent to the assignment of CCG's agreements with PointSource to Globant, LLC.

28.    By Agreement and Plan of Merger, dated November 22, 2017 and filed with the Florida Secretary of State (the "Merger Plan"), PointSource merged with and into Globant, LLC.  Pursuant to the Merger Plan, "all debts, liabilities and duties of each of the said domestic limited liability company and other business entity that have merged shall thenceforth attach to the surviving limited liability company and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it."

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties and because the amount in dispute, excluding interests and costs, exceeds $75,000.

30.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to CCG's claims occurred in this district.

31.    This Court has personal jurisdiction over Globant, LLC,  Globant S.A., and the John Doe Defendants pursuant to Fla. Stat. § 48.193(1)(a) and/or § 48.193(2) because, *inter alia*, each defendant operates, conducts, engages in, and carries on its business in the State of Florida for pecuniary benefit; committed a tortious act within the State of Florida; or breached contracts in the State of Florida, and is engaged in substantial and not isolated activity within the State of Florida.  Alternatively, Globant, LLC acted as an agent for and alter ego of Globant S.A. and the John Doe Entities Defendants, with respect to the services provided to, and misconduct against, CCG, or Globant S.A. conspired with and aided and abetted Globant, LLC's misconduct.

32.    This Court also has personal jurisdiction over the John Doe Defendants because they conspired with and aided and abetted the misconduct of Globant, LLC and Globant S.A.

33.    Additionally, this Court has personal jurisdiction over Globant, LLC pursuant to Fla. Stat. § 48.193(1)(a)(9) and Fla. Stat. § 685.101-102 because the primary agreement governing the parties' contractual relationship contained (1) a Florida choice of law provision; and (2) a forum selection clause in which the parties irrevocably (a) submitted to the exclusive jurisdiction of the United States District Court for the Middle District of Florida or the Twelfth Judicial District in and for Sarasota County, Florida; and (b) agreed that such courts shall have exclusive jurisdiction.

## **FACTUAL BACKGROUND**

A.      **CCG's Business and Its Decision to Implement a New ERP System**

34.    Headquartered in Sarasota, Florida, CCG includes seven of the world's leading expert services companies focused on the certification, grading, and conservation of collectibles.  Among its member companies are NGC, an industry leader in coin grading services, formed in 1987; CGC, an industry leader in comic book, magazine, concert poster, lobby card, and vintage photograph grading services, formed in 2000; PMG, an industry leader in paper money grading services, formed in 2005; ASG (Authenticated Stamp Guaranty), a stamp grading service, formed in 2017; and CAG (Collectibles Authentication Guaranty), the newest member of CCG, formed in 2018, and providing services to preserve the authenticity and provenance of memorabilia and estate items.

35.    "Grading" refers to the process of ascertaining and certifying the authenticity, quality, and condition of a collectible using established industry standards.  Grading is a critical factor in determining the value of a collectible.  CCG's employees include dozens of the world's most experienced and respected experts in authenticating, and assigning a grade to, all manner of coin, stamp, paper money, comic books, and other collectibles, ranging in value from relatively insignificant sums to tens of millions of dollars.

36.    Since its inception, CCG has graded 43 million coins, 4 million notes, and 5 million comic books, magazines, and posters.  The majority of CCG's business comes from several thousand dealers that utilize CCG's grading services.  As the international market for different collectibles has grown substantially over the last decade, CCG has seized on opportunities to expand, both in the United States and abroad, particularly in China, where the collectibles market has soared in recent years.  CCG has also experienced rapid growth in

Germany, Hong Kong, South Korea, Singapore, Japan, the Netherlands, the United Kingdom, Thailand, and Malaysia.  CCG now has annual revenues over $80 million, and employs approximately 265 employees at its Florida headquarters and nearly 100 people in its overseas offices.

37.    CCG's success has been fueled in large part by its singular focus on and commitment to delivering consistent standards, prompt turnaround time, and superior customer service -- all of which depend on an appropriately functioning software system.  To sustain, expand, and accelerate the trajectory of the customer, revenue, and profit growth it was experiencing, it was imperative that CCG upgrade its decades-old and outmoded software system.

38.    That software, known as "The Next Level" and developed by Megasys, Ltd. ("Megasys"), was programmed in an older language known as ProIV.  In addition to the inherent limitations of that platform in terms of scalability and functionality, another risk loomed:  there are only a handful of consultants proficient in ProIV capable of supporting CCG's legacy system, let alone modernizing it to handle CCG's expanded product offerings, higher transaction volumes, and the language and currency requirements stemming from CCG's overseas expansion.  As a result, replacing CCG's aging legacy system with a new and more robust ERP system became a mission-critical initiative.

**B.    PointSource's Campaign to Land the Project**

39.    At or about the same time that CCG decided to replace its legacy software system, two of its member companies, NGC and CGC, had engaged PointSource, a software consulting and development firm, for discrete technology projects, including the

development of an imaging service application (the "NGC Imaging App") and an online invoice/order form (the "CGC Online Form").

40. In or about February 2016, PointSource's Chief Executive Officer, Chris Hugill, and Lab Technology Officer, Aaron Shook, approached CCG's management, including its Chief Executive Office, Steven Eichenbaum, and its Senior Vice President of Sales and Marketing, Max Spiegel, to request that CCG engage PointSource to lead the design and implementation of the new ERP system.

41. In its campaign to be selected to design and implement the new system, PointSource repeatedly assured CCG that it knew CCG's unique business requirements and that its consultants had the skills and experience "to ensure that the new ERP system accomplishes everything necessary to take CCG to the next level."

42. In making these representations, PointSource highlighted the urgency by which CCG needed to upgrade its software, noting that CCG was "growing at a pace that is outgrowing the technology currently used" to operate its core business.  In fact, PointSource neatly summed up the objectives of CCG's software upgrade project as follows:

    a. Provide configurable options for CCG to allow quick deployments to manage its changing processes and services without requiring the assistance of an outside vendor;

    b. Streamline CCG's business operations with an updated user interface and reduce overhead;

    c. Enable better business decisions by providing access to real-time data and robust reporting metrics;

d.   Allow better management of customer relations;

e.   Drive efficiencies in accounts payable and accounts receivable processing; and

f.   Lower delivery timelines and costs.

43.   Even as it recognized that CCG's business was "unique," PointSource minimized the complexity of the ERP implementation, assuring CCG, among other things, that "the core financial piece of the business is standard to other businesses."  Hugill, who led the PointSource sales effort, repeatedly represented that the implementation would be "easy" for PointSource to deliver based on the skills and experience of the PointSource consultants he would assign to the project.  PointSource's pre-contract sales materials recognized that "some customization" would be necessary, that a large portion of CCG's business relied on providing grading services, and that the software solution required flexibility "to ensure customers are getting the level of service they [have] come to expect for their business."

44.   From the outset of its pre-contract interactions with CCG and throughout the months-long sales cycle and pre-contract due diligence meetings and exchange of information, beginning in or about February 2016 and culminating in agreements between the parties in October 2016, CCG emphasized three primary points that purportedly would guide CCG's design and implementation strategy.  These points, which PointSource stressed at formal sales presentations, informal meetings, and on phone conversations, included the following:

a. CCG's own employees lacked the experience, knowledge, or expertise to perform the project by themselves, and would need to rely on PointSource's qualified resources to deliver the implementation.

b. Because CCG's business model depended on continued growth and expansion, both geographically and in its service lines, it was imperative that the new ERP system could scale globally and be easily configured by business users to adapt to changing business requirements and new products and services.

c. CCG could not tolerate a software roll-out that would negatively impact its exacting operational standards and impeccable customer service.  As a result, the new system would have to deliver 100% of the functionality available in CCG's legacy system, and would have to be "at least as fast as PROIV is at performing all functions," both in the United States and abroad.  The importance of this requirement could not be overstated: while CCG needed a new ERP system that could seamlessly scale and integrate with its expanding domestic and foreign operations, CCG could not afford to take a technological step back.  The new ERP system therefore had to deliver all of the functionality of its legacy system, plus new features, scalability, and flexibility for continuous upgrades.

45.   Beginning in February 2016 and through July 2016, PointSource purportedly engaged in five months of due diligence to evaluate and analyze CCG's business processes to enable it to make informed decisions about how to design both the new ERP system and the

overall systems-related architecture in which the new ERP system would reside.  In this context, "systems architecture" refers to the components of the overall computer system that would be used to run CCG's business, including the new ERP platform, any CCG legacy software systems that might remain in use, and other software systems that would be used to support, for example, CCG's accounting, pricing, or other business processes.

46.     PointSource referred to this due diligence work alternatively as the "ERP Evaluation" phase or the "Deep Dive," and charged CCG $500,000 to perform this work. During this period, PointSource led due diligence meetings with CCG employees at CCG's Sarasota headquarters, discussing the details of CCG's core business processes and functional requirements.  In information gathering sessions with CCG, PointSource officials, including Hugill, Shook, and a Senior Business Analyst, Ron Reed, purported to immerse themselves in, among other things, the business processes that CCG uses to obtain and process customer orders, invoice customers, obtain, manage, and track inventory, and perform its various grading, certification, encapsulation, and other services.

47.     Throughout the ERP Evaluation period, PointSource provided assurances that it would encounter "no issues" in designing and implementing an ERP solution capable of delivering all of the functionality CCG needed to operate its business.  PointSource represented that not only would its new ERP solution provide all of the required functionality, but that it would do so "faster, both from performance and usability standpoints," than CCG's legacy system.

48.     Following its five-month Deep Dive, PointSource prepared and presented CCG with a business requirements specification document ("BRD") that captured CCG's business

processes.  As described by Shook, the BRD was "intended to be [the] reference to all the requirements that a new ERP system would need to achieve in order for [CCG] to run its business" both today and in the future.

49.   PointSource further represented that the new ERP system would have "configuration flexibility" and the power to deliver new products and services with a guided user interface to give CCG "the continued ability to grow at the rate they have been accustomed to for years."

50.   PointSource also represented that the new ERP system would reduce labor costs by streamlining CCG's business operations, enabling users to bypass the current process of navigating through multiple complex screens to quickly access information.

