UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CERTIFIED COLLECTIBLES
GROUP, LLC, et al.,

      Plaintiffs,

v.                                      CASE NO. 8:19-cv-1962-SDM-AEP

GLOBANT, LLC,
GLOBANT S.A., et al.,

      Defendants.

_____/

## ORDER

Anticipating a surge in business, Certified Collectibles Group and its affiliates (collectively Certified) contracted with a company acquired by Globant, LLC, to develop a new software system that could manage Certified's growing business. After collecting more than $10 million in fees, Globant allegedly "botched" the project during five years of work and lied about the project's progress. Certified sues Globant for breach of contract. Also, Certified sues both Globant and Globant S.A. (a parent company and affiliates) for fraud, for negligent misrepresentation, for professional negligence, for unjust enrichment, and for a violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA). Moving to dismiss for failure to state a claim, Globant and Globant S.A. argue that Certified's fraud claims are "re-styled" claims for breach of contract. (Docs. 73, 104)

## THE ALLEGATIONS

Certified specializes in collectable "grading," which entails establishing and certifying the authenticity, the quality, and the condition of a collectable, such as an antique coin or a vintage comic book.  Using a software system, "The Next Level" (the legacy system), Certified's employees grade collectables, share information, and organize projects.  Swelling to more than 265 employees and surpassing $80 million in annual revenue, Certified's success strained the legacy system's ability to manage business.  Fearing that the legacy system was ill-equipped to handle Certified's growth, Certified undertook to replace the legacy system with a software system designed "to handle Certified's expanded product offerings, higher transaction volumes, and the language and currency requirements stemming from Certified's overseas expansion."  (Doc. 67 at 10–11)

### A.  The Master Software Development Agreement

In February 2016, Certified retained PointSource, a software consulting firm, to "evaluate and analyze Certified's business processes" and design an "enterprise resource planning system" (the new system) that "accomplishes everything necessary to take Certified to the next level."  Certified wanted "all the functionality of [Certified's] legacy system, plus new features, scalability, and flexibility for continuous upgrades."  (Doc. 67 at 12, 14)  Certified alleges that PointSource understood the "objectives of Certified's software upgrade project."  Further, Certified alleges that PointSource repeatedly assured Certified that implementation

"would be easy" and that PointSource would encounter "no issues" designing the new system to meet Certified's needs.  (Doc. 67 at 12–13, 15)

Between February 2016 and July 2016, PointSource conducted "due diligence to evaluate and analyze Certified's business processes to enable [PointSource] to make informed decisions about how to design both the new [ ] system" and the computer program that would integrate the new system into Certified's existing computer network.  (Doc. 67 at 14–15)  Charging $500,000 for this due diligence, PointSource produced a Business Requirements Document, which summarizes "the business requirements that are needed from a [new] system to successfully replace [the legacy system]."  Although acknowledging that the business requirements "are not necessarily all solvable by solely [the new system]," the Busines Requirements Document states that PointSource will "ensure that the new system accomplishes everything necessary" to improve Certified's current system.  (Doc. 67-1 at 42)  The Business Requirements Document describes several features considered "in scope" and critical to PointSource's design plan.  (Doc. 67-1 at 43)  Also, the Business Requirements Document explicitly describes "out of scope" features "unrelated to the [legacy system's] transformation" and "not necessarily for PointSource [to address] as a whole."  (Doc. 67-1 at 44–45)

PointSource supplemented the Business Requirements Document with a proposal — a "Roadmap" — that describes PointSource's plan for implementing "in

- 3 -

scope" features and for completing the new system.  Defining the Roadmap as a

"living document," PointSource explains that:

> [The Roadmap] serves as the baseline for the overall scope,
> scheduling, estimates, and timelines for the Certified [ ]
> replacement project. As with any project of this magnitude with
> this many unknowns, the schedule and scope will need to be
> flexible in order to accommodate unforeseen challenges that
> always pop up when implementing long-term strategic technical
> investments.