51.   After the Deep Dive, in addition to the BRD, PointSource also prepared and presented to CCG a roadmap document, referred to as the "Roadmap," which set forth PointSource's plan for implementing the new ERP system.  The Roadmap indicated that PointSource would design and code a partially customized solution that would integrate with, among other components, third-party software applications licensed from SalesForce.com, Inc. and FinancialForce.com, Inc., which would operate CCG's pricing and accounting/inventory processes, respectively.

52.   PointSource's plan was for CCG to migrate off its legacy system using a sequenced approach whereby certain applications would go live in different phases of the project, with CCG's legacy system components being gradually integrated with the new ERP system.

53.     PointSource represented that the fully implemented ERP system would go live within two years, with a July 2017 go-live date.  PointSource estimated that the fees for its work on the project, including the integration with SalesForce.com and FinancialForce.com, would be $1.8 million.

54.     In good-faith reliance on PointSource's representations (as reflected in, among other documents, the BRD and the Roadmap, for example) about its purported skills and experience and the suitability of the new ERP system for CCG's business processes, CCG engaged PointSource to implement the new ERP system (the "Project"), and the parties signed a contract known as the Master Software Development Agreement (the "MSDA").  A copy of is the MSDA is attached hereto as Exhibit A.

55.     The MSDA, effective October 1, 2016, provided the general terms governing the parties' contractual relationship and contained specific representations concerning, among other things, PointSource's performance obligations.

56.     Pursuant to the MSDA, in Section 4, PointSource was required to "design, develop, create, test, deliver, install, configure, integrate, customize, and otherwise provide and make fully operational Software as described in the Business Requirements Specification [BRD], Roadmap, and each Statement of Work on a timely and professional basis[.]"

57.     In Section 2.3, PointSource further acknowledged and agreed that "time is of the essence" with respect to its obligations thereunder, and that timely performance was "strictly required."

58.     The MSDA also imposed explicit obligations on PointSource to deploy a team of appropriately skilled and experienced consultants to work on the Project.  Section 6

required that the "Developer Project Manager" have the "requisite authority, and necessary skill, experience, and qualifications, to perform in such capacity" and further provided that PointSource "shall provide all Services and Work Product hereunder in a timely, professional, and workmanlike manner[.]"

59.    In the same vein, in Section 17.2(a) of the MSDA, PointSource explicitly warranted that "it will perform all Services in a professional and workmanlike manner in accordance with best industry standards and practices for similar services, using personnel with the requisite skill, experience, and qualifications, and shall devote adequate resources to meet its obligations under this Agreement."

60.    The MSDA contained an extremely broad provision as to the recoverable damages in the event of a dispute between the parties.  Section 19 provided that the "parties explicitly agree" that all forms of recoverable damages would be available to CCG, including "consequential, incidental, indirect, exemplary, special, or punitive damages."  This provision supplemented a separate provision, Section 23.11, allowing for the recovery of liquidated damages for three specific breaches related to (1) PointSource's failure to cause a buyer to take assignment of the contract; (2) "repeated failure of Acceptance Tests"; and (3) failure to "deliver all Work Product as contemplated in the Business Requirements Specification and the Roadmap[.]"

61.    Section 23.19 of the MSDA allowed for the recovery of attorneys' fees and court costs by the prevailing party.

62.    The MSDA also contained explicit provisions entitling CCG to (1) various credits towards fees (Section 12.4); (2) hold back 10 percent of fees until such time as CCG

was no longer reliant on its legacy system (Section 13.1(a)); and (3) set off, at any time, any amount owing to it under the contract against any amount payable (Section 13.4).  Further, Section 13.2(b) provided that "Developer shall continue performing its obligations in accordance with th[e] Agreement notwithstanding any such [fee] dispute or actual or alleged nonpayment that is the subject of the dispute, pending its resolution."

63.    In addition to the MSDA, the parties entered into four statements of work (each an "SOW"), along with associated amendments and change requests, all of which were governed by the MSDA and all of which further detailed the work to be performed during the phased implementation.

**C.    PointSource's Performance Failures, Globant's Acquisition of PointSource, and Globant's Fraudulent Scheme to Extract Millions More in Fees**

64.    Soon after the parties signed the first SOW, on or about October 10, 2016, PointSource began its work on the Project.  Only two months later, PointSource conceded that it had to scrap its planned design, in which the new ERP system was to be integrated with the legacy system's Oracle database.  On December 12, 2016, Megasys, the developer of CCG's legacy ProIV system, advised that under its contract with Oracle, the Oracle database could only be used in conjunction with Megasys-developed software, and that third-party applications were prohibited from directly accessing the database.

65.    Had PointSource conducted appropriate due diligence and taken basic steps to validate its proposed design from the outset, it would have been aware of this issue and would have been able to formulate a different design before the Project even began.  Instead, PointSource was forced to come up with a different integration strategy to accomplish the phased implementation of the new ERP system.

66.    This lapse by PointSource led to a four-month delay under the Project timeline, forcing the parties to enter into a second SOW to ensure that there was sufficient time for PointSource to complete planned tasks.  The completion of other tasks had to be postponed to a later Project phase.  This change in integration approach also required that CCG pay additional database management fees to Megasys and engage an additional vendor, at significant cost, to accomplish the transfer of customer and other business data from the legacy system to the new ERP system.

67.    More delays would follow.  The first (and only) module that PointSource delivered -- in August 2017, some nine months into the Project -- was a grading screen. Grading screens are among the most fundamental components of CCG's business, as they are the site where CCG's experts undertake their skilled analysis and use a set grading scale to assign quantitative values to collectibles.  Such grading services comprise approximately 95% of CCG's business.

68.    The grading screen that PointSource designed and delivered was completely unusable, as it failed to connect with or access the collectible data on CCG's legacy ProIV system.  In other words, graders could not populate the screens with critical collectible-identifying information, rendering the screens useless for the grading process.  Thereafter, PointSource spent months attempting to correct this defect but was never able to deliver the required grading screen functionality.

69.    In the face of these problems and ongoing delays, PointSource provided repeated assurances that the Project was not at risk.  But CCG became increasingly concerned that the Project was far behind schedule, that PointSource had made minimal or no

progress on key Project deliverables, and that more than two-thirds of the Project budget (nearly $1.2 million out of $1.8 million) was already expended, with less than 10% of the new ERP system developed.

70.    In light of the delays, the poor quality of the few deliverables received, and the alarming variance to the budget, on or about August 21, 2017, CCG demanded that PointSource conduct an onsite review to assess the state of the Project and present a detailed strategy for completing it.

71.    The parties met at CCG's Sarasota headquarters on September 29, 2017.  At that meeting, Hugill and Reed provided assurances to Eichenbaum, Spiegel, and CCG's Director of Information Technology, Brad Westover, that PointSource would dedicate additional offshore resources to keep the Project on track and provide regular Project status updates. Hugill also agreed to schedule another on-site meeting to take place approximately one month later.

72.    Less than one week after the September 29 meeting, in an October 3, 2017 letter to CCG, PointSource announced that it had been acquired by Globant S.A., an international technology company run primarily out of Argentina.  PointSource advised that all of its contractual obligations, including its agreements with CCG, had been assumed by Globant.

73.    Globant's acquisition of PointSource was of concern to CCG, whose mission-critical ERP project was now in the hands of a large multinational company, about which CCG knew nothing, and whose corporate profile was markedly different than that of PointSource.  Whereas PointSource was a small, privately-held company with approximately 80 employees, was headquartered in Raleigh, North Carolina, and routinely serviced clients

of CCG's size (all of which were attributes that CCG wanted in its ERP vendor), Globant

was a huge, publicly traded company with more than 6000 employees working in 12

countries, was headquartered outside of the United States, and routinely serviced clients far

bigger than CCG, on projects that were more lucrative for Globant than CCG's ERP project.

74.     To assuage those concerns, PointSource and Globant took pains to emphasize

that the terms of the parties' agreements would not be impacted at all by the Globant

acquisition, and that Globant would provide PointSource's customers with "quality and

partnership."  Based on these written representations by PointSource and Globant in the

October 3, 2017 joint letter, CCG countersigned that letter, providing written consent to the

assignment to Globant of all agreements CCG had with PointSource.

75.     Thereafter, PointSource and Globant intensified their assurances that Globant

had the ability and intention to deliver the Project as planned and scheduled.  On or about

November 21, 2017, at a meeting at CCG's Sarasota headquarters attended by Hugill and

Reed, CCG expressed its concerns over PointSource's delays and missed deadlines, its

failure to deliver any usable component of the ERP system, its lack of an overall project

vision and implementation plan, and the ballooning variance to the budget.

76.     In response, Hugill and Reed recognized that CCG had lost confidence in

PointSource's performance, and assured CCG that Globant would take corrective actions to

put the Project "back on a path to success."  In a revised, high-level plan to complete the

Project, Globant acknowledged that, notwithstanding the "time is of the essence" clause, it

would have to once again postpone the go-live, this time to the second quarter of 2019 --

representing almost a *two-year slippage* from the original Project schedule, which had set the go-live at July 2017.

77.    CCG thereupon demanded that Globant agree to a fixed-fee and firm deadline to complete the Project and deliver a fully-functioning ERP system.  Globant responded by agreeing to a firm October 31, 2019 go-live date, and proposing a fixed-price of $1,465,000.

78.    That agreement was memorialized in a "Fixed Price" SOW (#0060h000016KDzS), referred to as "SOW #3."  A copy of SOW #3 between Globant and CCG is attached hereto as Exhibit B.  This fixed-fee contract, which went into effect on November 1, 2017, was signed by CCG on June 28, 2018 and countersigned by Globant the following day.

79.    Setting an October 31, 2019 deadline for Globant to complete all of the remaining deliverables, SOW #3 defined the "agreed upon scope" as that set forth in "categories" (described in the SOW) and in a requirements traceability matrix appended to the SOW.  A "requirements traceability matrix" is a common ERP document intended to capture all of a client's functional requirements to ensure that the ERP system is appropriately tested and validated and will, upon go-live, support the client's business processes.