(Doc. 67-1 at 89)  Although reiterating that the Roadmap's timeline "is a best-case

estimate," PointSource describes "milestones" that not only achieve "in scope"

business requirements but also "deliver fast value" and "minimize disruption to core

Certified business."  (Doc. 67 at 90–92)  Certified alleges that PointSource

fraudulently "represented that it could design and implement the new [ ] system

within two years, with a 'go-live' date of July 2017, for an estimated cost of $1.8

million."  (Doc. 67 at 3)

Relying on the Business Requirements Document and the Roadmap, Certified

and PointSource signed in October 2016 a Master Software Development Agreement

(the master agreement), which promises "to complete the services set forth in the

Business Requirements [Document] and the Roadmap" according to tasks, described

as "statements of work."  (Doc. 67-1 at 10)  Under the master agreement, Certified

must sign each statement of work, which accomplishes all or part of a "milestone"

that the Roadmap proposes.  Also, at least thirty days before the completion of each

statement of work, PointSource must "provide [Certified] with a proposal for the

next statement of work as needed for [PointSource] to complete the services set forth in the Business Requirements [Document] and the Roadmap."  (67-1 at 10)

According to these statements of work, PointSource undertakes:

> To design, develop, create, test, deliver, install, configure, integrate, customize, and otherwise provide and make fully operational software as described in the Business Requirements [Document], Roadmap, and each Statement of Work on a timely and professional basis in accordance with all terms, conditions, and specifications set forth in this agreement (including all Schedules and Exhibits attached hereto) and such Statement of Work.

(Doc. 67-1 at 11)  In the first statement of work, which PointSource attached to the master agreement and which Certified signed, PointSource intended to create in four months a coin "grading screen" that "lay[s] the groundwork and plumbing for the entire [new design] solution."  (Doc. 67-1 at 77–87)

## B.  The Alleged Fraud and the Alleged Breaches of Contract

Eight months later, PointSource allegedly had to "scrap" the new system's design because of defects, several of which PointSource allegedly concealed from Certified.  (Doc. 67 at 19)  Although Certified and PointSource agreed to a second statement of work to correct the grading screen and to accelerate the project, ongoing delays and "poor quality" jeopardized the project.  (Doc. 67 at 20–21; Doc. 67-3)  After the "go-live" date passed, Certified demanded in September 2017 assurances that PointSource could resuscitate the project within the agreed budget and within the agreed time.  PointSource promised "to dedicate additional offshore resources to keep the project on track."  (Doc. 67 at 21)

In October 2017, Globant S.A. acquired PointSource and merged PointSource with Globant (a subsidiary of Globant S.A.), which assumed PointSource's obligations under the master agreement.  Certified alleges that Globant falsely assured Certified that Globant "had the ability and the intention to deliver the [new system] as planned and as scheduled." (Doc. 67 at 22)  By this assurance, Globant allegedly misrepresented and concealed PointSource's design defects that would further delay the project. (Doc. 67 at 22–26)  Skeptical that Globant could timely accomplish the project, Certified "demanded that Globant agree to a fixed-fee and firm deadline" to complete the project. (Doc. 67 at 23)  Certified and Globant signed a third statement of work (Doc. 67-2), which set a firm deadline for Globant "to complete all remaining deliverables" under the master agreement. (Doc. 67 at 23)

But Certified alleges that Globant "knew or should have known that Globant would have to start the new system over from scratch because PointSource had failed to prepare core design documents and complete other essential deliverables." (Doc. 67 at 4, 43–44)  Instead, Globant allegedly concealed the status of the project by "falsely assuring Certified, for months on end, [and for nearly two years], that the project was on track for an on-time and on-budget go-live [date]." (Doc. 67 at 24–31, 37, 43–44)  Certified claims more than twenty breaches of contract, "which include a host of deficient project management practices and a defective system design." (Doc. 67 at 5, 35–44)  After paying almost $10 million over five years for an allegedly defective system that Certified needed to re-design "from scratch," Certified sues

- 6 -

Globant and Globant S.A. "to recover the tens of millions in damages caused by [an] 'extortionate bait-and-switch.'" (Doc. 67 at 5, 45)

## C. Certified's Claims

Certified asserts three categories of claims.  First, Certified asserts several claims premised on fraudulent or deceptive conduct.  In Count I, Certified claims that Globant fraudulently induced Certified to sign the statements of work by misrepresenting PointSource's progress on the new system.  In Count II, Certified claims that Globant and Globant S.A. committed "common law fraud" by inducing Certified to assign the master agreement from PointSource to Globant and by misrepresenting the progress on the new system.  In Count III, Certified claims that Globant and Globant S.A. fraudulently concealed and lied about material facts that would expose the new system's deficiencies.  In Count IV, Certified claims that Globant and Globant S.A. negligently misrepresented the status of the new system by failing to provide complete and accurate information to Certified.  In Count X, Certified claims that Globant and Globant S.A. conspired to commit fraud.  And in Count XI, Certified claims that Globant S.A. aided and abetted Globant's fraud against Certified. [1]