80.    The fixed-fee amount in SOW #3, $1,465,600, was amended three times by mutual agreement, on or about March 22, June 25, and July 23, 2018.  Those amendments, and accompanying change orders for the additional work to be performed, increased the total Project cost to $1,820,722.  SOW #3 also set a payment schedule, commencing with the first

monthly payment to Globant in November 2017 and concluding with the last payment, as amended, at the end of November 2018 -- in other words, one year before the go-live date.

81.    SOW #3 also contained a provision concerning the software implementation methodology that Globant would use to guide and structure its work.  A "software implementation methodology" refers to a set of practices intended to ensure that a software implementation project unfolds pursuant to a systematically structured and efficient approach that focuses on, among other things, project planning, validating work product, and identifying and mitigating project risk.  SOW #3 required Globant to use the Agile methodology, which relies on incremental, iterative work sequences that are commonly known as "sprints."

82.    Reflecting the importance of the October 31, 2019 go-live date and the criticality of the MSDA's "time is of the essence" provision, SOW #3 stated that the Agile methodology would give the Globant team the "flexibility to react to shifting priorities *without shifting the deadline or adding additional resources*" -- in other words, without impacting the fixed-fee or the firm October 31, 2019 go-live date.

83.    As the months passed following Globant's acquisition of PointSource, CCG became concerned that Globant was insufficiently focused on the Project, and was starving it of consulting resources.  Those concerns arose in part because, over time, Globant shuffled personnel onto and off of the Project, and came to rely largely on a team of consultants working remotely from Belarus.  At no time during the entire Project did PointSource or Globant comply with the contractual requirement, set forth in MSDA Section 6.2, that

required it to "maintain the same Developer Project Manager throughout the term of [the applicable] Statement of Work" and assign a Project Manager who was "located in Florida."

84.    The revolving door of Globant consultants severely disrupted the Project in that, among other things, (a) it deprived CCG of the few Globant personnel who had gained some familiarity with and understanding of CCG's business processes, interfaces, and legacy systems; and (b) resulted in incomplete and ineffective training of replacement consultants, delays in Project tasks, and inferior work product, as various tasks were not performed and monitored by the same person from beginning to end, or even for substantial periods of time. And, because the departures of Globant personnel were often sudden and abrupt, the Project consistently was set back by the loss of critical knowledge that was not properly transferred.

85.    Significantly, the first time that senior Globant officials began to show any interest in the Project was in or about November 2018 -- which just happened to coincide with the last installment payment (for $43,742 in fees) under the fixed-price SOW #3.  In other words, no sooner did Globant realize that it would not be receiving additional fees -- that the money spigot was, by the terms of the contract, being shut off -- than it dispatched a senior leadership contingent to meet with CCG's executives.  But as it turned out, Globant's newfound interest in CCG had nothing to do with taking steps to ensure delivery of a fully functioning ERP solution by the October 31, 2019 go-live date.  Rather, Globant's sudden charm offensive had a very different purpose: to extort additional fees from CCG.

86.    On November 26, 2018, Globant's Executive Vice President & General Manager of the U.S. East Region, Alejandro Scannapieco, arrived at CCG's Sarasota offices to introduce members of the Globant Project team.  Scannapieco was the former Chief

Financial Officer of Globant and was "responsible for Globant's business operations and strategic growth in the [U.S. East] region."  Scannapieco was accompanied by Globant officials Maximiliano Herrera (Vice President of Technology), Gabriel Dominguez (Senior Technology Director), and Javi Rodriguez (Senior Delivery Director).  Eichenbaum, Spiegel, and Westover attended the meeting from CCG, along with CCG's Vice President of Operations and Technology, Sam Yochem.  Hugill also attended the meeting.

87.     During the meeting, the CCG attendees sought assurances that Globant's work was on track for an October 31, 2019 go-live.  Globant provided those assurances.  In the course of the discussions, both Hugill and Scannapieco acknowledged -- as they had to, based on the plain, unambiguous language of SOW #3 -- that Globant was working pursuant to a fixed-fee arrangement for completion of the Project.

88.     Thereafter, Hugill provided written assurances confirming that Globant would complete the Project for the agreed-upon fixed-fee.  Hugill acknowledged that the parties "agreed to a top line number" in SOW #3 which would be "budgeted over the remaining months of the SOW's term," even if that meant that Globant would be working at a loss to deliver the ERP system.  Hugill further assured CCG that upon Globant's completion of SOW #3, CCG would obtain an ERP solution providing all of the functionality available in the legacy ProIV system.

89.     In a follow-up to the November 26, 2018 meeting, on December 17, 2018, the parties held a conference call during which Globant reiterated its commitment to deliver the ERP system in accordance with SOW #3.  In addition to the Globant officials who attended the onsite meeting the previous month, additional Globant participants on the call included

David Acomb (Managing Director) and Timothy Ramsey (Executive Vice President/Managing Director of Sales and Client Services).

90.    The interactions in November and December 2018, described above, gave CCG some degree of comfort that the Project was on track for an October 31, 2019 go-live, and that Globant was fully vested in ensuring a successful on-time and on-budget launch of the new system.  But that comfort was short-lived because, several weeks later, in early January 2019, Globant started to stick up CCG for more fees.

91.    On January 8, 2019, Hugill and Acomb, the Project's new engagement manager for Globant, met with CCG's Eichenbaum and Spiegel at CCG's Sarasota offices to demand that CCG pay an additional $1 million in fees.  Globant was candid in explaining the rationale behind its extortion: because SOW #3 was a fixed-fee contract, Globant was losing money on the CCG engagement and feeling "financial strain" that it wanted to offload onto CCG.  Outrageously, Acomb complained that because CCG had already paid all of the required fees under the contract -- *i.e.*, because CCG had pre-paid in full, even though Globant had ten more months of work to perform to reach the October 31, 2019 go-live -- Globant was uncomfortable having to work without generating ongoing revenue.  The fact that Globant had demanded the pre-pay arrangement, and that CCG had fully met its payment obligations under the precise terms of the contract, was of no moment to Globant, which insisted on obtaining more fees.

92.    As part of its proposal to extract more fees out of CCG, Globant said it would perform additional work to add functionality to software platforms that CCG used for two divisions not part of the ERP project.  When CCG expressed surprise at Globant's demand

for more revenue, Acomb tried to assuage CCG by explaining that it would only take an additional $1 million "to help get us through the situation," and that he needed to "go back and report to Globant that future revenue from CCG would be forthcoming."  In the course of making this demand, Acomb acknowledged that Globant was required to deliver a fully functional ERP system by October 31, 2019, and he committed to doing so.

93.   Several weeks later, the full scope of Globant's extortion scheme began to emerge when Globant stunned CCG with the revelation that Globant would not proceed with critical software development work unless it received additional fees to prepare design documents, which Globant referred to as "Product Development Documents," or PDDs.

94.   On January 24, 2019, during a Project status call, Globant's then Project Manager, Adrienne Bryant, and Reed first raised the issue of PDDs to Spiegel and Yochem. Bryant and Reed advised that in order for the Globant team to build out the rest of the ERP system, it would have to prepare the PDDs.

95.   CCG did not realize it at the time, but in fact the PDDs that Globant referenced were basic design documents, that should have been prepared, in accordance with standard ERP implementation practice, much earlier in the Project.  These design materials are foundational documents that must be prepared before the ERP system is coded to ensure that the consultants are developing a system that appropriately captures a client's functional requirements.

96.   Such design documents are fundamental components of an ERP implementation, as they necessarily guide and inform not only the design of an ERP system, but also, among other things, the coding and testing of an ERP system, the overall systems

architecture (of which the ERP system is one piece), and the interfaces that must be designed and built to enable the ERP system to pass data to, and receive data from, other system components.

97.    Globant's revelation in January 2019 -- more than *two years* after the Project began in October 2016 -- that it needed to prepare such design documents constituted a stunning admission that the entire Project essentially had to be started from scratch.  Globant fully admitted that without the PDDs, it could not proceed with further development (*i.e.*, coding) work.  Even worse, Globant later demanded that CCG pay Globant an additional $250,000 for its preparation of the PDDs -- falsely (and absurdly) claiming they were "outside the scope" of SOW #3.

98.    Again, because CCG was unfamiliar with ERP practice, it did not at the time of Globant's admission appreciate the full implication of what Globant had at long last disclosed -- namely, that the prior two years of work on the Project, first by PointSource and then by Globant, was a complete waste of time and money.  By this point in time, CCG had already paid $4,561,380 for the Project, including $2,970,950 to PointSource and $1,590,430 to Globant.  Globant's acknowledgement that it needed to start working on PDDs in January 2019 necessarily meant that for nearly $4.6 million in fees, CCG had received literally nothing of value -- that the Project had to start all over again, from scratch.

99.    At the time of Globant's admission that it needed to create the kind of fundamental design documents that should have been created more than two years prior, Globant had already been working on the Project for nearly 15 months, and, as noted, had already pocketed nearly $1.6 million in fees, in addition to the over $1.2 million in fees paid

to PointSource as an acquired Globant company.  That means that for that entire period of time -- day after day, week after week, and month after month, as it was all the while taking CCG's money -- Globant fraudulently concealed from its client CCG that the Project was in complete shambles, that PointSource had violated a core requirement of implementing ERP by not preparing basic design documents, and that, without those basic documents, the Project would never deliver a fully functional ERP system.  Globant only came clean, and finally advised CCG that the Project could not proceed without design documents, shortly after the last Project payment became due under SOW #3.  Globant thus squeezed every last dollar out of CCG under the contract, knowing full well, but concealing, that the Project was in fact an unmitigated disaster.  Then and only then, after it obtained nearly $4.6 million from CCG, did Globant reveal that neither it nor PointSource had prepared critical design documents, without which the Project could not continue.

100.  Had Globant not engaged in this egregious fraud -- in other words, had Globant disclosed, soon after acquiring PointSource, that PointSource had not prepared appropriate design documents without which the Project could not continue -- then CCG could have made an informed decision about how it should proceed and how it should spend its money. After Globant's acquisition of PointSource and its assumption of the Project, even a cursory evaluation and review of Project documentation would have revealed the absence of appropriate design documents and the fact that the Project was in fact in dire straits.