Second, Certified asserts two claims premised on Globant's breaching the master agreement and the statements of work.  In Count V, Certified claims a slew of

---

[1] Certified also sues "John Doe Entities 1 through 5," which are unknown affiliates of Globant and Globant S.A. (Doc. 67 at 7)

breaches of contract against Globant, which allegedly "bears successor-in-interest liability" for PointSource's failure to satisfy the first two statements of work. Also, Certified alleges that Globant bears direct liability for failing to adhere to the master agreement, including the third statement of work. In Count VIII, Certified requests a declaratory judgment finding that the master agreement entitles Certified to software wrongly withheld by Globant. (Doc. 67 at 45–47)

Third, Certified asserts an unjust enrichment claim, a FDUPTA claim, and a professional negligence claim. In Count IX, Certified claims unjust enrichment, including to recover "unreimbursed credit" for pre-purchasing defective software. In Count VI, Certified claims Globant and Globant S.A. engaged in a "cover-up" violating FDUTPA. And in Count VII, Certified claims that Globant and Globant S.A. failed to competently design a new system in accord with industry standards.[2]

## DISCUSSION

Moving to dismiss, Globant and Globant S.A. argue that Certified's fraud claims "simply recast the contract claims with florid language, center on non-particularized 'assurances,' and do not identify any actionable misrepresentations." (Doc. 73 at 2, Doc. 104 at 3) Further, Globant argues that Certified fails to state a

---

[2] Certified asserts eight claims against Globant S.A. For the reasons discussed below, in all but one claim (the FDUPTA claim), Certified fails to state a claim against both Globant and Globant S.A. This order reserves determination of the sufficiency of the allegations against Globant S.A. until Certified amends the complaint, if at all, to include a plausible claim against both Globant and Globant S.A.

claim for breach of contract because the master agreement "nowhere" promises to deliver a fully functional new system.  (Doc. 73 at 2)

### A.  Fraud Claims

Globant and Globant S.A. both argue that Certified cannot distinguish the facts constituting the alleged fraud from the facts constituting the alleged breach of the master agreement.  *Spears v. SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018) (Chappell, J.) ("The critical inquiry for a fraud claim focuses on whether the alleged fraud is separate and apart from the performance of the contract.").  Even if Certified could distinguish between the alleged fraud and the alleged breach of the master agreement, Globant and Globant S.A. contend that Certified fails to state a fraud claim under Florida law because Certified alleges "generalized allegations of misstatements or omissions by unidentified [persons]." *Gandy v. Trans World Comput. Techn. Grp.*, 787 So. 2d 116, 118 (Fla. 2d DCA 2001) (describing the elements of fraud).  Globant and Globant S.A. argue Certified fails to allege with sufficient particularity the basis for the fraud claims.  *W. Coast Roofing & Waterproofing, Inc. v. John Manville, Inc.*, 287 Fed. Appx. 81 (11th Cir. 2008) ("Rule 9(b) requires more than conclusory allegations that certain statements were fraudulent; it requires that a complaint plead facts giving rise to an inference of fraud.").

In response, Certified argues that the alleged fraud is distinct from the alleged breach of the master agreement because Globant's omissions and misrepresentations pre-date each statement of work.  In other words, Certified argues that Globant

committed a tort independent from the alleged breach of contract by fraudulently inducing Certified to assign the master agreement and to sign each statement of work that continued the development of the new system. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) ("Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract."). Certified asserts that, if Globant and Globant S.A. had provided "an honest assessment of the state of the project" before each statement of work, "Certified would have terminated its relationship" with Globant. (Doc. 84 at 11–14) Instead, Globant and Globant S.A.'s "false assurances" persuaded Certified to continue with the project.

Globant and Globant S.A. advance the better argument. Although fraudulent inducement can qualify as an independent tort, "the critical inquiry focuses on whether the alleged fraud is separate from the performance of [a] contract." *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, 2014 WL 2215770, at *5 (S.D. Fla. 2014) (Rosenbaum, J.). "An alleged fraud is not separate from the performance of the contract [if] the misrepresentations forming the basis for the fraud also form the basis for the breach of contract claim." *Sun Life Assurance Co. of Can.,* 2016 WL 10565034 at *5 (S.D. Fla. 2016) (Brannon, J.); *Medalie v. FSC Sec. Corp.*, 87 F. Supp. 2d 1295, 1305 (S.D. Fla. 2000) (Gold, J.). The conduct forming the basis for Globant and Globant S.A.'s alleged fraud breaches several contract provisions, a convergence that forestalls Certified's pursuing a "better bargain" by turning a breach of contract claim

into a fraud claim. *Freeman v. Sharpe Res. Corp*, 2013 WL 2151723, *7 (M.D. Fla. 2013) (Conway, J.) (citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 401, 408 (Fla. 2013) (Pariente, J. concurring)).