101.  At that point in time, before SOW #3 was ever signed, Globant should have told CCG the truth -- it should have disclosed to CCG that without appropriate design documents, the Project was entirely at risk and would need to be re-scoped and restarted.  Globant should

have formulated a new Project schedule and a new fixed-fee amount that took into account, and factored in, the need to prepare key design documents, or PDDs as Globant called them.

102.  Had Globant done so, CCG would have known the true facts, and therefore would have been able to make an informed decision about whether it wanted to proceed with the Project at all; whether it wanted to replace the entire legacy PointSource team with a different team of Globant consultants; whether it wanted to put the Project on hold and obtain input and advice from another consulting firm or firms; or whether it wanted to demand a refund of all the $1,698,000 in fees it had paid PointSource, and/or commence litigation to recover those fees and any other damages it had sustained up to that point in time.

103.  By concealing from CCG the true state of the Project and PointSource's lapses, Globant deprived CCG of the opportunity to make informed decisions about these issues. Indeed, Globant not only concealed the truth from CCG, but affirmatively misrepresented to CCG that the Project was on track for an October 31, 2019 go-live, and that the remaining work necessary to reach that go-live would require no more than $1,820,722 in additional fees.  Based on Globant's fraudulent assurances and concealment and omissions of the truth, Globant fraudulently induced CCG's consent to the assignment of the MSDA and related agreements, and fraudulently induced CCG into entering into SOW #3, continuing the Project with Globant, and continuing to pay Globant fees.

104.  What makes Globant's fraudulent conduct even more malicious and reprehensible is that the negotiations between CCG and Globant over SOW #3 played out over the course of eight months.  That meant that Globant had more than ample time to get up to speed about the Project's deficiencies and the PointSource team's performance failures

-- including that there were no PDDs -- and make appropriate disclosure to CCG about the true state of affairs.

105.   Soon after the January 24, 2019 call with Bryant, Globant advised CCG that Acomb had been removed as the Project's engagement manager and that Ramsey would be managing the account going forward.   Thereafter, on February 11, 2019, Ramsey met with Eichenbaum at CCG's Sarasota offices to reiterate Globant's sob story -- that notwithstanding the plain and unambiguous terms of SOW #3, Globant needed to generate more money on the Project.   Ramsey advised that Globant was "in a difficult spot" because, as a result of the fixed-fee agreement, the Project was a money-loser for Globant.   Cruelly concealing that the Project would have to be started from scratch -- and ignoring that it was most certainly CCG, not Globant, that was "in a difficult spot" -- Ramsey amped up Globant's extortion.   He threatened to stop work on the Project unless CCG turned the revenue spigot back on and paid Globant more fees.

106.   Even as CCG was shocked by Globant's demand for more fees, CCG was also concerned that if Globant abandoned the Project, CCG would have to find a replacement vendor, which would no doubt demand substantial fees just to get up to speed on the Project, much less start working on it.   Again, at this point in time, lacking technical ERP experience, CCG did not appreciate that the absence of PDDs required a do-over of the entire Project.

107.   Moreover, even as it demanded more fees and restarting the revenue stream, Globant (at least by this point) had not backed away at all from completing the Project by October 31, 2019.   To the contrary, Globant had repeatedly reassured CCG that the Project was on track to meet the October 31, 2019 go-live.   Accordingly, though under no obligation

to do so, Eichenbaum offered to pay Globant an additional $750,000 in fees, contingent, of course, on the delivery of a fully functional ERP system by the October 31, 2019 deadline. Eichenbaum made this offer to keep Globant from walking off the Project.  Ramsey agreed to consider Eichenbaum's offer.

108.  Globant subsequently responded by intensifying its extortion scheme and by continuing to fraudulently conceal the true facts.  Two weeks later, in a February 20, 2019 email, Ramsey sent Eichenbaum two draft SOWs that would have required CCG to pay Globant an additional $970,000 in fees for work that was already covered by SOW #3.  To add insult to injury, one of the proposed SOWs sought to reduce the scope of work set forth in SOW #3 -- that is, delivery of a fully functional ERP system -- and remove any deadline for the completion of the Project.

109.  Approximately one week later, in a February 28, 2019 email, Eichenbaum reiterated his offer to make a single additional payment upon Globant's successful completion of the Project and delivery of the new ERP system "by the end of the year." Eichenbaum also clarified that CCG's offer to pay Globant $750,000 to complete the Project would be reduced by the $125,000 outstanding credit that Globant owed to CCG under Section 12.4 of the MSDA and the $26,274 overcharge in Globant's October 2018 invoice that CCG had previously paid.  Eichenbaum further rejected both of the proposed SOWs, and reminded Globant that the parties' rights and obligations under the MSDA and SOWs of course remained in full force and effect.

110.  Globant, however, scoffed at the binding contracts it had signed.  In subsequent calls and letters, Globant threatened that the "October date" was at risk unless the parties

came up quickly with a path forward.  In a March 20, 2019 call with Eichenbaum, Ramsey issued yet another threat that Globant would unilaterally put the Project on hold.

111.  By this point in time, CCG was exceedingly nervous that Globant would abandon the Project.  From CCG's perspective, a replacement vendor would not only be cost-prohibitive but high risk, given that the legacy PointSource consultants had designed the system, making the necessary knowledge transfer to a new vendor untenable.  Therefore, on April 4, 2019, CCG convened a conference call with Globant to try to resolve the stalemate and get the Project back on track.

112.  On that call, Globant again reiterated that it needed to generate PDDs before it could continue with further work under SOW #3.  And, once again adding insult to injury, Ramsey advised that Globant would not prepare the PDDs unless CCG paid it another $250,000 in fees.  That was tantamount to yet another Globant threat to quit the Project, given that Ramsey emphasized that only upon completion of the PDDs would Globant be in a position to even estimate the cost and effort required for Globant to complete the Project. Globant ended the call with a final ultimatum: CCG would either pay $250,000 for the PDDs, or Globant would stop working.

113.  In an April 8, 2019 letter, CCG responded to Globant's threat and extortion scheme by putting Globant on notice that it was in material breach of SOW #3, the governing MSDA, and related Project agreements.

114.  Globant's response was to further raise the extortion ante.  In a June 17, 2019 call to Eichenbaum, Scannapieco -- Globant S.A.'s highest-ranking executive on the Project -- delivered the following threat:  If CCG wanted Globant to implement a new ERP system,

CCG would have to pay Globant *$5 million* in additional fees.  Scannapieco further declared that the October 2019 deadline was off the table and that it would take Globant *another 22 months* to complete the Project.

115.   Admitting that Globant's scheme was approved at the highest levels of management, Scannapieco also announced that his boss, Martín Migoya, the Co-Founder and Chief Executive Officer of Globant S.A. and Chairman of its Board of Directors, was not only fully aware of the CCG engagement but had approved the ultimatum that Scannapieco delivered.

116.   In this call, Globant had finally disclosed the truth: that the Project had to be started from scratch, and would take almost another *two years* and *another $5 million*.  This admission obviously demonstrated that Globant's repeated commitment to the fixed-fee nature of the contract, and its repeated assurances about meeting the October 31, 2019 go-live, were pure lies.

117.   The truth was that in its work on the Project, PointSource -- and, thereafter, its successor-in-interest, Globant -- materially breached the Project contracts and the MSDA's express warranty by, among other things:

- failing to implement and deliver a new ERP system to support CCG's business processes and meet CCG's functional requirements;

- failing to adhere to the Project implementation schedule and the "strictly required" obligation to meet the go-live deadline, as reflected by, among things, the MSDA's "time is of the essence" clause;

- failing to adhere to the fixed-fee budget to complete the Project;

- failing to exercise due professional care in the performance of its Services;

- failing to "maintain the same Developer Project Manager throughout the term of such [applicable] Statement of Work;"

- failing to maintain a Developer Project Manager with the "necessary skill, experience, and qualifications, to perform in such capacity;"

- failing to "use its best efforts to meet the Milestone Dates specified in the Statement of Work without any extension or Fee increase;"

- failing to "deliver each Deliverable and install all Software on or prior to the Milestone Date therefor in accordance with the delivery criteria set forth in the Statement of Work therefor;"

- failing to perform Acceptance Testing "to ensure the Software Deliverable, including all Software and Documentation, conforms to the requirements of th[e] Agreement, including the applicable Specifications;"

- failing to perform Integration Testing;

- failing to provide the contractually required "credit toward Customer's Fees in the amount of $125,000;"

- failing to "promptly deliver to [CCG] all Work Product generated by [Globant] under such Statement of Work (whether complete or incomplete);"

- failing to "provide such cooperation and assistance as requested by [CCG], at [Globant's] sole expense, in transitioning the related Services to an alternate service provider;"

- failing to refund to CCG "all amounts, if any, paid in advance for any Services or Work Product that have not been provided;"

- failing to remedy breaches on a "timely basis;"

- failing to adequately plan, manage, and supervise the performance of its Services;

- failing to appropriately identify, manage, mitigate, and escalate risks encountered in connection with its Services on the Project;

- failing to develop and prepare an adequate Project plan and appropriate business process design documentation, including functional and technical specifications during the critical design phase of the Project;

- failing to assign a competent solution architect to the Project;

- failing to assign appropriately skilled, experienced, knowledgeable, and competent personnel to the Project team;

- failing to provide the necessary on-site support, and instead relying in large part on a team of unknown consultants working remotely from Belarus who were unfamiliar with the Project;

- failing to apply or adhere to a standard implementation methodology and adequate and appropriate project management practices and protocols; and

- failing to perform the Services in accordance with "best industry standards and practices for similar services[.]"

118.   Globant also engaged in a deliberate and calculated scheme to conceal these and other egregious performance failures from CCG.  Globant knowingly and/or recklessly made false representations about, among other things, the Project's timeframe and costs, and failed to disclose that the proposed design of the ERP system would not be able to meet CCG's business requirements or appropriately scale to accommodate CCG's expanding business operations.

119.   As set forth below, Globant concealed critical problems with the Project, including PointSource's defective design, and continued to accept and demand fees for working on an ERP system it knew full well was not viable.

120.   Throughout the Project, PointSource, and thereafter Globant, failed to apply and adhere to a standard implementation methodology and adequate and appropriate project management practices and protocols.  The result was deficient work product, missed deadlines and repeated delays, and excessive implementation costs, all of which inflicted severe damage on CCG.