First, an expansive and encompassing contract predates the alleged fraud. Although focusing on the statements of work, Certified admits that the master agreement, which began the contractual relationship between Certified and Globant (then, PointSource), provides "the general terms governing the parties' contractual relationship and contained specific representations concerning . . . performance obligations."[3]  (Doc. 67 at 17; Doc. 84 at 6–11)  The master agreement obligates Globant to deliver "fully operational Software as described in the Business Requirements [Document] and the Roadmap," which the master agreement incorporates.  (Doc. 67 at 17)  The master agreement contains a list of warranties supporting Globant's performance obligations, including to create software "in conformity with [the master agreement] and the Specifications" (defined as the Business Requirements Document and the Roadmap).  (Doc. 67-1 at 8–11, 27–29) Because the Business Requirements Document and the Roadmap outline the salient the features of, and the process for delivering, a functional new system and expressly

---

[3] Certified appears to concede that the master agreement explains the new system and informs Globant's obligations under the statements of work. (Doc. 67 ¶¶ 184–186) Although a definitive interpretation remains premature, the master agreement's precedence over, and anticipation of, the statements of work gravitates against finding that each statement of work constitutes a "separate" contract that Globant could induce fraudulently. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1312 (S.D. Fla. 2014) (Bloom, J.).

contemplate implementing particularizing agreements in the form of "statements of work" (Doc. 67-1 at 7, 10–11, 35, 103), Globant's alleged misrepresentations about the progress and the requirements of the new system are "inextricably intertwined" with the performance of the master agreement. *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, 2018 WL 905752, at *11 (M.D. Fla. 2018) (Howard, J.).

By the misrepresentations, Globant allegedly breached the contract, that is, provided allegedly untimely, deficient, and over-cost software in violation of the master agreement, the Business Requirements Document, and the Roadmap. *Eye Care Int'l, Inc. v. Underhill*, 92 F. Supp. 2d 1310, 1315 (M.D. Fla. 2000) (Kovachevich, J.) ("An independent tort requires proof of facts separate and distinct from the breach of contract."); *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So.2d 74, 78 (Fla. 1997) ("Misrepresentations relating to the breaching party's performance of a contract do not give rise to an independent cause of action in tort because such misrepresentations are interwoven and indistinct from the heart of the contractual agreement."). Stated differently, Certified complains that for a faulty new system Certified paid millions of dollars more than agreed. The master agreement and the statements of work created whatever contractual duty Globant and Globant S.A. owed to Certified to charge a certain fee for a specific "deliverable;" any overcharge or deficiency, that is, any breach of the ultimate "performance obligations" encompassed by the master agreement, is a breach of contract, not a fraud. *CEMEX*, 2018 WL 905752 at *11; *Monsoon, Inc. v. Bizjet Int'l Sales & Support, Inc.*, 2017 WL 747555, at *10 (S.D. Fla.

2017) (Marra, J.) (dismissing "pre- and post-contract misrepresentation [claims that] relate exclusively to the defendant's performance of the contract."); *Callaway Marine Techs., Inc. v. Tetra Tech, Inc.*, 2016 WL 7407769, at *4 (S.D. Fla. 2016) (Gayles, J.) (dismissing a fraud claim in which "each of the allegedly fraudulent statements advanced . . . touches on subject matters later reduced to writing in a subcontract.").

Second, the master agreement and the statements of work address the logistics of communication between Certified and Globant.  For example, the master agreement requires "relationship managers" to communicate between the parties about the project's status, and the master agreement obligates Certified to participate in regular meetings.  (Doc. 67-1 at 8, 15–17)  Further, the first statement of work granted to PointSource "project management responsibilities, including scrums, meeting coordination, and project tracking" for Certified's benefit.  (Doc. 67-1 at 77, 85)  The other two statements of work enlarge Globant's responsibility "to facilitat[ing] communication and transparency."  (Doc. 67-2 at 8–10)  Any disingenuous appraisal of the new system qualifies not as a fraud but as a breach of contract violating Globant's "transparency" obligation, which is implicit under the master agreement and explicit under the statements of work.  *Kaye*, 2014 WL 2215770 at *5 (Rosenbaum, J.); *Freeman*, 2013 WL 2151723 at * 8 (dismissing a fraud claim "grounded in" the parties' contract).