### (i)      The Proposed ERP Design
### Was Ill-Conceived, Not Validated, and Undocumented

121.   A critical part of any ERP implementation is the design, during which functional consultants identify the company's existing business processes and then formulate a design for the future business processes in the context of a new ERP software solution.  On an ERP project being run pursuant to the Agile implementation methodology, the team must prepare business requirement documentation, referred to as "Epics."  The Epics are then used to create additional design documentation, referred to as "User Stories" that are supposed to capture and define the users' goals for the required business processes.  The User Stories comprise the functional requirements of the new ERP system.  After the User Stories are defined, "Acceptance/Test criteria" is documented to ensure that the software is programmed accurately and in conformity with the User Stories.

122.   Another crucial focus of the design phase is to identify, map, and prepare specifications for the required interfaces between software applications that comprise the new ERP system.  Design documents for interfaces are relied upon by the programmers on the technical team to write software code to build the interfaces.  This documentation is critical to the successful implementation of any ERP system where information needs to pass data to and receive data from different software systems.

123.   Incomplete and improper identification, definition, and mapping of business processes and interfaces results in an ERP system that is improperly coded and configured, and that will therefore be unable to perform necessary business functions.

124.   PointSource was responsible for the design of the ERP system.  Yet the design documents that PointSource prepared were deficient and incomplete, and specifications for critical system components were missing entirely.

125.   In addition, the ERP system design that PointSource proposed to CCG -- a partially customized solution that would integrate with, among other components, third-party software applications licensed from SalesForce.com, Inc. and FinancialForce.com -- was unable to function as intended because the integrations between the various software systems were not properly mapped or coded.

126.   As a result of these and other performance failures, the new ERP system could not properly access and transfer data to, from, and among the various software applications. As one example, the grading screen discussed above -- which was the only software deliverable that PointSource even provided -- had to be removed from production because it could not communicate properly with, and access data from, CCG's legacy system.

127.   To date, notwithstanding that CCG has spent hundreds of thousands of dollars in license fees to Salesforce.com, Inc. and FinancialForce.com, neither PointSource nor Globant has been able to formulate and execute on an appropriate integration approach to allow CCG to use this third-party software as part of a new ERP system.

128.   In addition to PointSource's failure to properly document the system design, its design approach was severely flawed.  The appropriate approach on an ERP implementation is to design from the top down, using process flows to identify business processes and objects, as opposed to designing from the bottom up, at the database level of tables and

fields.  Objects refer to the various elements of a business process (*e.g.*, a purchase order, or invoice), whereas fields and tables are used to organize data elements within a database.

129.   The reason why an "object first design" is preferable is because it is more holistic, as it enables the consulting team to more fully consider and take into account the functions of the new ERP system and its integration points with other software components.

130.   PointSource's defective design created problems with the synchronization of the new ERP system with its related components, and is directly attributable to the PointSource consultants' lack of adequate and appropriate ERP implementation experience.

131.   While PointSource's incompetence caused the defective design in the first place, it was Globant's deliberate fraud that inflicted devastating damages on CCG.  Upon assuming PointSource's Project obligations, Globant conducted -- or should have conducted -- an assessment of the Project to determine Project risks, including the risks that might have jeopardized successful Project completion within the required timeframe and budget.  Even a cursory assessment by Globant would have indicated that the design was deficient, key documentation was incomplete or in some cases non-existent, and system architecture was flawed.

132.   Instead of disclosing these risks to CCG and proposing the necessary redesign along with a realistic and viable schedule and budget, Globant did the opposite.  Globant chose to conceal PointSource's performance failures and the problems on the Project, and represented to CCG that the Project could be completed by October 31, 2019 at a fixed cost of first almost $1.5 million, and then $1.8 million.  Those representations were false, and

Globant either knew they were false when it made them, or it made them with reckless disregard for whether they were true or false.

133.   Only after the last payment on the fixed-fee contract was due -- more than two years after the Project began -- did Globant finally reveal to CCG that the Project had to be re-scoped and redesigned through the PDD process, which would take another 22 months and another $5 million in additional fees.

### (ii)   The Consultant Team Was Unqualified and Incompetent

134.   Contrary to PointSource's representations touting its purported skills and experience, the consultants it assigned to the Project did not have the appropriate and necessary skills and experience to manage, design, configure, and build an ERP implementation of the size and complexity of the Project.

135.   PointSource also failed to assign a consultant to the role of solution architect on the Project.  It is standard practice on complicated ERP projects to assign a senior consultant to act as the solution architect to ensure that the new ERP solution will be able to seamlessly integrate with the other software and technology components on which an organization depends.  Without a solution architect, PointSource and Globant consultants made decisions about overall system architecture that rendered the ERP system unusable.

136.   Additionally, after Globant acquired PointSource, the composition of the consultant team changed.  Most of Globant's resources worked remotely off-shore, and their unfamiliarity with the Project and CCG's business, coupled with the difference in time zones, further undermined progress.

137.   Moreover, throughout its work on the implementation, Globant constantly shuffled its personnel onto and off of the Project.  As described above, the revolving door of Globant consultants further disrupted the Project, resulting in failures of knowledge transfer, delays to critical Project tasks, and inferior work product, as various tasks were not performed and monitored by the same person, and inconsistent methods and approaches were applied.

### (iii)   The Project Lacked Adequate and Appropriate Project Management

138.   PointSource first, and Globant thereafter, was responsible for providing project management, including providing advice on overall Project direction and strategy, ensuring the efficient management and delivery of the Project, adhering to an implementation methodology, timeline, and budget, and identifying, managing, mitigating, and escalating Project risk.

139.   Further, under Section 6.2 of the MSDA, PointSource and Globant were required to provide a Project Manager who would "be responsible for overall management and supervision of Developer's performance[,]" "be Customer's primary point of contact for communications[,]" and have the "requisite authority, and necessary skill, experience, and qualifications, to perform in such capacity[.]"  Recognizing that continuity was critical to successful project management, the MSDA also required that the "Developer shall maintain the same Developer Project Manager throughout the term of [the applicable] Statement of Work."

140.   PointSource and Globant did not comply with these contractual obligations.  In fact, PointSource and Globant cycled through *five Project Managers* in three years,

notwithstanding their contractual obligation to maintain the same Project Manager throughout the term.  Such frequent turnover in such a critical project role is inappropriate in an ERP implementation.

141.   Nor did PointSource or Globant meet their obligations to appropriately identify, manage, mitigate, and escalate project risk.  These deficiencies described above were, or should have been, evident to Globant during its tenure on the Project.  At various times during the Project, Globant knew or should have known about critical risks that threatened to undermine the Project and that required the provision of skilled resources to validate that the proposed ERP solution, and its related components, were in fact appropriate for CCG's business and would enable CCG to achieve its objectives.  Fundamental standards and practices in the ERP implementation industry impose on a vendor, such as Globant, the duty to disclose such risks to the client.  But Globant failed to do so.

142.   For example, Globant (i) knew about, or should have known about, the following risks; (ii) should have, but did not, alert CCG management to such risks; and (iii) should have, but did not, take steps to manage and mitigate such risks:

   a.   Globant failed to adequately and appropriately disclose to CCG, during the negotiations for SOW #3 or at any time during the Project, that the proposed ERP solution had not been properly validated, and was in fact an inappropriate and flawed solution that would never be able to operate CCG's current business, much less scale to meet the expanded business that CCG had hoped to achieve through its ERP implementation initiative;

b.   Globant failed to adequately and appropriately disclose to CCG, during the negotiations for SOW #3 or at any time during the Project, that Globant did not have the ability or intention to provide CCG with consultants, and with a sufficient number of consultants, with the necessary skills, experience, and expertise in the design, development, configuration, testing, and project management areas, among others, necessary to perform the ERP implementation for CCG;

c.   Globant failed to adequately and appropriately disclose to CCG that the consultants assigned to the Project deviated from, and failed to adhere to, an adequate and appropriate implementation methodology, adequate and appropriate project management practices, and ERP implementation best practices; and

d.   Globant failed to adequately and appropriately disclose to CCG that it had not performed the necessary quality assurance of the ERP system it was designing and implementing.

143.  Notwithstanding Globant's duty and obligation to disclose risks on the Project, its consultants not only remained silent in the face of severe risks, but deliberately concealed critical Project risks and their significance, and made affirmative misrepresentations that there were no such risks, and to gloss over such risks.

144.  Globant withheld such information from CCG, and made misrepresentations to CCG, to further its own interests in continuing to collect fees under the fixed-price contract to which it was not entitled (because its work on the Project was of no value), and to extract

additional fees above and beyond those permitted under the fixed-price contract (to which it was also not entitled), all at great expense and damage to CCG.

145.   As a direct result of Globant's fraudulent scheme, CCG has now paid Globant and its predecessor-in-interest, PointSource, close to $5 million for a project that was initially estimated to cost $1.8 million -- a 450% price increase -- that has yielded no value and that is many years behind the originally scheduled go-live.  After three years, millions of dollars in costs, and an extraordinary diversion of resources and focus, CCG must still rely on its outmoded legacy system, and has been told by Globant that it must pay $5 million more, and wait almost two more years, for a project that must be started from scratch.

146.  In addition to the nearly $5 million in fees it has wasted, CCG has, as of the date of this filing, incurred, and will continue to incur, out-of-pocket damages totaling over $2 million, including payments made to third-party vendors and other external consultants.

147.  CCG has suffered tens of millions of dollars in damages related to business opportunities that it lost or that were foreclosed as a result of Globant's misconduct, as well as other indirect damages.

**D.**   **Globant's Refusal to Transition Customer-Owned Work Product**

148.  As part of its fraudulent extortion scheme, Globant is also wrongfully withholding from CCG work product that belongs to CCG.  Globant is holding such work product hostage in an unlawful attempt to pry still more fees out of CCG.

149.   On or about January 15, 2018, CCG entered into an agreement with Globant to provide, among other services, maintenance and support for the CGC Online Form and the NGC Imaging App that PointSource had previously developed for CCG.  The agreement,

referred to as the CCG T&M Statement of Work #2 (the "CCG T&M SOW") and governed by the terms of the MSDA, provided for a one-year term from January 15, 2018 through December 31, 2018, and allowed for "a maximum extension of one (1) calendar month" to be "mutually arranged via email."  A copy of the CCG T&M SOW is attached hereto as Exhibit C.