Third, the merger clause in the master agreement explains that:

> This agreement, together with all Schedules, Exhibits, and
> Statements of Work and any other documents incorporated

- 13 -

> herein by reference, constitutes the sole and entire agreement of
> the parties to this Agreement with respect to the subject matter
> of this Agreement and supersedes all prior and contemporane-
> ous understandings, agreements, representations, and warran-
> ties, both written and oral, with respect to each subject matter.

(Doc. 67-1 at 35)  Also, the merger clause addresses prospective agreements between the parties by creating an "order of precedence" governing the type of written agreements that can affect the master agreement's terms.  Because the master agreement provides "the general terms governing the parties' contractual relationship" and because the master agreement and the statements of work address the parties' communication obligations, Certified's fraud claims (Counts I–IV, X, XI), each "inextricably intertwined" with the contract, must fail.[4]

## B. Contract Claims

Globant argues that Certified cannot claim that Globant breached the master agreement because "the operative agreements did not require Globant to implement and deliver a new [ ] system."  (Doc. 73 at 21)  Rather, Globant suggests that Certified retained PointSource (and eventually Globant) "to provide services, and to document those services with written work product to assist [Certified] in migrating to a new [ ] system."  (Doc. 73 at 2)  According to Globant, the "project

---

[4] Globant and Globant S.A. argue that Certified's complaint fails to satisfy the threshold particularity requirement of Rule 8 and Rule 9(b), Federal Rules of Civil Procedure. *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (describing Rule 9(b)'s "particularity" standard); *Anderson v. District Bd. of Trustees of Central Florida Community College*, 77 F.3d 364, 366 (11th Cir. 1996). But a determination of whether Certified satisfies the particularity requirement is superfluous because Certified's fraud claims fail regardless of particularity.

methodology" in the statements of work shows "that the master agreement is a services agreement," not a promise to deliver a new system.  (Doc. 73 at 22)

But Certified alleges enough facts to advance the persuasive claim that Globant failed to deliver a new system "as described in the Business Requirements [Document], Roadmap, and each Statement of Work."  (Doc. 67-1 at 11)  Certified describes scores of alleged breaches of the master agreement, including the statements of work.  (Doc. 67 at 54–58)  By plausibly alleging that Globant failed to deliver in accord with the master agreement, including the statements of work, timely, under-cost, and adequate software, Certified preserves the breach of contract claim (Count V).[5]

And because Certified alleges that Globant continues to violate the master agreement by withholding software and by refusing to refund an "overpayment," Certified states a claim (Count VIII) for declaratory relief.  *Bleau Fontaine Condo. Ass'n No. Three, Inc. v. Indian Harbor Ins. Co.*, 2019 WL 1932785, at *2 (S.D. Fla. 2019) (Scola, J.) (remarking that "claims for declaratory judgment must look forward" and allege a continuing controversy between the parties because "any retrospective declaratory judgment would be equally solved by resolution of the breach-of-contract claim").

---

[5] Certified's civil conspiracy claim appears to focus on the alleged fraud. (Doc. 67 at 64) But even if Certified premises the civil conspiracy claim on a breach of contract, Florida law, although not expressly resolved, counsels that a breach of contract claim cannot sustain a civil conspiracy claim. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1317 (S.D. Fla. 2014) (Bloom, J.)

### C.  Other Claims

Certified's remaining claims allege (1) that Globant and Globant S.A. were unjustly enriched after collecting millions of dollars in fees originating from fraud, (2) that Globant and Globant S.A. committed professional negligence by failing to adhere to "standards for skill, prudence, and diligence that govern and apply to the work and conduct of software development professionals such as Globant" and (3) that Globant and Globant S.A. violated FDUTPA.  (Doc. 67 at 58–63)