150.  The CCG T&M SOW further estimated monthly fees of $26,920.

151.  In or about May 2019, following the expiration of the contract term, CCG requested that Globant transition the CGC Online Form and the NGC Imaging App to a replacement vendor, The Mx Group.  In accordance with Section 16.3(b)(i) of the MSDA, Globant was required to "promptly deliver all Work Product generated by Developer" upon termination of the CCG T&M SOW.

152.  Instead of complying with CCG's request, and in flagrant breach of its contractual obligations, Globant has refused to relinquish the CGC Online Form, the NGC Imaging App, and other related work product to CCG's replacement vendor unless CCG remits an additional $15,972 in unauthorized "transition" fees and an additional $140,260.64 in unbilled and disputed charges for work that Globant purports to have performed, but never invoiced.  Globant also demanded that CCG pay an outstanding balance of $79,532.25, which was subject to set-off under the contract, before it would release the CGC Online Form and the NGC Imaging App.

153.  Globant's demand for additional "transition" fees, which it has since agreed to "waive" if CCG delivers payment of $219,532.25, is a violation of Section 13.2 of the MSDA, which provided that CCG "may withhold from payment any amount disputed by

[CCG] in good faith, pending resolution of the dispute" and that Globant "shall continue performing its obligations in accordance with [the MSDA] notwithstanding any such dispute or actual or alleged nonpayment that is the subject of the dispute, pending its resolution."

154.  Further, Globant has refused to apply the $125,000 credit -- an amount it does not dispute it owes to CCG under Section 12.4 of the MSDA -- as a set off (under Section 13.4 of the MSDA) against any amounts allegedly owed to Globant under the CCG T&M SOW.

155.  Despite CCG's attempt to resolve this dispute, Globant has refused to honor its clear contractual obligations and instead has dragged its feet and thwarted CCG's efforts to transition the CGC Online Form and the NGC Imaging App to an alternate vendor.

## COUNT I
### (Fraudulent Inducement Of Contract As Against Globant, LLC)

156.   As set forth above, CCG acknowledged its consent to the assignment of the MSDA and related agreements, and signed SOW #3 and subsequent amendments and change orders with Globant, LLC, in reliance on Globant's numerous misrepresentations and omissions of material facts, concerning, among other things, the suitability of the proposed ERP system to meet CCG's business requirements and operational needs; the critical shortcomings of PointSource's defective design, build, configuration, and testing of the proposed ERP system; PointSource and Globant's failures to apply and adhere to an adequate and appropriate implementation methodology and adequate and appropriate project management practices and protocols; PointSource and Globant's failure to apply and adhere to adequate and appropriate quality control and risk identification and mitigation strategies; the nature, scope, and severity of Project risks and Globant's ability and intention to address

and remediate those risks; the feasibility of the Project timeline and the fixed-fee to complete the Project; and the competency, ability, skills, experience, intention, and availability of Globant's consultants to deliver a fully functional ERP system.

157.   Such misrepresentations were false, and Globant knew, or was reckless in failing to know, that such statements were false at the time they were made.  Globant also provided incomplete and misleading assurances and concealed material facts during the discussions and negotiations leading up to the assignment of the MSDA and related agreements and execution of SOW #3 and subsequent amendments and change orders, with no intention of acting or delivering upon those assurances.

158.   By making such false, deceitful, and misleading representations, and by omitting and concealing material facts from CCG, Globant intended to deceive CCG, and such misrepresentations and omissions by Globant were made wrongfully in order to induce CCG to enter into the assignment, SOW #3, and subsequent amendments and change orders.

159.   Globant intended that CCG rely on its misrepresentations and CCG did reasonably and justifiably rely on Globant's misrepresentations and omissions when it signed the assignment, SOW #3, and the subsequent amendments and change orders with Globant. CCG's ability to make informed decisions as to these agreements was severely undermined by Globant's fraudulent conduct.  Had CCG known the truth, it would never have signed those agreements.  Instead, it would have halted the Project, not paid any fees to Globant, and would have demanded a refund of the fees it paid to PointSource.  As a direct and proximate result of Globant's fraudulent inducement of contract, CCG sustained tens of millions of dollars in damages, in an amount to be determined at trial.

160.  Additionally, because Globant's omissions and misrepresentations were intentional, malicious, oppressive, reckless, or fraudulent, they give rise to liability for exemplary and punitive damages, which CCG seeks and is entitled to recover, according to proof at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II
### (Fraud As Against Globant, LLC, Globant S.A., And The John Doe Defendants)

161.  As described above, Globant represented to CCG that Globant had the ability and intention to provide technology consultants and managers with the necessary knowledge, skills, and experience to complete the design and delivery of a new ERP system for a fixed cost by the October 31, 2019 deadline.  Globant also represented that it was assuming all of the obligations of its predecessor-in-interest, PointSource, including the delivery of a new ERP system with all of the functionality of CCG's legacy system, plus new features, scalability, and flexibility for continuous upgrades.

162.  Globant's representations, which concerned material facts, were untrue.  At the time Globant made the representations, it either knew they were untrue, should have known they were untrue, or had no reason to believe they were true and made them with reckless disregard for their truth or falsity.  To the extent that Globant did not know these representations were untrue when it made them, Globant eventually came to learn that they were untrue, yet Globant concealed that truth from CCG, and instead tacitly and affirmatively assured CCG that CCG should believe and rely upon Globant's prior misrepresentations.

163.  After CCG signed SOW #3 with Globant to complete the Project, Globant continued its fraud by misrepresenting and failing to disclose the quality of its work and the true status of the Project, and by concealing from CCG the flaws and deficiencies in PointSource's project management, design, and development work, and the critical shortcomings of Globant's Project team and its failure to manage the Project.  As part of its fraud during this period, Globant misrepresented and concealed the extent and nature of critical Project risks, and engaged in other deceptive and misleading conduct, all in an effort to maximize its collection of fees from CCG.

164.  Globant made these misrepresentations and omissions with reckless disregard or with the knowledge that they were false when made, and with the intent to induce CCG to continue to pay money to Globant and to not terminate the MSDA, and/or any of the SOWs or other related agreements thereunder (collectively, the "Project contracts").  CCG reasonably relied on these misrepresentations and omissions when it contracted with Globant, and when it continued to employ, rely on, and make payments to Globant and did not terminate the Project contracts.

165.  Had Globant not engaged in these actions, CCG would never have contracted with Globant.  Instead, it would have halted the Project, not paid any fees to Globant, and demanded a refund of the fees paid to PointSource.

166.  As a direct and proximate result of Globant's material misrepresentations and omissions, CCG sustained tens of millions of dollars of damages, in an amount to be determined at trial.

167.   Additionally, because Globant's omissions and misrepresentations were intentional, malicious, oppressive, reckless, or fraudulent, they give rise to liability for exemplary and punitive damages, which CCG seeks and is entitled to recover, according to proof at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT III
### (Fraudulent Concealment As Against Globant, LLC, Globant S.A., And The John Doe Defendants)

168.   As described above, Globant continued to conceal, and failed to disclose, material facts concerning the Project after SOW #3 was signed.  Among other fraudulent omissions, Globant intentionally concealed and/or failed to disclose that: (1) the proposed design for the new ERP system was not suitable or feasible for CCG's business operations; (2) the new ERP system would not meet CCG's business requirements; (3) the new ERP system would not provide all of the functionality of CCG's legacy system; (4) the new ERP system would be unable to scale to accommodate CCG's expanding business operations; (5) the new ERP system would not provide flexibility for easy configuration and continuous upgrades; (6) the new ERP system could not be completed by October 31, 2019; (7) the new ERP system could not be completed for the fixed-fee; (8) neither PointSource nor Globant had performed any quality assurance to validate the system; (9) there were no useable design documents and the Project documentation was incomplete and deficient; (10) neither PointSource nor Globant had applied or adhered to industry ERP implementation best practices on the Project and had failed to apply or adhere to an adequate and appropriate

implementation methodology or adequate and appropriate project management practices and protocols; and (11) Globant would have to design an ERP system from scratch.

169.  Globant omitted and concealed these material facts, even though it had a duty to disclose them and knew, or should have known, that they should have been disclosed, when it agreed to assume the Project contracts upon acquiring PointSource and purported to conduct a review of the Project and made certain representations concerning the Project.

170.  Globant knew that its concealment of and failure to disclose these material facts would induce CCG to continue to pay money to Globant and to not terminate the Project contracts.  CCG detrimentally relied on these omissions when, among other things, it made, and continued to make, payments to Globant and did not terminate the Project contracts.

171.  Had Globant not engaged in these actions, CCG would have terminated the Project contracts, halted the Project, not paid any fees to Globant, and would have demanded a refund of the fees paid to PointSource.

172.  As a direct and proximate result of Globant's material omissions, CCG sustained tens of millions of dollars of damages, in an amount to be determined at trial.

173.  Additionally, because Globant's omissions were intentional, malicious, oppressive, reckless, or fraudulent, they give rise to liability for exemplary and punitive damages, which CCG seeks and is entitled to recover, according to proof at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT IV
### (Negligent Misrepresentation As Against Globant, LLC, Globant S.A., And The John Doe Defendants)

174.   Globant owed CCG a duty of care to provide CCG with accurate, truthful, and complete information regarding, among other things, the suitability of the new ERP system; the feasibility of the Project timeline and the fixed-fee to complete the Project; and the competency, ability, skills, experience, intention, and availability of Globant's consultants to perform the Project contracts and deliver a fully functional ERP system.

175.   Globant breached this duty by making representations to CCG that were materially false, incomplete, or misleading at the time they were made, by failing to exercise reasonable care and competence in obtaining and communicating information to CCG, and by failing to ensure that the information it provided to CCG was complete and accurate.

176.   Globant was fully aware that CCG was depending on and relying upon Globant to furnish the superior knowledge, skills, expertise, and experience necessary for a successful ERP implementation.

177.   Globant made these misrepresentations with the intent that CCG rely on them. Globant made these misrepresentations to induce CCG to enter into SOW #3 and subsequent agreements with Globant and, thereafter, to not terminate those agreements and the MSDA, and to continue to pay money to Globant.

178.   Globant made these representations without reasonable grounds for believing they were true and in a manner not warranted by the information in Globant's possession, or information that it should have known.

179.   CCG justifiably relied upon Globant's misrepresentations concerning, among other things, the true status of the Project; the severity of problems and risks that threatened the Project; and the competency, ability, skills, experience, intention, and availability of Globant's consultants to perform the Project contracts and to deliver the ERP system by the October 31, 2019 deadline for the agreed-upon fixed-fee.

180.   As a direct and proximate result of CCG's justifiable reliance on Globant's negligent misrepresentations, CCG sustained tens of millions of dollars of damage in an amount to be determined at trial.  In addition, because Globant's acts of negligent misrepresentation were committed with conscious indifference to CCG's rights, and with a specific intent to cause harm to CCG, CCG is entitled to recover punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT V
### (Breach of Contract and Breach of Express Warranty
### As Against Globant, LLC)

181.   CCG and Globant, LLC entered into and are parties to SOW #3 and all related agreements and Globant, LLC, as successor-in-interest to PointSource, legally assumed all of the obligations of PointSource as contained in the Project contracts that preceded Globant S.A.'s acquisition of PointSource.

182.   CCG has performed, has substantially performed, or was excused from performing due to Globant, LLC's material contract breaches and/or the material breaches of its predecessor-in-interest, PointSource, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the Project contracts.  CCG

is, and has been, entitled to Globant, LLC's performance of its obligations under the Project contracts.

183.   Globant, LLC unilaterally and materially breached numerous provisions of the Project contracts and Globant, LLC is also unilaterally liable for the material breaches of the Project contracts by its predecessor-in-interest, PointSource.

184.   Globant LLC's material breaches of contract, both in connection with the contracts it entered into with CCG as well as the Project contracts entered into by its acquired company, PointSource, for which Globant, LLC bears successor-in-interest liability, include but are not limited to its failure to:  (i) implement and deliver a new ERP system that met CCG's needs in connection with its business processes and functional requirements in violation of Section 4 of the MSDA and Section I.2 of SOW #3; (ii) adhere to the implementation schedule in SOW #3 and the "strictly required" time of the essence clause in Section 2.3 of the MSDA; (iii) adhere to the fixed-fee budget as provided by SOW #3 and in violation of Section 12.2 of the MSDA; (iv) exercise due professional care in the performance of its Services in violation of Section 6 of the MSDA; (v) "maintain the same Developer Project Manager throughout the term of such [applicable] Statement of Work" in violation of Section 6.2(c) of the MSDA;" (vi) provide a Developer Project Manager with the "necessary skill, experience, and qualifications to perform in such capacity;" (vii) "use its best efforts to meet the Milestone Dates specified in the Statement of Work without any extension or Fee increase" in violation of Section 7.3 of the MSDA; (viii) "deliver each Deliverable and install all Software on or prior to the Milestone Date therefor in accordance with the delivery criteria set forth in in [sic] the Statement of Work therefor" in violation of

Section 9 of the MSDA; (ix) perform Acceptance Testing "to ensure the Software

Deliverable, including all Software and Documentation, conforms to the requirements of this

Agreement, including the applicable Specifications" in violation of Section 10.1(a) of the

MSDA; (x) perform Integration Testing as required by Section 10.1(c) of the MSDA; (xi)

"provide a credit towards Customer's Fees in the amount of $125,000" in violation of

Section 12.4(a) of the MSDA; (xii) "promptly deliver to [CCG] all Work Product generated

by [Globant, LLC] under such Statement of Work (whether complete or incomplete)" in

violation of Section 16.3(b)(i)(A) of the MSDA; (xiii) "provide such cooperation and

assistance as requested by [CCG], at [Globant, LLC's] sole expense, in transitioning the

related Services to an alternate service provider" as required by Section 16.3(b)(i)(B) of the

MSDA; (xiv) refund to CCG "all amounts, if any, paid in advance for any related Services or

Work Product that have not been provided" in violation of Section 16.3(b)(i)(C) of the

MSDA, including the $26,274 overcharge in Globant, LLC's October 2018 invoice; (xv) to

remedy breaches on a timely basis as set forth in Section 17.3(b) of the MSDA; (xvi)

adequately plan and supervise the performance of its Services; (xvii) appropriately identify,

manage, and mitigate risks encountered in connection with its, or its predecessor's Services

on the Project; (xviii) engage a competent Solution Architect; (xix) develop and provide an

adequate Project plan and appropriate business process design documentation, including

functional and technical specifications during the design phase of the Project; and (xx) assign

to the Project personnel with the adequate, appropriate, and necessary skills, experience,

expertise, competence, and qualifications.

185.   Globant, LLC's breaches were material to the Project contracts and not incidental in nature.

186.   Globant, LLC additionally and expressly warranted in Section 17.2(a) of the MSDA that it would "perform all Services in a professional and workmanlike manner in accordance with best industry standards and practices for similar services, using personnel with the requisite skill, experience, and qualifications, and shall devote adequate resources to meet its obligations under th[e] Agreement."

187.   Globant, LLC materially breached its express warranties to CCG by, among other things, (i) failing to assign a competent solution architect to the Project; (ii) failing to assign to the Project team personnel with the skills and experience necessary to deliver the Project; (iii) failing to provide on-site support; (iv) relying in large part on a team of unknown consultants working remotely from Belarus who were unfamiliar with the Project; (v) failing to engage in proper Project staffing by, among things, rolling its personnel onto and off of the Project; (vi) failing to apply or adhere to an adequate and appropriate implementation methodology, adequate and appropriate program management practices and protocols, and ERP implementation best practices; (vii) failing to adequately and appropriately identify, manage, mitigate, and escalate project risk; (viii) failing to prepare the adequate and appropriate project documentation; (ix) failing to deliver all but a small portion of the new ERP system; (x) failing to comply with the fixed-fee contract; and (xi) failing to meet Project deadlines.

188.   As a direct result of Globant, LLC's material breaches of contract and express warranties, CCG sustained in excess of $10 million dollars in contract damages and tens of

millions more in consequential and other recoverable damages, and continues to be damaged, in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT VI
**(Violation Of Florida's Deceptive And Unfair Trade Practices Act**
**Fla. Stat. § 501.201 *et seq*. As Against Globant, LLC, Globant S.A.,**
**And The John Doe Defendants)**

189.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat**.** § 501.201 *et seq.* ("FDUTPA"), is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

190.    Globant violated FDUTPA by engaging in unconscionable, deceptive, or unfair acts or practices in the conduct of its business in Florida by making false representations and engaging in omissions concerning material facts to CCG upon its assumption of the Project contracts, during the negotiations for SOW #3 and subsequent amendments and change orders, and after the fixed-fee contract was signed.

191.    As detailed above, Globant fraudulently induced CCG to consent to the assignment of the Project contracts and to enter into SOW #3 and subsequent amendments and change orders.  Globant further engaged in a cover-up scheme to conceal the true state of the Project and withhold critical information concerning risks that threatened the Project to further its own interests in continuing to collect and attempting to extract additional fees from CCG, at great expense and damage to CCG.

192.    Globant's deceptive and unfair trade practices include, but are not limited to, its (1) deliberate scheme to extort millions in fees from CCG; (2) continued acceptance of

monies for services that it failed to provide and/or knew were deficient and incomplete; (3) pocketing and refusing to return monies that were overcharged as a result of billing errors of which it was aware; and (4) refusing to issue a $125,000 credit owed to CCG under the express terms of the MSDA.

193.   Globant's unscrupulous, unethical, and misleading conduct constitutes deceptive and unfair trade practices pursuant to FDUTPA as they are, among other things, likely to deceive a consumer acting reasonably in the same circumstances.

194.   As a direct result of Globant's deceptive and unfair trade practices, CCG sustained actual damages in an amount to be determined at trial.  Those damages include CCG's payment of fees to Globant, and other vendors, for an ERP system that Globant failed to deliver and thus was rendered valueless, the costs of assessing the defects of and any salvage value in the development work performed by Globant, the costs of implementing a new ERP system, and CCG's internal costs and lost profits.  CCG is also entitled to recover its attorneys' fees and costs pursuant to Fla. Stat. § 501.2105.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### COUNT VII
**(Professional Negligence As Against Globant, LLC, Globant S.A.,
And The John Doe Defendants)**

195.   Within the ERP implementation industry, there are accepted standards for skill, prudence, and diligence that govern and apply to the work and conduct of ERP implementation professionals such as Globant's representatives who were assigned to the Project.  In its work and conduct on the Project, Globant failed to adhere to, work pursuant to, employ, and utilize this standard skill, prudence, and diligence in designing, configuring,

coding, testing, building, and implementing the ERP system; in managing the Project; and in identifying, managing, and mitigating risk on the Project.

196.   Globant knew that the services it was providing and the software solution it was designing and implementing was for CCG, and that CCG would suffer harm if those services and the software solution were provided negligently.  It was reasonably foreseeable that CCG's losses would include payments for the ERP related work, delays in CCG's business expansion and growth, impairments to CCG's operational efficiency, and the continued costs of maintaining CCG's legacy system.

197.   Globant also knew or should have known that refusing to turn over customer work product is contrary to professional standards applicable to the industry.  Globant nonetheless has refused to transition the CGC Online Form and NGC Imaging App to an alternate service provider and CCG does not have access to its Customer-Owned Work Product, as that term is defined in the MSDA.

198.   Globant's breaches of the professional standards and duties applicable to the industry resulted in damages to CCG, including millions of dollars that CCG wasted by paying Globant fees and expenses for a software solution that was unusable, defectively designed, defectively configured, defectively coded, defectively integrated, and deficiently tested, on a project that was deficiently managed.  CCG further suffered additional losses by paying fees and expenses to third-party vendors, lost profits stemming from delays and difficulties in its business growth caused by the failure of the Project, impaired operational efficiency, incurring costs by having to divert its employees and resources onto the Project,

and the continued costs of maintaining CCG's legacy system.  CCG also suffered losses due to the delayed transition of the CGC Online Form and NGC Imaging App.

199.   CCG seeks compensatory damages for the losses it suffered as a result of the defendants' professional negligence, in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## <u>COUNT VIII</u>
### (Declaratory Judgment - 28 U.S.C. § 2201 As Against Globant, LLC)

200.   As alleged above, beginning in or about May 2019, CCG has repeatedly requested that Globant transition the CGC Online Form and the NGC Imaging App to a replacement vendor, The Mx Group, pursuant to Section 16.3(b)(i)(B) of the MSDA.

201.   The CGC Online Form and the NGC Imaging App comprise critical parts of CGC's and NGC's business operations and constitute Customer Materials and Work Product as those terms are defined in Section 1 of the MSDA.

202.   Under Section 16.3(b)(i)(B) of the MSDA, Globant, LLC is required to "provide such cooperation and assistance as requested by [CCG], at [Globant, LLC's] sole expense, in transitioning the related Services to an alternate service provider[.]"

203.   Globant has wrongly refused to transition the CGC Online Form and the NGC Imaging App unless CCG remits additional unbilled, unearned, and disputed fees in contravention of Sections 13.2(b) and 13.4 of the MSDA.

204.   As alleged above, Globant has further refused to provide CCG with a credit towards its fees in the amount of $125,000 as expressly required by Section 12.4(a) of the MSDA.

205.   Globant does not dispute that the $125,000 credit is owed to CCG, but has refused to comply with its contractual obligation to issue the credit.

206.   Further, Globant refuses to acknowledge CCG's right of set-off as provided in Section 13.4 of the MSDA.

207.   As alleged above, Globant issued an erroneous bill to CCG in October 2018 overcharging CCG $26,274.

208.   Globant has not disputed the overpayment, but has refused to return the excess payment in contravention of Section 16.3.

209.   Further, in demanding additional fees from CCG purportedly relating to SOW #3, Globant has failed to acknowledge CCG's right, under Section 13.1(a) of the MSDA, to hold back 10 percent of all fees invoiced by Globant until such time as CCG is "no longer reliant" on its legacy system (the "Holdback Date").  As a result, there exists an actual and continuing controversy between CCG on the one hand, and Globant on the other.  The controversy is real and immediate and the parties have adverse legal interests.  Although the terms of the MSDA are clear and unambiguous, Globant's conduct has placed CCG in doubt as to its rights under the MSDA.

210.   As a result of Globant's conduct, CCG is suffering an actual and threatened injury that requires a declaration of the rights of the parties with respect to the transition of the Customer Materials and Work Product, the issuance of the $125,000 credit, the return of the $26,274 payment, and CCG's right to hold back 10 percent of all fees paid to Globant.

WHEREFORE, CCG respectfully requests a declaratory judgment declaring that: (1) CCG is entitled to the immediate transition of the CGC Online Form and the NGC Imaging

App to an alternate service provider of its choosing without further expense to CCG in accordance with the terms of Section 16.3 of the MSDA; (2) CCG is entitled to the immediate refund of  $125,000 from Globant in accordance with the terms of Section 12.4(a) of the MSDA; (3) CCG is entitled to the immediate return of $26,274 reflecting an erroneous billing overcharge in Globant's October 2018 invoice that CCG paid; and (4) CCG is entitled to hold back 10 percent of all invoices issued prior to the Holdback Date as that term is defined in Section 13.1(a) of the MSDA.

## COUNT IX
### (Unjust Enrichment As Against Globant, LLC, Globant S.A., And The John Doe Defendants)

211.   CCG conferred benefits to Globant in the form of millions of dollars in payments, which Globant had knowledge of and voluntarily accepted.  Globant also has improperly retained the benefit of a $125,000 credit owed to CCG.  The circumstances under which Globant has retained and accepted the benefit of millions of dollars in payments and credits due to CCG are such that it would be inequitable for Globant to retain the benefit of those payments and credits without providing the services and ERP system promised to CCG.

212.   Globant will be unjustly enriched if not required to restore to CCG any money or property, real or personal, which Globant acquired by means of the improper conduct described herein.  This includes, at a minimum, all payments made by CCG to Globant and the unreimbursed credit.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**COUNT X**
**(Civil Conspiracy To Commit Fraud As Against Globant, LLC, Globant S.A.,**
**And The John Doe Defendants)**

213.   Globant, LLC, Globant S.A., and the John Doe Defendants conspired and agreed to fraudulently induce CCG to assign the Project to Globant and to string CCG along by making affirmative misrepresentations and concealing material facts concerning the state of the Project and Globant's intent and capability to complete the Project for the fixed price set forth in SOW #3 in order to generate more fees.  As part of and in furtherance of the conspiracy, Globant, LLC fraudulently induced CCG to assign the Project to Globant, and, when the Project experienced problems, officials from Globant S.A. and the John Doe Defendants made the misrepresentations and concealed the material facts discussed at the November 26, 2018 meeting and the follow-on meeting, as described above.  Globant S.A. was consulted on and approved of this fraudulent conduct.

214.   As part of and in furtherance of the conspiracy, Globant, LLC, Globant S.A., and the John Doe Defendants acted in concert to perpetrate a fraudulent scheme by engaging in the following misconduct:  (1) misrepresenting that they had the ability and intention to provide technology consultants and managers with the necessary knowledge, skills, and experience to complete the design and delivery of a new ERP system for a fixed cost by the October 31, 2019 deadline; (2) misrepresenting that they would deliver a new ERP system with all of the functionality of CCG's legacy system, plus new features, scalability, and flexibility for continuous upgrades; (3) misrepresenting the quality of their work and the true state of the Project; (4) concealing from CCG the flaws, defects and deficiencies in PointSource's project management, design, and development work, (5) concealing the

critical shortcomings of the PointSource Project team and its failure to appropriately manage the Project; and (6) concealing the extent and nature of critical Project risks, and (7) engaging in other deceptive and misleading conduct, all in an effort to maximize their collection of fees from CCG.

215.   As a direct and proximate result of the conspiracy, CCG has sustained tens of millions of dollars of damages, in an amount to be determined at trial.

216.   Additionally, because Globant, LLC, Globant S.A., and the John Doe Defendants' actions were intentional, malicious, oppressive, reckless, or fraudulent, they give rise to liability for exemplary and punitive damages, which CCG seeks and is entitled to recover, according to proof at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT XI
### (Aiding And Abetting Fraud As Against Globant S.A. And The John Doe Defendants)

217.   As described above in Counts I, II, and III, Globant, LLC made material misrepresentations to CCG that Globant, LLC had the ability and intention to provide the necessary and appropriate resources to complete the design and delivery of a new ERP system for a fixed cost by the October 31, 2019 deadline.  Globant, LLC continued its fraud after CCG signed SOW #3 by making material misrepresentations about the true state of the Project, concealing the extent and nature of critical Project risks, and engaging in other deceptive and misleading conduct to convince CCG that the Project was on track.

218.   Globant, LLC made these misrepresentations and omissions with reckless disregard or with the knowledge that they were false when made, and CCG reasonably relied on these misrepresentations when it contracted with Globant, LLC.

219. The John Doe Defendants and Globant S.A. had knowledge of the fraud and provided substantial assistance, direction, and advice to Globant, LLC to advance the commission of the fraud.  Scannapieco, Herrera, Dominguez, and Rodriguez – agents of Globant S.A and/or the John Doe Defendants – participated in the November 26, 2018 meeting and the follow-on meeting described above, during which they made material misrepresentations of fact concerning the Project and Globant's intent and capability to complete the Project for the fixed price in SOW #3, and concealed the true state of the Project to induce CCG to continue to pay money to Globant and not to terminate the Project contracts.  Globant S.A.'s CEO Migoya was consulted on and endorsed and approved the fraudulent scheme.

220. As a direct and proximate result of Globant S.A. and the John Doe Defendants' aiding and abetting Globant, LLC in its fraud, CCG has sustained tens of millions of dollars of damages, in an amount to be determined at trial.

221. Additionally, because the actions of Globant S.A. and the John Doe Defendants were intentional, malicious, oppressive, reckless, or fraudulent, they give rise to liability for exemplary and punitive damages, which CCG seeks and is entitled to recover, according to proof at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, CCG respectfully requests that this Court enter judgments against Globant and provide the following relief:

    a.  Actual, indirect, expectation, consequential, and compensatory damages in an amount to be determined at trial;

    b.  Rescission of the Project contracts;

    c.  Restitution of all amounts paid by CCG to Globant;

    d.  Punitive and/or exemplary damages;

    e.  Reasonable and necessary attorneys' fees;

    f.  Statutory money damages;

    g.  Declaratory judgment declaring that (1) CCG is entitled to the immediate transition of the CGC Online Form and the NGC Imaging App to an alternate service provider of its choosing without further expense to CCG in accordance with the terms of Section 16.3 of the MSDA; (2) CCG is entitled to the immediate refund of $125,000 from Globant in accordance with the terms of Section 12.4(a) of the MSDA; (3) CCG is entitled to the immediate return of $26,274 reflecting an erroneous billing overcharge in Globant's October 2018 invoice that CCG paid; and (4) CCG is entitled to hold back 10 percent of all invoices issued prior to the Holdback Date as that term is defined in Section 13.1(a) of the MSDA.

    h.  Pre- and Post-judgment interest at the maximum rate allowed by law;

    i.  All costs of suit; and

j.   All such further relief, both general and special, at law or in equity, to which

CCG may show itself justly to be entitled or as this Court may deem

appropriate.

Dated:  August 5, 2020

KASOWITZ BENSON TORRES LLP

By: /s/ *Mark P. Ressler*
Maria Ruiz (Florida Bar No. 182923)
Mark P. Ressler (Admitted *Pro Hac Vice* )

1441 Brickell Avenue
Suite 1420
Miami, Florida 33131
Telephone: (786) 587-1044
Email:  mruiz@kasowitz.com

-and-

1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Email:  mressler@kasowitz.com

*Attorneys for Plaintiffs Certified Collectibles Group, LLC,*
*Numismatic Guaranty Corporation of America, Certified*
*Guaranty Company LLC and Paper Money Guaranty, LLC*