#### 1.  Unjust Enrichment

In Count IX, Certified claims that Globant and Globant S.A. were unjustly enriched by "retain[ing] and accept[ing] the benefit of millions of dollars in payments and credits . . . without providing the services and [the new] system promised to Certified."  (Doc. 67 at 63–64)  But no party contests whether the master agreement and the statements of work "govern the subject of the dispute."  *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337–38 (S.D. Fla. 2002) (Moreno, J.)  The existence of an express contract governing a dispute precludes an action for unjust enrichment. *Mario v. Centex Homes*, 2006 WL 560150, at *1 (M.D. Fla. 2006) (Merryday, J.) (citing *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla. 5th DCA 1998); *Poe v. Estate of Levy*, 411 So.2d 253, 256 (Fla. 4th DCA 1982).  Because Certified plausibly alleges a breach of contract and because Certified has an adequate remedy for a breach of contract, Certified cannot state a claim for unjust enrichment.  *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., ITT*, 139 F.3d 1396, 1413 (11th Cir.

1998) ("Recovery on a theory of unjust enrichment however, is only available 'when as a matter of fact there is no legal contract.'"); *Tobin & Tobin Ins. Agency, Inc. v. Zeskind*, 315 So.2d 518, 520 (Fla. 3rd DCA 1975).

    2.  <u>Professional Negligence</u>

        In Count VII, Certified claims that by failing to competently design a new system, Globant and Globant S.A. breached "professional standards and duties applicable" to software developers.  (Doc. 67 at 59–61)  Even without a "direct contract" between a professional and an aggrieved party, Florida recognizes a cause of action against a person, similar to Globant S.A.'s consultant, negligently providing a professional service.  *Moransais v. Heathman*, 744 So.2d 973, 975 (Fla. 1999), *receded from on other grounds*, *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Co., Inc.*, 110 So.3d 399 (Fla. 2013); *Rushing v. Bosse*, 652 So.2d 869, 873 (Fla. 4th DCA 1995).  "[If] the negligent party is a professional, the law imposes a duty to perform the requested services in accordance with the standard of care used by similar professionals in the community under similar circumstances."  *Moransais*, 744 So. 2d at 975–976.

        But to state a claim for professional negligence, Certified must allege that Globant's and Globant S.A.'s "consultants" engaged in a "profession," which Florida often defines as "any vocation requiring at minimum a four-year college degree before licensing is possible."  *Moransais*, 744 So. 2d at 975–976 (citing *Garden v. Frier*, 602 So.2d 1273, 1275 (Fla. 1992)).  Because Certified alleges no facts to

- 17 -

establish that Globant and Globant S.A.'s "consultants" — a generic title of unknown provenance and uncertain content — plausibly qualify as "professionals" under Florida's definition, Certified fails to state a claim. *Waterford LLC v. Garlick*, 2009 WL 248093, at *2 (N.D. Fla. 2009) (Mickle, J.) (rejecting a professional negligence claim that assumed a "consulting service" qualifies as a "profession" in Florida); *Sunset Beach Invs., LLC v. Kimley-Horn & Assocs., Inc.*, 207 So. 3d 1012 (Fla. 4th DCA 2017) (applying Florida's "profession" definition); *Rocks v. McLaughlin Eng'g Co.*, 49 So. 3d 823 (Fla. 4th DCA 2010) (describing an engineer as a "professional").[6]

## CONCLUSION

The motions (Docs. 73, 104) to dismiss the amended complaint are **GRANTED-IN-PART**.  Certified's fraud claims and unjust enrichment claim (Counts I–IV and Counts IX–XI) are **DISMISSED WITH PREJDUICE**.  Certified's professional negligence claim (Count VII) is **DISMISSED WITHOUT PREJUDICE**.  A determination of whether Certified states a claim under FDUTPA (Count VI) is deferred.

---

[6] Unlike Certified's fraud claims, a professional negligence claim appears to constitute (but not conclusively) a tort independent of a contract claim.  *Martinez v. QBE Specialty Ins. Co.*, 2018 WL 4354831, at *4 (M.D. Fla. 2018) (Honeywell, J.) (describing the cases); *Auto-Owners Ins. Co. v. Triple P Const. Inc.*, 2009 WL 1457115, at *1 (N.D. Fla. 2009) (Hinkle, J.) ("The law imposes a duty on a professional separate and apart from any contractual obligation."); *Moransais v. Heathman*, 744 So.2d 973 (Fla. 1999).

Not later than **APRIL 16, 2021**, Certified may amend the complaint, which may include, as requested by Certified, "additional allegations regarding the relationship between Globant S.A. and [Globant] revealed by Globant S.A. in jurisdictional discovery."  (Doc. 112 at 20)

ORDERED in Tampa, Florida, on March 31, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE