# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CERTIFIED COLLECTIBLES GROUP, LLC, NUMISMATIC GUARANTY CORPORATION OF AMERICA, CERTIFIED GUARANTY COMPANY LLC and PAPER MONEY GUARANTY, LLC,

    Plaintiffs,

v.

GLOBANT, LLC, GLOBANT S.A., and JOHN DOE ENTITIES 1 THROUGH 5,

    Defendants.

**Civil Action No. 19-CV-1962-SDM-AEP**

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Certified Collectibles Group, LLC, Numismatic Guaranty Corporation of America, Certified Guaranty Company LLC, and Paper Money Guaranty, LLC (collectively, "CCG"), for their complaint against defendants Globant, LLC, Globant S.A. (collectively, "Globant") and John Doe Entities 1 through 5, allege as follows:

## PRELIMINARY STATEMENT

*"Ha, if we had to put together a book about how to do lots of things wrong...we won it!"*

~ Globant S.A. Chief Financial Officer
Alejandro Scannapieco, October 2, 2018

1.     This action -- and Globant's admission that it could write the book on doing lots of things wrong -- arises from the misconduct of international technology firm Globant S.A., its U.S. subsidiary Globant, LLC, its affiliates John Doe Entities 1 through 5 (the "John Doe Defendants"), and a technology firm that Globant S.A. acquired, PointSource, LLC ("PointSource," and, together with Globant S.A., Globant, LLC, and the John Doe Defendants, "Globant"), in botching and then lying about a project to design and implement a new enterprise resource planning ("ERP") software system for CCG (the "Project"), a leader in the collectibles industry.

2.     Defendants' internal documents do in fact read like a book -- specifically, a memoir in real-time that chronicles, over the course of years, the stunning incompetence of Globant's consultants and the deceptive and unfair practices of Globant's management in concealing the true state of the Project while seeking to extort fees from CCG for a software system Globant had neither the ability nor intention to deliver.

3.     Globant's internal communications concerning its performance on the Project describe, in brutally candid terms, Globant's internal disarray, gross ineptitude, and brazenly dishonest and unethical treatment of its client, CCG. Acutely aware that it was botching the Project -- and that it was singularly unqualified to perform the Project in the first place -- Globant mused internally

about whether it should finally come clean and tell the client "the real deal," or

continue "blowing smoke" in order to pocket still more fees.  As reflected in its

internal emails, Globant opted to conceal the truth, continue to string CCG along

with false assurances, and threaten to abandon the Project unless CCG handed over

more money:

- August 23, 2018:  "**We have also lost a large number of US team members**, many of whom, if they were around, would [be] the ones providing guidance to Belarus and growing their skills.  Without that, **we are left with a massive skills, seniority, and knowledge gap that can't be improved with anything other than time**."[1]

- August 23, 2018:  "**[W]e are working on features we don't fully understand** but with limited budget/time, which as you know, cannot work."

- August 28, 2018:  "**The team had a big attrition, for that reason, the team lost knowledge of the [P]roject**."

- August 28, 2018:  "**Bad distribution of the management team**, some positions were covered in USA and the rest in Belarus, but **without the proper management and without the proper [knowledge transfer] process** as well. . . . **nobody took the technical lead from the USA** and they relied over [sic] Yury which was a bad idea. . . . As a consequence of that [sic] use key team members are **not able today to understand very well how the team in Belarus is performing**."

- August 28, 2018:  "One of the USA key player quit Globant 3 weeks ago **without the replacement of this position and any plan in place to follow**.  We need to take into consideration he advised he was quitting a month before."

---

[1] Emphasis has been added to the quotations throughout.

- August 28, 2018: "There are different visions of the current situation. **Seems the team members does [sic] not have the same vision of the situation at the different levels (CP, VP of Delivery, DD, solution Architect, etc)** and what seems to be more strange is that **nobody was working on a plan in order to place everything under control**."

- January 10, 2019: "In my opinion, **there has been no communication to the project team or to CCG's leads on this project**, Max and Sam, that we are now working this way."

- January 10, 2019: "We have a status meeting with the client this afternoon in which **I would like to to [sic] tell them that we are implementing this plan instead of blowing smoke**."

- January 29, 2019: "[O]k I talked with C. Hugill yesterday and told him to go to the client and say **they have to pay $1m to finish the project and/or we will pull the ERP team Monday**."

- March 7, 2019: "**We have lacked architectural direction since Sept**. The addition of Andy is helping a lot but **he was not an architect and is learning as he goes**."

- March 26, 2019: "**I feel if we go with straight honesty and share what it will take to complete we are in a better position. Risky but he [CCG's CEO Steve Eichenbaum] has never been told the real deal. My 2 cents**."

4.   Globant consultants also admitted internally that their failure to complete basic design documents at the outset of the Project doomed it to failure. On August 23, 2018, Globant consultant Neal Raval concisely summed up the dire situation for his superiors:

> **This project is where it is because we fundamentally changed the way we were working without doing any of the work to make the change**. As Ron talked about last time, this

> went from a truly agile project (T&M) to waterfall (fixed price/fixed scope) **without taking the time to write a formal requirements document or do any of the other work to prepare us for success in the new world (fixed price)**.

Yet despite this knowledge, Globant sat on this information for another *five months*, until January 2019, and then waited another *four* months, until May 2019, when it finally told CCG the Project would essentially have to start over from scratch.

5.     Sarasota-based CCG -- which specializes in the certification, grading, and conservation of coins, stamps, paper money, comic books, and other collectibles for individual collectors, collectibles dealers, and not-for-profit institutions -- decided to replace its aging legacy computer system with a new ERP system in January 2016.  CCG's ERP initiative was intended to increase its efficiencies, support the rapid growth in its domestic and overseas operations, and move its business to the next level.  This initiative, which was supposed to deliver enhanced automation and operational flexibility, was a central component of CCG's growth strategy.

6.     Recognizing that the demands of its expanding global customer base would soon outpace the capabilities of its current technology -- and given the operational risks inherent in replacing its core software system -- CCG knew that it had to rely on an appropriately skilled and experienced consulting firm to design

and implement its new software solution.  CCG further knew that its new software system would have to be customized to support the unique business processes that enable it to provide state-of-the-art certification, grading, and conservation services.

7.     At this time, PointSource, a software technology firm, was engaged by CCG's affiliated company, Certified Guaranty Company, to develop an online order form solution for its comic book grading business.

8.     Seizing upon CCG's decision to replace its ERP system -- and fully aware that a timely and successful ERP implementation was critical to CCG's strategic business plan -- PointSource represented that it had the requisite skills and experience to implement a custom business solution for CCG that would not only deliver 100% of the functionality of CCG's legacy system, but also provide enhanced functions, improved performance, and scalability to support CCG's expanding business requirements.

9.     PointSource then spent five months examining CCG's business and purportedly determining the scope of the project, for which CCG paid it $500,000 in fees.  Thereafter, PointSource represented that it could design and implement the new ERP system within two years, with a "go-live" date of July 2017, for an estimated cost of $1.8 million.  Based on those representations, CCG hired PointSource for the project, which began in October 2016.

10.   PointSource floundered, coming nowhere close to designing and implementing the new ERP system.  Then, on June 1, 2017, ten months into the project, and one month before the go-live date -- with less than 10% of the system partially built -- PointSource sold itself to Globant in a $28 million transaction.  By the time of that sale, CCG had already paid PointSource nearly $1.2 million, or more than 66%, of the $1.8 million that PointSource had stated the entire project would cost.  Globant thereupon expressly assumed all of PointSource's customer engagements and contractual obligations, including its agreements with CCG.

11.   In the months that followed, Globant assured CCG that the implementation was on track to deliver a fully functional ERP system.  By November 2017, CCG had paid and committed to pay all of PointSource's estimated fees and nearly $500,000 more, for a project that was more than a year behind schedule.  Acknowledging CCG's frustration with the budget overrun, Globant agreed to complete the project for a "fixed price" pursuant to a statement of work that set a firm go-live deadline.

12.   The new statement of work required Globant to implement a fully functional ERP system for a fixed additional cost of almost $1.5 million, which was later amended to $1.8 million.  As to the deadline, Globant advised that it needed almost two more years to complete the project, and committed to a new go-live date of October 31, 2019.

13.   CCG agreed to pay Globant these additional fees, and to delay the go-live for another two years, based on Globant's assurances that the project was on track to meet the new go-live date for the fixed fee amount.  At no time during the negotiation of the fixed-fee agreement did Globant disclose that the ERP solution it inherited from PointSource was defectively designed and unable to meet CCG's requirements, much less deliver the heightened efficiencies and automation central to CCG's strategic plan.

14.   In fact, at the time it entered into the fixed-fee agreement, Globant knew or should have known that it would have to start the project over from scratch because PointSource had failed to prepare core design documentation and complete other essential deliverables.  But Globant concealed that fact, falsely assuring CCG, for months on end, that the project was on track for an on-time and on-budget go-live.  Stringing CCG along with these lies, Globant was able to collect nearly $2.7 million in additional fees, consisting of an additional $1.1 million paid to PointSource as a Globant company, and almost $1.6 million in additional fees paid to Globant.

15.   Only after it pocketed the last payment from CCG did Globant finally reveal the true state of the project, demanding that CCG pay *another $5 million* and insisting it would need to move the go-live by almost *two more years*, to August 2021.  After entering into the fixed fee agreement, effective November

2017, Globant accomplished nothing, and admitted that the project could not proceed without basic design documents that should have been prepared years ago.

16.   Had Globant disclosed to CCG in November 2017 that the project would in fact cost *8 million in additional fees* and take an *additional four years* to complete, CCG would have cancelled the project and proceeded with a different vendor.  Instead, Globant remained silent, inducing CCG to enter into the contract and to pay nearly $2.7 million in additional fees, all the while concealing that it would have to start the project over from scratch.

17.   As a result of Globant's fraudulent, deceptive and unfair practices, a project that CCG was told would take a year and cost $1.8 million in fees will ultimately take five years and cost almost $10 million in fees -- *a price increase of 455 percent*.  In the meantime, CCG is now in the process of uncovering the full extent of Globant's performance failures, which include a host of deficient project management practices and a defective system design.

18.   CCG brings this action to recover the tens of millions of dollars in damages caused by Globant's extortionate bait-and-switch.  Globant's scheme -- which was approved at the highest levels of Globant's management, including by a senior executive team at Globant S.A. -- induced CCG to enter into a contract with a fixed price and a firm deadline, both of which Globant knew full well it could not and would not meet.  Those damages include not only the fees CCG paid to

PointSource, Globant, and other third-parties, but also CCG's internal spend and the loss of critical business opportunities foreclosed by Globant's failure to implement the new ERP system.

## PARTIES

19.  Plaintiff Certified Collectibles Group, LLC is a privately-owned Florida limited liability company with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

20.  Plaintiff Numismatic Guaranty Corporation of America ("NGC") is a privately-owned Florida S-corporation with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

21.  Plaintiff Certified Guaranty Company LLC ("CGC") is a privately-owned Florida limited liability company with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

22.  Plaintiff Paper Money Guaranty, LLC ("PMG") is a privately-owned Florida limited liability company with its principal place of business at 5501 Communications Parkway in Sarasota, Florida.

23.  Globant, LLC is a Delaware limited liability company, with its principal place of business in San Francisco, California.  Globant, LLC is registered to do business in the State of Florida and is a wholly-owned subsidiary of Globant España S.A., which is a wholly owned subsidiary of Globant S.A.

24.   Upon information and belief, Globant S.A. is a global information technology and software development firm founded in Argentina and now based in Luxembourg, with its headquarters located at 37A, Avenue J.F. Kennedy, L-1855. Globant S.A. has offices in eight cities across the United States, including an office located at 1001 Brickell Bay Drive in Miami, Florida.  Globant S.A. is publicly traded on the New York Stock Exchange under the symbol GLOB.

25.   Upon information and belief, defendants John Doe Entities 1 through 5 (the "John Doe Defendants") are affiliates of Globant, LLC and Globant S.A., the names and addresses of residences of which are unknown.  Also upon information and belief, the John Doe Defendants are employers of the following senior officials who played an active and direct role in the misconduct and deception alleged herein:  Alejandro Scannapieco, Maximiliano Herrera (Vice President of Technology), Gabriel Dominguez (Senior Technology Director), and Javi Rodriguez (Senior Delivery Director).

26.    At all relevant times, each of the defendants was the agent of the other with respect to the misconduct alleged herein.

27.   Upon information and belief, at all relevant times, Globant, LLC, Globant S.A., and the John Doe Defendants were each an alter ego of the other insofar as there was a unity of interest between them -- *i.e.*, they commingled resources, work product, and employees freely, and failed to maintain arm's length

relationships, such that they constituted a single business enterprise for purposes of providing services to CCG.  The commingling of resources included the participation of the senior leadership team of Globant S.A. and the John Doe Defendants in providing CCG with false assurances about Globant's work and in managing Globant's overall engagement with CCG.  Additional jurisdictional contacts are alleged below.

28.   On or about June 1, 2017, Globant S.A. entered into a definitive stock purchase agreement to purchase 100% of the membership interests of PointSource. Pursuant to the stock purchase agreement, 100% of the issued and outstanding membership interests of PointSource were transferred to Globant S.A.

29.   By letter dated October 3, 2017, PointSource informed CCG that months earlier, in June 2017, PointSource had been acquired by Globant S.A. and that Globant S.A. intended to merge PointSource with Globant, LLC.  The letter stated that Globant, LLC would "assume all of PointSource's customer and vendor arrangements" and that "[t]he terms of the relevant agreements [would] not be impacted. . . ."  Additionally, Globant sought and received CCG's written consent to the assignment of CCG's agreements with PointSource to Globant, LLC.

30.   By Agreement and Plan of Merger, dated November 22, 2017 and filed with the Florida Secretary of State (the "Merger Plan"), PointSource merged with and into Globant, LLC.  Pursuant to the Merger Plan, "all debts, liabilities and

duties of each of the said domestic limited liability company and other business entity that have merged shall thenceforth attach to the surviving limited liability company and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it."

## JURISDICTION AND VENUE

31.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties and because the amount in dispute, excluding interests and costs, exceeds $75,000.

32.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to CCG's claims occurred in this district.

33.   This Court has personal jurisdiction over Globant, LLC, Globant S.A., and the John Doe Defendants pursuant to Fla. Stat. § 48.193(1)(a) and/or § 48.193(2) because, *inter alia*, each defendant operates, conducts, engages in, and carries on its business in the State of Florida for pecuniary benefit; committed a tortious act within the State of Florida; or breached contracts in the State of Florida, and is engaged in substantial and not isolated activity within the State of Florida.  Alternatively, Globant, LLC acted as an agent for and alter ego of Globant S.A. and the John Doe Entities Defendants, with respect to the services

provided to, and misconduct against, CCG, or Globant S.A. conspired with and aided and abetted Globant, LLC's misconduct.

34.    Additionally, this Court has personal jurisdiction over Globant, LLC pursuant to Fla. Stat. § 48.193(1)(a)(9) and Fla. Stat. § 685.101-102 because the primary agreement governing the parties' contractual relationship contained (1) a Florida choice of law provision; and (2) a forum selection clause in which the parties irrevocably (a) submitted to the exclusive jurisdiction of the United States District Court for the Middle District of Florida or the Twelfth Judicial District in and for Sarasota County, Florida; and (b) agreed that such courts shall have exclusive jurisdiction.

35.    Additionally, Globant S.A. has consented to the personal jurisdiction of this Court in connection with this action.

### GLOBANT S.A.'S CONTROL OVER GLOBANT, LLC AND ITS PARTICIPATION IN THE UNFAIR AND DECEPTIVE CONDUCT ALLEGED HEREIN

36.    At all times relevant to the facts set forth herein, all significant corporate decision-making for Globant, LLC, including with respect to the Project, was exclusively vested in, and carried out by a select group of Globant S.A. officers and directors.  Pursuant to a May 30, 2018 resolution, Globant, LLC's direct parent, Globant España S.A., appointed a cohort of Globant S.A.'s officers and directors as "agents of" Globant, LLC, including the following persons:

Martín Migoya (Globant S.A. Chief Executive Officer, Board Chairman, and Co-Founder); Martín Gonzalo Umaran (Globant S.A. Chief of Staff, Board Member, and Co-Founder); Guibert Andrés Englebienne (Globant S.A. Chief Technology Officer, Board Member, and Co-Founder); Néstor Augusto Nocetti (Globant S.A. Executive Vice-President and Co-Founder); Alejandro Scannapieco (Globant S.A. Chief Financial Officer from 2008 to October 8, 2018, and current "Partner Business Hacking"); Guíllermo Willi (Globant S.A. Chief People Officer); Wanda Weigert (Globant S.A. Chief Brand Officer); Patricia Pomies (Globant S.A. Chief Delivery Officer); Sol Mariel Noello (Globant S.A. General Counsel since 2018); and Javier Gagliardo (Globant S.A. Chief Business Officer).

37.   Pursuant to the same resolution, the foregoing officers and directors were vested with the authority, as agents, "to represent [Globant, LLC] and conduct all of [Globant, LLC's] affairs, as well as exercise [Globant, LLC's] legal rights and powers" in order to carry out Globant, LLC's significant corporate activities.  Such agents had authority to, among other things, "enter into contracts for services, leases and construction, in which [Globant, LLC] [was] the contracting party," authorize payments, appoint staff and personnel, negotiate with unions, receive goods for payment, "[s]et amounts, terms and interests, whether they are normal or punitive damages, agreeing penalty clauses, establish special domiciles, set up grounds for termination and other terms and conditions for all

contracts . . .[,]" and take other significant corporate actions.  Upon information and belief, the persons vested with corporate decision-making authority for Globant, LLC were limited to the foregoing officers and directors of Globant S.A.

38.  These executives' authority and responsibility to make decisions concerning Globant, LLC's important corporate affairs and events, including with respect to the technology projects that Globant, LLC handled, was confirmed by former Globant, LLC Vice President of Business Development, Michael Chadwick.  In a declaration he submitted in this litigation, Chadwick stated: "Throughout the period I worked at Globant, all material decisions related to my sales and marketing work were made, overseen, directed and approved by a group of executives and attorneys based in Argentina.  I needed to obtain approval from this Argentina-based group to negotiate and enter into contracts with clients and potential clients.  Within Globant, it was well-known, and a frequent topic of conversation, that material issues related to revenues and profit needed to be decided and approved by the group in Argentina. . . . I routinely had to send drafts of contracts with clients and potential clients to this Globant group in Argentina to obtain their approval as to key contract terms, prices and project schedules.  This Globant group in Argentina provided their approval for contract in the form of a special marking, or 'stamp,' that would appear on each page of finalized contract documents.  Obtaining 'the stamp' from Argentina was a necessary and routine

part of my job at Globant, as it was for my fellow sales executives."  (Dkt. 36 ¶¶ 7-8.)

39.   Further, according to Globant S.A.'s motion to dismiss the First Amended Complaint (Dkt. 104), Alejandro Scannapieco "was both a [Globant S.A.] executive and an agent of [Globant, LLC] in 2018-2019[.]"  In addition, Patricio Pablo Rojo, Globant S.A.'s General Counsel from 2013 through December 2018, executed some of the most important contracts at issue in this litigation, including two amendments to SOW #3.  Juan Urthiague has served as Globant S.A.'s Chief Financial Officer since October 2018.

40.   As set forth in detail below, officers and executives of Globant S.A. directly and actively oversaw, directed, and supervised critical aspects of the Project, including with respect to Project fees, billing, finances, and schedule; the client relationship with CCG; disputes and negotiations with CCG; contracts with CCG; and communications with CCG executives about the state of the Project. Some of these officers and executives of Globant S.A., such as Scannapieco, engaged in deceptive and fraudulent acts and omissions when communicating directly with CCG executives concerning these aspects of the Project.

41.   For example, in August 2018, Scannapieco, who was at that time Globant S.A.'s CFO, was informed of significant problems with Globant's delivery of the Project, but failed to disclose those problems to CCG.  Throughout 2018 and

2019, while acting as an agent of both Globant S.A. and Globant, LLC, Scannapieco was routinely informed of major problems with Globant's delivery of the Project, including problems stemming from Globant's performance failures and shortcomings, but failed to disclose those failures and shortcomings to CCG.  To the contrary, as detailed below, Scannapieco not only concealed Globant's performance failures and shortcomings to CCG, but falsely assured CCG that Globant's team was performing well and that the Project was on track.

42.   Further, during this same period, and as set forth in detail below, while acting as an agent of both Globant, LLC and Globant S.A., Scannapieco authorized and approved threats and ultimatums to CCG, which were delivered by Globant, LLC executive Timothy Ramsey to CCG CEO Eichenbaum, that Globant, LLC would abandon and stop working on the Project unless CCG paid Globant an additional $1 million in fees over and above the agreed-to fixed price as set forth in the parties' agreements.

43.   In addition, Scannapieco authorized and approved Ramsey's fraudulent and manipulated billing practices and requests for payment for services purportedly rendered by Globant, LLC on the Project in November and December 2018.  In June 2019, Scannapieco personally delivered an extortionate threat to Eichenbaum that Globant would abandon the Project, and refuse to complete delivery of the ERP system it was contractually obligated to deliver, and for which

CCG had paid in full, unless CCG paid Globant an additional $5 million in fees. Scannapieco made this threat in full knowledge that critical CCG initiatives depended on timely completion of the Project, and that CCG would incur significant damages if Globant abandoned the Project and failed to deliver the new ERP system.

44.   Further, Globant S.A. executives, including current CFO Juan Urthiague and current General Counsel Sol Noello, were consulted by Scannapieco in connection with Globant's threats and ultimatums to CCG, which, on information and belief, were made to CCG with Urthiague's and Noello's knowledge and approval.  Scannapieco also informed Eichenbaum that Scannapieco's boss, Martín Migoya, the Co-Founder and Chief Executive Officer of Globant S.A. and Chairman of its Board of Directors, was not only fully aware of the Project but had also approved the threat and ultimatum that Scannapieco delivered.

## **FACTUAL BACKGROUND**

A.   **CCG's Business and Its Decision to Implement a New ERP System**

45.   Headquartered in Sarasota, Florida, CCG includes seven of the world's leading expert services companies focused on the certification, grading, and conservation of collectibles.  Among its member companies are NGC, an industry leader in coin grading services, formed in 1987; CGC, an industry leader in comic

book, magazine, concert poster, lobby card, and vintage photograph grading services, formed in 2000; PMG, an industry leader in paper money grading services, formed in 2005; ASG (Authenticated Stamp Guaranty), a stamp grading service, formed in 2017; and CAG (Collectibles Authentication Guaranty), the newest member of CCG, formed in 2018, and providing services to preserve the authenticity and provenance of memorabilia and estate items.

46.   "Grading" refers to the process of ascertaining and certifying the authenticity, quality, and condition of a collectible using established industry standards.  Grading is a critical factor in determining the value of a collectible. CCG's employees include dozens of the world's most experienced and respected experts in authenticating, and assigning a grade to, all manner of coin, stamp, paper money, comic books, and other collectibles, ranging in value from relatively insignificant sums to tens of millions of dollars.

47.   Since its inception, CCG has graded 43 million coins, 4 million notes, and 5 million comic books, magazines, and posters.  The majority of CCG's business comes from several thousand dealers that utilize CCG's grading services. As the international market for different collectibles has grown substantially over the last decade, CCG has seized on opportunities to expand, both in the United States and abroad, particularly in China, where the collectibles market has soared in recent years.  CCG has also experienced rapid growth in Germany, Hong Kong,

South Korea, Singapore, Japan, the Netherlands, the United Kingdom, Thailand, and Malaysia.  CCG now has annual revenues over $80 million, and employs approximately 265 employees at its Florida headquarters and nearly 100 people in its overseas offices.

48.   CCG's success has been fueled in large part by its singular focus on and commitment to delivering consistent standards, prompt turnaround time, and superior customer service -- all of which depend on an appropriately functioning software system.  To sustain, expand, and accelerate the trajectory of the customer, revenue, and profit growth it was experiencing, it was imperative that CCG upgrade its decades-old and outmoded software system.

49.   That software, known as "The Next Level" and developed by Megasys, Ltd. ("Megasys"), was programmed in an older language known as ProIV.  In addition to the inherent limitations of that platform in terms of scalability and functionality, another risk loomed:  there are only a handful of consultants proficient in ProIV capable of supporting CCG's legacy system, let alone modernizing it to handle CCG's expanded product offerings, higher transaction volumes, and the language and currency requirements stemming from CCG's overseas expansion.  As a result, replacing CCG's aging legacy system with a new and more robust ERP system became a mission-critical initiative.

**B.**  <u>**PointSource's Campaign to Land the Project**</u>

50.  At or about the same time that CCG decided to replace its legacy software system, two of its member companies, NGC and CGC, had engaged PointSource, a software consulting and development firm, for discrete technology projects, including the development of an imaging service application (the "NGC Imaging App") and an online invoice/order form (the "CGC Online Form").

51.  In or about February 2016, PointSource's Chief Executive Officer, Chris Hugill, and Lab Technology Officer, Aaron Shook, approached CCG's management, including its Chief Executive Officer, Steven Eichenbaum, and its Senior Vice President of Sales and Marketing, Max Spiegel, to request that CCG engage PointSource to lead the design and implementation of the new ERP system.

52.  In its campaign to be selected to design and implement the new system, PointSource repeatedly assured CCG that it knew CCG's unique business requirements and that its consultants had the skills and experience "to ensure that the new ERP system accomplishes everything necessary to take CCG to the next level."

53.  In making these representations, PointSource highlighted the urgency by which CCG needed to upgrade its software, noting that CCG was "growing at a pace that is outgrowing the technology currently used" to operate its core business.

In fact, PointSource neatly summed up the objectives of CCG's software upgrade project as follows:

    a.  Provide configurable options for CCG to allow quick deployments to manage its changing processes and services without requiring the assistance of an outside vendor;

    b.  Streamline CCG's business operations with an updated user interface and reduce overhead;

    c.  Enable better business decisions by providing access to real-time data and robust reporting metrics;

    d.  Allow better management of customer relations;

    e.  Drive efficiencies in accounts payable and accounts receivable processing; and

    f.  Lower delivery timelines and costs.

54.   Even as it recognized that CCG's business was "unique," PointSource minimized the complexity of the ERP implementation, assuring CCG, among other things, that "the core financial piece of the business is standard to other businesses."  Hugill, who led the PointSource sales effort, repeatedly represented that the implementation would be "easy" for PointSource to deliver based on the skills and experience of the PointSource consultants he would assign to the project. PointSource's pre-contract sales materials recognized that "some customization"

would be necessary, that a large portion of CCG's business relied on providing grading services, and that the software solution required flexibility "to ensure customers are getting the level of service they [have] come to expect for their business."

55.   Prior to PointSource being hired for the Project, Hugill touted PointSource's experience implementing ERP software systems.  On June 16, 2015, he wrote to Eichenbaum:

> I know I am preaching to the choir…but all my senior people come from building "enterprise" systems like or significantly bigger than the one you need.  As fate would have it…we are ideally positioned to build it, but with a 2015 b2e mobile component.  I would argue that no other company is as well positioned.  We lack the domain experience but that is why we have business analysts that get that.[2]

56.   From the outset of its pre-contract interactions with CCG and throughout the months-long sales cycle and pre-contract due diligence meetings and exchange of information, beginning in or about February 2016 and culminating in agreements between the parties in October 2016, CCG emphasized three primary points that purportedly would guide CCG's design and implementation strategy.  These points, which PointSource stressed at formal sales

---

[2] As set forth *infra* at ¶¶ 179-82, Globant's sworn interrogatory responses fail to identify a single ERP project on which any of the 86 consultants who touched the Project worked in the two-years prior to the Project.

presentations, informal meetings, and on phone conversations, included the following:

a.  CCG's own employees lacked the experience, knowledge, or expertise to perform the project by themselves, and would need to rely on PointSource's qualified resources to deliver the implementation.

b.  Because CCG's business model depended on continued growth and expansion, both geographically and in its service lines, it was imperative that the new ERP system could scale globally and be easily configured by business users to adapt to changing business requirements and new products and services.

c.  CCG could not tolerate a software roll-out that would negatively impact its exacting operational standards and impeccable customer service.  As a result, the new system would have to deliver 100% of the functionality available in CCG's legacy system, and would have to be "at least as fast as PROIV is at performing all functions," both in the United States and abroad.  The importance of this requirement could not be overstated: while CCG needed a new ERP system that could seamlessly scale and integrate with its expanding domestic and foreign operations, CCG could not afford to take a technological step back.  The new ERP system therefore had to deliver all of the

functionality of its legacy system, plus new features, scalability, and flexibility for continuous upgrades.

57.   Beginning in February 2016 and through July 2016, PointSource purportedly engaged in five months of due diligence to evaluate and analyze CCG's business processes to enable it to make informed decisions about how to design both the new ERP system and the overall systems-related architecture in which the new ERP system would reside.  In this context, "systems architecture" refers to the components of the overall computer system that would be used to run CCG's business, including the new ERP platform, any CCG legacy software systems that might remain in use, and other software systems that would be used to support, for example, CCG's accounting, pricing, or other business processes.

58.   PointSource referred to this due diligence work alternatively as the "ERP Evaluation" phase or the "Deep Dive," and charged CCG $500,000 to perform this work.  During this period, PointSource led due diligence meetings with CCG employees at CCG's Sarasota headquarters, discussing the details of CCG's core business processes and functional requirements.  In information gathering sessions with CCG, PointSource officials, including Hugill, Shook, and a Senior Business Analyst, Ron Reed, purported to immerse themselves in, among other things, the business processes that CCG uses to obtain and process customer

orders, invoice customers, obtain, manage, and track inventory, and perform its various grading, certification, encapsulation, and other services.

59.    Throughout the ERP Evaluation period, PointSource provided assurances that it would encounter "no issues" in designing and implementing an ERP solution capable of delivering all of the functionality CCG needed to operate its business.  PointSource represented that not only would its new ERP solution provide all of the required functionality, but that it would do so "faster, both from performance and usability standpoints," than CCG's legacy system.

60.    The above representations by PointSource concerning its ability and intention to staff the Project with appropriately skilled and experienced consultants, and its qualifications to deliver an ERP solution capable of running CCG's business, were false, and PointSource's executives knew they were false when it made them.

61.    Following its five-month Deep Dive, PointSource prepared an "ERP Recommendation" for CCG.  PointSource's design of the new ERP called for CCG to license software from SalesForce.com and FinancialForce.  PointSource further recommended that CCG license software called Jitterbit to integrate SalesForce and FinancialForce with other elements of the ERP system.  PointSource further advised CCG to engage Nubik, Inc. -- a consulting firm specializing in SalesForce and FinancialForce implementations -- to assist on the Project.  CCG followed

PointSource's advice in each respect, spending hundreds of thousands of dollars on software licenses and consultants in reliance on PointSource's ERP design and recommendations following the Deep Dive.

62.   PointSource also presented CCG with a business requirements specification document ("BRD") that captured CCG's business processes.  As described by Shook, the BRD was "intended to be [the] reference to all the requirements that a new ERP system would need to achieve in order for [CCG] to run its business" both today and in the future.

63.   PointSource further represented that the new ERP system would have "configuration flexibility" and the power to deliver new products and services with a guided user interface to give CCG "the continued ability to grow at the rate they have been accustomed to for years."

64.   PointSource also represented that the new ERP system would reduce labor costs by streamlining CCG's business operations, enabling users to bypass the current process of navigating through multiple complex screens to quickly access information.

65.   After the Deep Dive, in addition to the BRD, PointSource also prepared and presented to CCG a roadmap document, referred to as the "Roadmap," which set forth PointSource's plan for implementing the new ERP system.  The Roadmap indicated that PointSource would design and code a partially customized solution

that would integrate with, among other components, third-party software applications licensed from SalesForce.com, Inc. and FinancialForce.com, Inc., which would operate CCG's pricing and accounting/inventory processes, respectively.

66.   PointSource's plan was for CCG to migrate off its legacy system using a sequenced approach whereby certain applications would go live in different phases of the project, with CCG's legacy system components being gradually integrated with the new ERP system.  To accomplish this plan, PointSource required CCG to spend hundreds of thousands of dollars in fees to its legacy service provider, Megasys, for Megasys to assist PointSource with the implementation.[3]

67.   PointSource represented that the fully implemented ERP system would go live within two years, with a July 2017 go-live date.  PointSource estimated that the fees for its work on the project, including the integration with SalesForce.com and FinancialForce.com, would be $1.8 million.

68.   In good-faith reliance on PointSource's representations (as reflected in, among other documents, the BRD and the Roadmap, for example) about its

---

[3] As a result of PointSource and Globant's failure to implement the contractually required ERP system, CCG was forced to continue to run its business on its aging legacy ProIV system, and has had to pay Megasys millions of dollars for system support, maintenance, modifications, and ERP-related migration work.

purported skills and experience and the suitability of the new ERP system for
CCG's business processes, CCG engaged PointSource to implement the new ERP
system (the "Project"), and the parties signed a contract known as the Master
Software Development Agreement (the "MSDA").  A copy of is the MSDA is
attached hereto as Exhibit A.

69.  The MSDA, effective October 1, 2016, provided the general terms
governing the parties' contractual relationship and contained specific
representations concerning, among other things, PointSource's performance
obligations.

70.  Pursuant to the MSDA, in Section 4, PointSource was required to
"design, develop, create, test, deliver, install, configure, integrate, customize, and
otherwise provide and make fully operational Software as described in the
Business Requirements Specification [BRD], Roadmap, and each Statement of
Work on a timely and professional basis[.]"

71.  In Section 2.3, PointSource further acknowledged and agreed that "time
is of the essence" with respect to its obligations thereunder, and that timely
performance was "strictly required."

72.  The MSDA also imposed explicit obligations on PointSource to deploy
a team of appropriately skilled and experienced consultants to work on the Project.
Section 6 required that the "Developer Project Manager" have the "requisite

authority, and necessary skill, experience, and qualifications, to perform in such capacity" and further provided that PointSource "shall provide all Services and Work Product hereunder in a timely, professional, and workmanlike manner[.]"

73.   In the same vein, in Section 17.2(a) of the MSDA, PointSource explicitly warranted that "it will perform all Services in a professional and workmanlike manner in accordance with best industry standards and practices for similar services, using personnel with the requisite skill, experience, and qualifications, and shall devote adequate resources to meet its obligations under this Agreement."

74.   The MSDA contained an extremely broad provision as to the recoverable damages in the event of a dispute between the parties.  Section 19 provided that the "parties explicitly agree" that all forms of recoverable damages would be available to CCG, including "consequential, incidental, indirect, exemplary, special, or punitive damages."  This provision supplemented a separate provision, Section 23.11, allowing for the recovery of liquidated damages for three specific breaches related to (1) PointSource's failure to cause a buyer to take assignment of the contract; (2) "repeated failure of Acceptance Tests"; and (3) failure to "deliver all Work Product as contemplated in the Business Requirements Specification and the Roadmap[.]"

75.   Section 23.19 of the MSDA allowed for the recovery of attorneys' fees and court costs by the prevailing party.

76.   The MSDA also contained explicit provisions entitling CCG to (1) various credits towards fees (Section 12.4); (2) hold back 10 percent of fees until such time as CCG was no longer reliant on its legacy system (Section 13.1(a)); and (3) set off, at any time, any amount owing to it under the contract against any amount payable (Section 13.4).  Further, Section 13.2(b) provided that "Developer shall continue performing its obligations in accordance with th[e] Agreement notwithstanding any such [fee] dispute or actual or alleged nonpayment that is the subject of the dispute, pending its resolution."

77.   In addition to the MSDA, the parties entered into four statements of work (each an "SOW"), along with associated amendments and change requests, all of which were governed by the MSDA and all of which further detailed the work to be performed during the phased implementation.

## C.   PointSource's Performance Failures, Globant's Acquisition of PointSource, and Globant's Fraudulent Scheme to Extract Millions More in Fees

78.   Soon after the parties signed the first SOW, on or about October 10, 2016, PointSource began its work on the Project.  Only two months later, PointSource conceded that it had to scrap its planned design, in which the new ERP system was to be integrated with the legacy system's Oracle database.  On

December 12, 2016, Megasys, the developer of CCG's legacy ProIV system, advised that under its contract with Oracle, the Oracle database could only be used in conjunction with Megasys-developed software, and that third-party applications were prohibited from directly accessing the database.

79.   Had PointSource conducted appropriate due diligence and taken basic steps to validate its proposed design from the outset, it would have been aware of this issue and would have been able to formulate a different design before the Project even began.  Instead, PointSource was forced to come up with a different integration strategy to accomplish the phased implementation of the new ERP system.

80.   This lapse by PointSource led to a four-month delay under the Project timeline, forcing the parties to enter into a second SOW to ensure that there was sufficient time for PointSource to complete planned tasks.  The completion of other tasks had to be postponed to a later Project phase.  This change in integration approach also required that CCG pay additional database management fees to Megasys and engage an additional vendor, at significant cost, to accomplish the transfer of customer and other business data from the legacy system to the new ERP system.

81.   More delays would follow.  The first (and only) module that PointSource delivered -- in August 2017, some nine months into the Project -- was

- 33 -

a grading screen.  Grading screens are among the most fundamental components of CCG's business, as they are the site where CCG's experts undertake their skilled analysis and use a set grading scale to assign quantitative values to collectibles. Such grading services comprise approximately 95% of CCG's business.

82.   The grading screen that PointSource designed and delivered was completely unusable, as it failed to connect with or access the collectible data on CCG's legacy ProIV system.  In other words, graders could not populate the screens with critical collectible-identifying information, rendering the screens useless for the grading process.  Thereafter, PointSource spent months attempting to correct this defect but was never able to deliver the required grading screen functionality.

83.   In the face of these problems and ongoing delays, PointSource provided repeated assurances that the Project was not at risk.  But CCG became increasingly concerned that the Project was far behind schedule, that PointSource had made minimal or no progress on key Project deliverables, and that more than two-thirds of the Project budget (nearly $1.2 million out of $1.8 million) was already expended, with less than 10% of the new ERP system developed.

84.   In light of the delays, the poor quality of the few deliverables received, and the alarming variance to the budget, on or about August 21, 2017, CCG

demanded that PointSource conduct an onsite review to assess the state of the Project and present a detailed strategy for completing it.

85.    The parties met at CCG's Sarasota headquarters on September 29, 2017.  At that meeting, Hugill and Reed provided assurances to Eichenbaum, Spiegel, and CCG's Director of Information Technology, Brad Westover, that PointSource would dedicate additional offshore resources to keep the Project on track and provide regular Project status updates.  Hugill also agreed to schedule another on-site meeting to take place approximately one month later.

86.    Less than one week after the September 29 meeting, in an October 3, 2017 letter to CCG, PointSource announced that it had been acquired by Globant S.A., an international technology company run primarily out of Argentina. PointSource advised that all of its contractual obligations, including its agreements with CCG, had been assumed by Globant.

87.    At the time of PointSource's acquisition by Globant, the Project had been underway for nearly a year, and CCG had already paid PointSource nearly $1.2 million in fees.  In light of this investment in time and money, CCG wanted PointSource to continue working on the Project.  In October 2017, when PointSource and Globant sought CCG's written consent to have PointSource assign its contracts to Globant, LLC, PointSource/Globant, through Hugill, assured CCG that the PointSource personnel who had been working on the Project for

more than a year would continue to work on the Project, and emphasized that such continuity was essential to ensure delivery of the ERP solution.  CCG, through Eichenbaum, expressed concerns that the corporate profile of PointSource (a small, privately held company with approximately 80 employees headquartered in Raleigh, North Carolina that was comfortable servicing clients of CCG's size) was markedly different than that of Globant (a large publicly traded company with thousands of employees working in offices around the world, run by management in Argentina, that typically serviced clients far larger than CCG on projects that generated more in revenue and profits).  In response, Hugill and Globant executives took pains to assure CCG that they had nothing to worry about because PointSource's team would not only continue to lead the Project, but would now have access to, and be able to take advantage of, Globant's purportedly deep bench of skilled and experienced ERP resources and that Globant would provide PointSource's customers with "quality and partnership."

88.   Hugill's touting of Globant had in fact commenced earlier in 2017, when Globant was considering purchasing PointSource.  On or about May 5, 2017, Hugill provided Eichenbaum with information about Globant, including a presentation titled "Globant: We Are Ready."  The "We Are Ready" document included extensive information about Globant, including with respect to its finances, abilities, customers, projects, personnel, investments, and other aspects of

its business and operations.  The "We Are Ready" document touted various attributes of Globant's business, operations, and team.  Among other representations about Globant, the "We Are Ready" document stated that Globant possessed, "[s]trong global presence with great talent," "unlimited talent pool of highly educated IT professionals," and "global talent from development centers in North America, Latin America, and Asia."  The "We Are Ready" document also touted "Innovative Solutions By Globant" for major clients including Banco Santander, BBVA, Electronic Arts, and National Geographic.  Also on or about May 5, 2017, Hugill provided Eichenbaum with a Globant Q4 2016 earnings conference call transcript in which Martín Migoya and Alejandro Scannapieco presented to analysts at length about Globant's business.

89.   Based on these assurances by PointSource/Globant, and in light of the substantial investment in time and money that CCG had already made in having PointSource lead the Project, CCG agreed to the assignment of PointSource's contracts to Globant.

90.   In making the above representations and assurances to CCG, PointSource and Globant were aware of the importance that CCG, from the outset of their interactions with PointSource, had placed on the continuity of the Project team.  Indeed, PointSource/Globant was well aware that CCG was so concerned about a disruption to the Project team that during negotiations of the MSDA, CCG

had insisted upon inserting a provision addressing the risk that PointSource might

be sold during the course of the Project.  To guard against that risk -- and the

accompanying disruption in Project team continuity and uneven or incomplete

knowledge transfer between PointSource and a potential replacement vendor --

CCG demanded that PointSource agree to Section 23.11 of the MSDA.  That

provision -- providing that CCG may recover liquidated damages in the event that

PointSource, for any reason, "fail[ed] to cause a buyer to take assignment of [the

MSDA]" -- was intended to incentivize PointSource to ensure the seamless

continuity of services in the event PointSource was acquired by or merged with

another company.

91.   Based on these written representations by PointSource and Globant in

the October 3, 2017 joint letter, CCG countersigned that letter, providing written

consent to the assignment to Globant of all agreements CCG had with PointSource.

92.   Thereafter, Globant intensified its assurances that Globant had the

ability and intention to deliver the Project as planned and scheduled.  On or about

November 21, 2017, at a meeting at CCG's Sarasota headquarters attended by

Hugill and Reed, CCG expressed its concerns over Project delays and missed

deadlines, PointSource's failure to deliver any usable component of the ERP

system, its lack of an overall project vision and implementation plan, and the

ballooning variance to the budget.

93.   In response, Hugill and Reed recognized that CCG had lost confidence in PointSource's performance, and assured CCG that Globant, PointSource's new owner, would take corrective actions to put the Project "back on a path to success." In a revised, high-level plan to complete the Project, Globant acknowledged that, notwithstanding the "time is of the essence" clause, it would have to once again postpone the go-live, this time to the second quarter of 2019 -- representing almost a *two-year slippage* from the original Project schedule, which had set the go-live at July 2017.

94.   CCG thereupon demanded that Globant agree to a fixed fee, fixed scope, and firm deadline to complete the Project and deliver a fully-functioning ERP system.  Globant responded by agreeing to a firm October 31, 2019 go-live date, and proposing a fixed price of $1,465,000.

95.   That agreement was memorialized in a "Fixed Price" SOW (#0060h000016KDzS), referred to as "SOW #3."  A copy of SOW #3 between Globant and CCG is attached hereto as Exhibit B.  This fixed fee contract, which went into effect on November 1, 2017, was signed by CCG on June 28, 2018 and countersigned by Globant the following day.

96.   Setting an October 31, 2019 deadline for Globant to complete all of the remaining deliverables, SOW #3 defined the "agreed upon scope" as that set forth in "categories" (described in the SOW) and in a requirements traceability matrix

appended to the SOW.  A "requirements traceability matrix" is a common ERP document intended to capture all of a client's functional requirements to ensure that the ERP system is appropriately tested and validated and will, upon go-live, support the client's business processes.  SOW #3 bears the "Globant Legal Department" (undifferentiated as between Globant, LLC and Globant S.A.) stamp on each page.

97.   The fixed fee amount in SOW #3, $1,465,600, was amended twice by mutual agreement, on or about March 22, June 25, and July 23, 2018.  Those amendments, and accompanying change orders for the additional work to be performed, increased the total Project cost to $1,820,722.  Both amendments were executed by Globant S.A.'s General Counsel, Patricio Pablo Rojo, and each page of the amendments bears the "Globant Legal Department" stamp.

98.   SOW #3 also set a payment schedule, commencing with the first monthly payment to Globant in November 2017 and concluding with the last payment, as amended, at the end of November 2018 -- in other words, one year before the go-live date.

99.   SOW #3 also contained a provision concerning the software implementation methodology that Globant would use to guide and structure its work.  A "software implementation methodology" refers to a set of practices intended to ensure that a software implementation project unfolds pursuant to a

systematically structured and efficient approach that focuses on, among other things, project planning, validating work product, and identifying and mitigating project risk.  SOW #3 required Globant to use the Agile methodology, which relies on incremental, iterative work sequences that are commonly known as "sprints."

100. Reflecting the importance of the October 31, 2019 go-live date and the criticality of the MSDA's "time is of the essence" provision, SOW #3 stated that the Agile methodology would give the Globant team the "flexibility to react to shifting priorities *without shifting the deadline or adding additional resources*" -- in other words, without impacting the fixed fee or the firm October 31, 2019 go-live date.

101. As the months passed following Globant's acquisition of PointSource, CCG became concerned that Globant was insufficiently focused on the Project, and was starving it of consulting resources.  Those concerns arose in part because, over time, Globant shuffled personnel onto and off of the Project, and came to rely largely on a team of consultants working remotely from Belarus.  At no time during the entire Project did PointSource or Globant comply with the contractual requirement, set forth in MSDA Section 6.2, that required it to "maintain the same Developer Project Manager throughout the term of [the applicable] Statement of Work" and assign a Project Manager who was "located in Florida."

102. The revolving door of Globant consultants severely disrupted the Project in that, among other things, (a) it deprived CCG of the few Globant personnel who had gained some familiarity with and understanding of CCG's business processes, interfaces, and legacy systems; and (b) resulted in incomplete and ineffective training of replacement consultants, delays in Project tasks, and inferior work product, as various tasks were not performed and monitored by the same person from beginning to end, or even for substantial periods of time. And, because the departures of Globant personnel were often sudden and abrupt, the Project consistently was set back by the loss of critical knowledge that was not properly transferred. In fact, in response to interrogatories propounded by Plaintiffs in this litigation, Globant, LLC has admitted that some 86 consultants performed work on or were otherwise involved in the Project, the CGC Online Form, or the NGC Imaging App.

103. During the Project, Globant consultants *internally* acknowledged a spate of significant project management failures -- including a high level of staffing turnover -- that contributed to the pervasive problems on the Project. For example, on August 23, 2018, in a report to Globant executives Maximiliano Herrera and Javier Rodriguez, Globant consultant Neal Raval catalogued Globant's project management lapses as encompassing not only staffing deficiencies but also a failure to adhere to an appropriate software implementation methodology, to

prepare appropriate Project documentation, and to engage in appropriate

requirements gathering:

> I have JIRA statistics on velocity (we average around 70
> story points).  However due to multiple shifts in
> operation, loss of team members, and changes to team
> organization, so being honest, the numbers don't mean
> much.  Ron [Reed] is correct when he says the client
> cares VERY little about velocity, tickets completed, etc,
> so sharing that info provides little to no value to NGC.
>                         ***
> This project is where it is because we fundamentally
> changed the way we were working without doing any of
> the work to make the change.  As Ron talked about last
> time, this went from a truly agile project (T&M) to
> waterfall (fixed price/fixed scope) without taking the
> time to write a formal requirements document or do any
> of the other work to prepare us for success in the new
> world (fixed price).  As a result, we are working on
> features we don't fully understand but with limited
> budget/time, which as you know, cannot work.
> We have also lost a large number of US team members,
> many of whom, if they were around, would the ones [sic]
> providing guidance to Belarus and growing their skills.
> Without that, we are left with a massive skills, seniority,
> and knowledge gap that can't be improved with anything
> other than time.  And again, with limited budget/time,
> this becomes difficult.
> Ron / I have an idea for what we think a proper
> achievable MVP is for this project, roughly a target date,
> and we have an idea of what it would take from a people
> standpoint.  What we don't have is how we can do that
> given our current contract / agreement with NGC.

104. At no time did Globant disclose to CCG that the Globant team was

suffering from a "massive skills, seniority, and knowledge gap" or that the Globant

development team members in Belarus were still "growing their skills" while

purportedly coding the new software system.  Notably, just weeks after Raval diagnosed these Globant performance failures to his Globant superiors, Globant removed Raval from the Project team.

105. Days later, on August 28, 2018, Rodriguez expanded on Raval's concerns in a report to Globant employees Gabriel Allasia, Daniel Kuperstein, Silvia Pollastrini, and Maximiliano Herrera, which was later forwarded to Globant S.A.'s then CFO, Scannapieco on October 1, 2018.  In his report, Rodriguez identified a number of issues crippling the Project, including the following:

- "The team had a big attrition, for that reason the team lost knowledge of the [P]roject."

- "Bad distribution of management team, some positions were covered in USA and the rest in Belarus, but without the proper management and without the proper [knowledge transfer] process as well.  With independence of a PM placed in Belarus, nobody took the technical lead from USA and they relied over Yury which was a bad idea due to the nature of Yury's daily tasks.  As a consequence of that the use [sic] key team members are not able today to understand very well how the team in Belarus is performing."

- "One of the USA key player quit Globant 3 weeks ago without the replacement of this position and any plan in place to follow.  We need to take into consideration he advised he was quitting a month before."

- "There are different visions of the current situation.  Seems the team members does [sic] not have the same vision of the situation at the different levels (CP, VP of Delivery, DD, solution Architect, etc) and what seems to be more strange is that nobody was working on a plan in order to place everything under control."

106. Yet even as Rodriguez saw fit to report his concerns over these significant "issues" to his Globant colleagues on the Project, no one from Globant ever disclosed these root-cause problems to CCG, despite CCG's repeated inquiries as to why Globant was not making progress on the Project.

107. Significantly, the first time that senior Globant officials began to meaningfully interface with CCG executives was in or about November 2018 -- which just happened to coincide with the last installment payment (for $43,742 in fees) under the fixed price SOW #3.  In other words, no sooner did Globant realize that it would not be receiving additional fees -- that the money spigot was, by the terms of the contract, being shut off -- than it dispatched a senior leadership contingent to meet with CCG's executives.  But as it turned out, Globant leadership's newfound interest in CCG had nothing to do with taking steps to ensure delivery of a fully functioning ERP solution by the October 31, 2019 go-live date.  Rather, Globant's sudden charm offensive had a very different purpose: to extort additional fees from CCG.

108. On November 26, 2018, Scannapieco arrived at CCG's Sarasota offices to introduce members of the Globant Project team.  Now "responsible for Globant's business operations and strategic growth in the [U.S. East] region," Scannapieco was accompanied by Globant officials Maximiliano Herrera (Vice President of Technology), Gabriel Dominguez (Senior Technology Director), and

Javi Rodriguez (Senior Delivery Director).  Eichenbaum, Spiegel, and Westover attended the meeting from CCG, along with CCG's Vice President of Operations and Technology, Sam Yochem.  Hugill also attended the meeting.

109. Even though the whole point of this in-person meeting was to discuss Project status and issues, none of the Globant executives who attended saw fit to tell the truth to CEO Eichenbaum and the other CCG executives:  that the Project was beset with the kind of "red flag" problems that demanded a complete Project timeout, reevaluation, revised timeline, and overhauled Project team.  Neither Rodriguez, Scannapieco, nor Herrera disclosed the alarming problems that Rodriguez had carefully detailed in his August 28, 2018 internal email.  Instead, the Globant executives did the opposite:  they assured the CCG attendees, including Eichenbaum, that the Project was going well.

110. During the meeting, the CCG attendees sought assurances that Globant's work was on track for an October 31, 2019 go-live.  Globant provided those assurances.  In the course of the discussions, both Hugill and Scannapieco acknowledged -- as they had to, based on the plain, unambiguous language of SOW #3 -- that Globant was working pursuant to a fixed fee arrangement for completion of the Project.

111. Thereafter, Hugill provided written assurances confirming that Globant would complete the Project for the agreed-upon fixed fee.  Hugill acknowledged

that the parties "agreed to a top line number" in SOW #3 which would be "budgeted over the remaining months of the SOW's term," even if that meant that Globant would be working at a loss to deliver the ERP system.  Hugill further assured CCG that upon Globant's completion of SOW #3, CCG would obtain an ERP solution providing all of the functionality available in the legacy ProIV system.

112. In a follow-up to the November 26, 2018 meeting, on December 17, 2018, the parties held a conference call during which Globant reiterated its commitment to deliver the ERP system in accordance with SOW #3.  In addition to the Globant officials who attended the onsite meeting the previous month, additional Globant participants on the call included David Acomb (Managing Director) and Timothy Ramsey (Executive Vice President/Managing Director of Sales and Client Services).  During this call, Globant again failed to disclose to CCG the egregious performance failures by Globant, and the dire Project risks, that had been the subject of Globant's internal email discussions.

113. The interactions in November and December 2018, described above, gave CCG some degree of comfort that the Project was on track for an October 31, 2019 go-live, and that Globant was fully vested in ensuring a successful on-time and on-budget launch of the new system.  But that comfort was short-lived

because, several weeks later, in early January 2019, Globant started to stick up CCG for more fees.

114. On January 8, 2019, Hugill and Acomb, the Project's new engagement manager for Globant, met with CCG's Eichenbaum and Spiegel at CCG's Sarasota offices to demand that CCG pay an additional $1 million in fees.  Globant was candid in explaining the rationale behind its extortion: because SOW #3 was a fixed fee contract, Globant was losing money on the CCG engagement and feeling "financial strain" that it wanted to offload onto CCG.  Outrageously, Acomb complained that because CCG had already paid all of the required fees under the contract -- *i.e.*, because CCG had pre-paid in full, even though Globant had ten more months of work to perform to reach the October 31, 2019 go-live -- Globant was uncomfortable having to work without generating ongoing revenue.  The fact that Globant had demanded the pre-pay arrangement, and that CCG had fully met its payment obligations under the precise terms of the contract, was of no moment to Globant, which insisted on obtaining more fees.

115. As part of its proposal to extract more fees out of CCG, Globant said it would perform additional work to add functionality to software platforms that CCG used for two divisions not part of the ERP project.  When CCG expressed surprise at Globant's demand for more revenue, Acomb tried to assuage CCG by explaining that it would only take an additional $1 million "to help get us through

the situation," and that he needed to "go back and report to Globant that future revenue from CCG would be forthcoming."  In the course of making this demand, Acomb acknowledged that Globant was required to deliver a fully functional ERP system by October 31, 2019, and he committed to doing so.  Acomb did not inform CCG that the "financial strain" on Globant stemmed from its own Project management failures, as previously diagnosed internally by Raval and Rodriguez.

116. Several weeks later, the full scope of Globant's extortion scheme began to emerge when Globant stunned CCG with the revelation that Globant would not proceed with critical software development work unless it received additional fees to prepare design documents, which Globant referred to as "Product Development Documents," or PDDs.

117. On January 24, 2019, during a Project status call, Globant's then Project Manager, Adrienne Bryant, and Reed first raised the issue of PDDs to Spiegel and Yochem.  Bryant and Reed advised that in order for the Globant team to build out the rest of the ERP system, it would have to prepare the PDDs.

118. CCG did not realize it at the time, but in fact the PDDs that Globant referenced were basic design documents that should have been prepared in accordance with standard ERP implementation practice, much earlier in the Project.  These design materials are foundational documents that must be prepared

before the ERP system is coded to ensure that the consultants are developing a system that appropriately captures a client's functional requirements.

119. Such design documents are fundamental components of an ERP implementation, as they necessarily guide and inform not only the design of an ERP system, but also, among other things, the coding and testing of an ERP system, the overall systems architecture (of which the ERP system is one piece), and the interfaces that must be designed and built to enable the ERP system to pass data to, and receive data from, other system components.

120. Globant's revelation in January 2019 -- more than *two years* after the Project began in October 2016 -- that it needed to prepare such design documents constituted a stunning admission that the entire Project essentially had to be started from scratch.  Globant fully admitted that without the PDDs, it could not proceed with further development (*i.e.*, coding) work.  Even worse, Globant later demanded that CCG pay Globant an additional $250,000 for its preparation of the PDDs -- falsely (and absurdly) claiming they were "outside the scope" of SOW #3.

121. Again, because CCG was unfamiliar with ERP practice, it did not at the time of Globant's admission appreciate the full implication of what Globant had at long last disclosed -- namely, that the prior two years of work on the Project, first by PointSource and then by Globant, was a complete waste of time and money.  By this point in time, CCG had already paid $4,561,380 for the Project, including

$2,970,950 to PointSource and $1,590,430 to Globant.  Globant's acknowledgement that it needed to start working on PDDs in January 2019 necessarily meant that for nearly $4.6 million in fees, CCG had received literally nothing of value -- that the Project had to start all over again, from scratch.

122. At the time of Globant's admission that it needed to create the kind of fundamental design documents that should have been created more than two years prior, Globant had already been working on the Project for nearly 15 months, and, as noted, had already pocketed nearly $1.6 million in fees, in addition to the over $1.2 million in fees paid to PointSource as an acquired Globant company.  That means that for that entire period of time -- day after day, week after week, and month after month, as it was all the while taking CCG's money -- Globant fraudulently concealed from its client CCG that the Project was in complete shambles, that PointSource had violated a core requirement of implementing ERP by not preparing basic design documents, and that, without those basic documents, the Project would never deliver a fully functional ERP system.

123. Globant only came clean, and finally advised CCG that the Project could not proceed without design documents, shortly after the last Project payment became due under SOW #3.  Globant thus squeezed every last dollar out of CCG under the contract, knowing full well, but concealing, that the Project was in fact an unmitigated disaster.  Then and only then, after it obtained nearly $4.6 million

from CCG, did Globant reveal that neither it nor PointSource had prepared critical design documents, without which the Project could not continue.

124. Had Globant not engaged in this fraud -- in other words, had Globant disclosed, soon after acquiring PointSource, that PointSource had not prepared appropriate design documents without which the Project could not continue -- then CCG could have made an informed decision about how it should proceed and how it should spend its money.  After Globant's acquisition of PointSource and its assumption of the Project, even a cursory evaluation and review of Project documentation would have revealed the absence of appropriate design documents and the fact that the Project was in fact in dire straits.

125. At that point in time, before SOW #3 was ever signed, Globant should have told CCG the truth -- it should have disclosed to CCG that without appropriate design documents, the Project was entirely at risk and would need to be re-scoped and restarted.  Globant should have formulated a new Project schedule and a new fixed fee amount that took into account, and factored in, the need to prepare key design documents, or PDDs as Globant called them.

126. Had Globant done so, CCG would have known the true facts, and therefore would have been able to make an informed decision about whether it wanted to proceed with the Project at all; whether it wanted to replace the entire legacy PointSource team with a different team of Globant consultants; whether it

wanted to put the Project on hold and obtain input and advice from another

consulting firm or firms; or whether it wanted to demand a refund of all the

$1,698,000 in fees it had paid PointSource, and/or commence litigation to recover

those fees and any other damages it had sustained up to that point in time.

127. Globant's internal documents reflect that while Globant might have

finally told CCG about the need to prepare PDDs on January 24, 2019, Globant

continued to conceal the truth about the state of the Project, and Globant's

numerous other lapses and deficiencies.  The Globant project manager, Bryant,

fretted internally about Globant's failure to tell CCG the truth, and, in January

2019, leading up to the January 24 conference call, she tried to persuade her

supervisors that it was time for Globant to finally level with CCG.  Specifically, on

January 10, 2019, Bryant internally lamented Globant's strategy of concealment

and nondisclosure, writing to her supervisors:

> In my opinion, **there has been no communication to
> the project team or to CCG's leads on this project**,
> Max and Sam, that we are now working this way.
> Without that, it is hard to put this plan into action.  **The
> longer we wait to put this into action, the more of a
> risk we run** in not hitting that September deadline,
> which I am already extremely skeptical of. . . .  **We have
> a status meeting with the client this afternoon in
> which I would like to to [sic] tell them that we are
> implementing this plan instead of blowing smoke.**

128. Globant executives cynically rejected Bryant's plea to tell CCG the

truth, and Bryant went along with the scheme.  Instead of disclosing the true state

of affairs to CCG, Bryant acted as if it were business as usual, advising CCG that the Project was on track.

129. By concealing from CCG the true state of the Project and PointSource's lapses, Globant deprived CCG of the opportunity to make informed decisions about these issues.  Indeed, Globant not only concealed the truth from CCG, but affirmatively misrepresented to CCG that the Project was on track for an October 31, 2019 go-live, and that the remaining work necessary to reach that go-live would require no more than $1,820,722 in additional fees.  Based on Globant's fraudulent assurances and concealment of the truth from the time it acquired PointSource, Globant fraudulently induced CCG's consent to the assignment of the MSDA and related agreements, and fraudulently induced CCG into entering into SOW #3, continuing the Project with Globant, and continuing to pay Globant fees.

130. What makes Globant's fraudulent, deceptive, and unfair conduct even more malicious and reprehensible is that the negotiations between CCG and Globant over SOW #3 played out over the course of eight months -- a period during which Globant became well aware of the Project's deficiencies and the PointSource team's performance failures (including that there were no PDDs), but failed to make appropriate disclosure to CCG about the true state of affairs.

131. Soon after the January 24, 2019 call with Bryant, Globant advised CCG that Acomb had been removed as the Project's engagement manager and that

Ramsey would be managing the account going forward.  Thereafter, on February 11, 2019, Ramsey met with Eichenbaum at CCG's Sarasota offices to reiterate Globant's sob story -- that notwithstanding the plain and unambiguous terms of SOW #3, Globant needed to generate more money on the Project.  Ramsey advised that Globant was "in a difficult spot" because, as a result of the fixed fee agreement, the Project was a money-loser for Globant.  Cruelly concealing that the Project would have to be started from scratch -- and ignoring that it was most certainly CCG, not Globant, that was "in a difficult spot" -- Ramsey amped up Globant's extortion.  He threatened to stop work on the Project unless CCG turned the revenue spigot back on and paid Globant more fees.

132. For his part, Ramsey had been advocating internally within Globant that, notwithstanding SOW #3's firm fixed price and fixed go-live date, Globant should issue CCG an ultimatum: pay more fees, or Globant will walk off the Project.  Internal Globant documents establish that Ramsey had previously directed Hugill to deliver such an ultimatum.  On January 29, 2019, Globant consultant Robb Czyzewski wrote to Ramsey and Acomb, "[s]haring info as I uncover:  NGC ERP project is currently zero revenue and costs are $80k/mo (for some reason Javier did not include DD costs in this forecast … will go up if we continue.)" Ramsey responded, "ok I talked with C. Hugill yesterday and told him to go to the

client and say they have to pay $1m to finish the project and/or we will pull the ERP team Monday."

133. Even as CCG was shocked by Globant's demand for more fees, CCG was also concerned that if Globant abandoned the Project, CCG would have to find a replacement vendor, which would no doubt demand substantial fees just to get up to speed on the Project, much less start working on it. Again, at this point in time, lacking technical ERP experience, CCG did not appreciate that the absence of PDDs required a do-over of the entire Project.

134. Moreover, even as it demanded more fees and restarting the revenue stream, Globant (at least by this point) had not backed away at all from completing the Project by October 31, 2019. To the contrary, Globant had repeatedly reassured CCG that the Project was on track to meet the October 31, 2019 go-live. Accordingly, though under no obligation to do so, Eichenbaum offered to pay Globant an additional $750,000 in fees, contingent, of course, on the delivery of a fully functional ERP system by the October 31, 2019 deadline. Eichenbaum made this offer to keep Globant from walking off the Project. Ramsey agreed to consider Eichenbaum's offer.

135. Globant's internal documents highlight its deception in continuing to string CCG along with assurances that the Project was on track to meet the October 31, 2019 go-live date. Those documents reveal that Globant knew those

assurances were false, and that it made them only to squeeze more money out of CCG -- by fraudulently inflating bills, if necessary -- to satisfy Globant's own internal profitability metrics.

136. On February 14, 2019, Ramsey emailed Eichenbaum: "We will promptly send you two invoices for the work the team did on the ERP solution for Nov/Dec. Each invoice will be $110,000. I went ahead and applied a 20% discount as a show of good faith and to get us back on track." But Ramsey's description of Globant, LLC's purported work on the Project, and its "show of good faith," were a sham.

137. On November 15, 2018, Javier Rodriguez wrote the following to his Globant team regarding November and December billing on the Project:

> Guys, On the ERP side November has only 43k. In order to secure the team **we need to find the way to increase the bill around 100k and another 140 or 150k in December, just to have the chance to buy time to negotiate** during December the extension or not for 2019. That's why we need to sync our next steps. We can not [sic] just wait for this until the meeting with Ale and the CEO.

138. Then, on February 14, after sending the above email to Eichenbaum, Ramsey wrote to Scannapieco:

> Just FYI. Trying to get it all paid and we can recognize more in q1. The reference to 20% is mainly an optics things as we really did not have a payment schedule. I looked back at the past 5/6 ERP invoices and they were all over the place so I kind of averaged them and then cut

> it back a bit to what I thought would be palatable.  The
> 100k would be about a 30% gm for November/dec and as
> of right now was not shared with him prior.

Scannapieco responded,

> "Smart. Fully supportive, let's make sure milestones and
> scope is fully clear in the new contract, dates,
> deliverables, 2-3 bizz days to approve
> sprints/deliverables, etc, let's not get into the same
> nightmare[,] Good negotiation path here and well done!

139. Two weeks later, in a February 20, 2019 email, Ramsey sent

Eichenbaum two draft SOWs that would have required CCG to pay Globant an

additional $970,000 in fees for work that was already covered by SOW #3.  To add

insult to injury, one of the proposed SOWs sought to reduce the scope of work set

forth in SOW #3 -- that is, delivery of a fully functional ERP system -- and remove

any deadline for the completion of the Project.  The draft SOW included a

provision seeking payment of $110,000 for November 2018 and $110,000 for

December 2018, purportedly for work Globant consultants performed during those

months.  But those amounts did not reflect work that Globant actually performed;

rather, they were made up by Ramsey because he thought they would be

"palatable" to CCG.

140. Approximately one week later, in a February 28, 2019 email,

Eichenbaum reiterated his offer to make a single additional payment upon

Globant's successful completion of the Project and delivery of the new ERP

system "by the end of the year."  Eichenbaum also clarified that CCG's offer to pay Globant $750,000 to complete the Project would be reduced by the $125,000 outstanding credit that Globant owed to CCG under Section 12.4 of the MSDA and the $26,274 overcharge in Globant's October 2018 invoice that CCG had previously paid.  Eichenbaum further rejected both of the proposed SOWs, and reminded Globant that the parties' rights and obligations under the MSDA and SOWs of course remained in full force and effect.

141. Globant, however, scoffed at the binding contracts it had signed.  In subsequent calls and letters, Globant threatened that the "October date" was at risk unless the parties came up quickly with a path forward.  In a March 20, 2019 call with Eichenbaum, Ramsey issued yet another threat that Globant would unilaterally put the Project on hold.

142. In response, on March 26, 2019, fearing work on the Project would stop, Eichenbaum wrote to Ramsey, "Tim, All I would like is for you guys to continue on the ERP work while we work things out … Lets work this thing through."  Ramsey apparently forwarded Eichenbaum's message to Acomb, Scannapieco, Czyzewski, and Reed, noting internally, "Not sure why the change in tone, but I'll call him tomorrow."  In his reply, Acomb acknowledged the extent to which Globant had concealed the truth from Eichenbaum: "Positive and he needs us too.  **I feel if we go with straight honesty and share what it will take to**

- 59 -

**complete we are in a better position.  Risky but he has never been told the real deal.  My 2 cents**."

143. Acomb's email reflects Globant's dishonesty with CCG as to what Globant knew was the true cost to complete the Project, *i.e.,* the "real deal." Globant's demand for $1 million to complete the Project was just another round of Globant bait-and-switch, as Globant was fully aware that the actual cost to complete the Project was much higher.  Fearing that CCG might cancel the Project if the "real" cost was disclosed, Globant sought to lull CCG into committing to pay a portion of that cost by lowballing the actual cost-to-complete.  All the while, Globant knew full well that $1 million was in fact a mere fraction of the additional fees it would ultimately demand to complete the Project.

144. By this point in time, CCG was exceedingly nervous that Globant would abandon the Project.  From CCG's perspective, a replacement vendor would not only be cost-prohibitive but high risk, given that the legacy PointSource consultants had designed the system, making the necessary knowledge transfer to a new vendor untenable.  Therefore, on April 4, 2019, CCG convened a conference call with Globant to try to resolve the stalemate and get the Project back on track.

145. On that call, Globant again reiterated that it needed to generate PDDs before it could continue with further work under SOW #3.  And, once again adding insult to injury, Ramsey advised that Globant would not prepare the PDDs unless

CCG paid it another $250,000 in fees.  That was tantamount to yet another Globant threat to quit the Project, given that Ramsey emphasized that only upon completion of the PDDs would Globant be in a position to even estimate the cost and effort required for Globant to complete the Project.  Globant ended the call with a final ultimatum: CCG would either pay $250,000 for the PDDs, or Globant would stop working.

146. In an April 8, 2019 letter, CCG responded to Globant's threat and extortion scheme by putting Globant on notice that it was in material breach of SOW #3, the governing MSDA, and related Project agreements.

147. In response, on April 30, 2019, Globant took a new approach by asserting -- absurdly, and in utter bad faith -- that Globant was not required to deliver a functional ERP system, or, for that matter, any functional work product at all.  Globant told CCG that the fixed price, fixed scope contract the parties signed somehow did not "define a fixed end product to be delivered within the scope of the SOW."  Accordingly, Globant insisted it had no obligation to finish the Project.

148. Not surprisingly, Globant's internal documents reflect that Globant executives knew full well their statements to CCG disclaiming Globant's contractual obligations were sheer nonsense.  Internal Globant emails contain admissions by Globant consultants and executives that the whole point of the Project was, as set forth in the contracts, to provide CCG with a fully functional

ERP system by a fixed date and for a fixed price.  For example, as Scannapieco

wrote to his team after meeting with Eichenbaum on November 26, 2018:

> [H]ad the meeting Today with their CEO and the rest of
> the management team Today, very productive from
> different angles and they really value that we came up to
> their offices in Sarasota and that **we have a plan to fix
> what hasn't been done properly in the past or to
> achieve the milestones needed to get their ERP
> product up and running.**
>
> They are really very unique in terms of nature of services
> (a true numismatic corporation) but they make money
> and are expanding even through M&A.  We can get more
> business in the future **as long as we deliver on what we
> committed to (a release of a new customized ERP that
> will replace Oracle by mid year/third quarter 2019 as
> far as the timeline that the Team showed Today)**

149. On May 31, 2019, Maximiliano Herrera attempted to falsely renounce

Globant's contractual obligations to deliver a functional ERP system, emailing

Max Spiegel at CCG that:

> As we discussed during our call on Tuesday, we appear
> to have a disagreement as to the scope of SOW #3
> because **we do not believe that it is as a [sic] fixed
> scope engagement**, as you have indicated.  Among the
> other reasons mentioned in our call, the agreement so
> states that the services would be delivered under
> agile/scrum methodology.  And this has been the
> approach since MSA execution, all prior SOWs were also
> fixed price (month basis) but flexible scope, to be
> delivered under agile/scrum.  And the MSA is aligned on
> that aspect, as it anticipates that a serious [sic] of
> consecutive SOWs can be signed to govern the execution
> of the services by vendor.  As much as we want to
> resolve this promptly, the fact that NGC had visibility of

> the project all along and it was not but until recently that
> we heard this feedback has really placed us in a very
> uncomfortable situation.

150. In an internal Globant email dated June 1, 2019, Tim Ramsey expressed

concern to his colleague about Herrera's blatant falsehood, advising Herrera,

"Maxi, **SOW #3 right at the top of the document, says Fixed Price** …"  Herrera

responded that Globant legal, and senior Globant executive Scannapieco, had

approved the strategy to simply lie about Globant's unambiguous contractual

obligation: "The message it's a copy and past [sic] from legal message.  Ale

[Scannapieco] was ok on this[.]"

151. Other internal Globant emails reflect that Scannapieco, Herrera, Noello,

Rodriguez, Ramsey, Acomb, and Gabriel Dominguez had discussed a "walk away"

from the Project in light of Globant's lack of ability and intention to meet its

contractual obligations.  On January 11, 2019, inquiring about the scope of the

contract Globant had failed to perform, Scannapieco wrote to his colleagues:

> Javi, Gaby, **We need to understand in detail what part
> of the scope of the original contract with NGC we
> haven't complied with/delivered** and quantify that ($)
> It is important to quantify in case an early walk away of
> the contract happens, assuming we don't settle on an
> agreement for existing/future services with NGC CEO[.]

152. Scannapieco then forwarded this email to other Globant executives,

including Globant S.A.'s Chief Financial Officer, Juan Urthiague, writing simply,

"fyi[.]"   Urthaigue responded, apparently to assuage Scannapieco's concerns,

"Ale, a problem worth around 125k.  Do you realize that?"  In response,

Scannapieco stated:

> **The problem is bigger than 125k, they don't want to pay us more until we comply with the fixed price they had signed with PS which included the construction and migration of an ERP that we never delivered**.  We made a proposal to develop it from now to Oct 2019 at a low margin but they rejected it and **I'm not going to invest 600k/700k in cost at a loss or 0 revenue** and with a "promise" that they'll give us more work in the future, before that **I'll release the whole team and sort it out in Legal** and Chris Hugill will pay with his EO … I'll keep you posted, this is another one of the "low cost" [things] inherited from our friend Hugill[.]

153. In a July 18, 2019 internal Globant email, Maria Florencia Ussher of

Globant cut to the heart of Globant's predicament.  Far from being forced to

deliver on an obligation it was not required to perform, Ussher fully acknowledged

that Globant simply did not want to incur costs meeting its obligations under a

contract that was not sufficiently lucrative for Globant: "This account is in a

complicated situation and in legal at this time.  It's a fixed price that was valued

wrong or got complicated and we have equipment at costs at this time."

154. When Globant realized that CCG would of course not entertain

Globant's bad-faith assertion that it did not have to deliver a functional ERP

solution, Globant's response was to further raise the extortion ante.  In a June 17,

2019 call to Eichenbaum, Scannapieco -- Globant S.A.'s highest-ranking executive

on the Project -- delivered the following threat:  If CCG wanted Globant to

implement a new ERP system, CCG would have to pay Globant *$5 million* in additional fees.  Scannapieco further declared that the October 2019 deadline was off the table and that it would take Globant *another 22 months* to complete the Project.

155. Admitting that Globant's scheme was approved at the highest levels of management, Scannapieco also announced that his boss, Martín Migoya, the Co-Founder and Chief Executive Officer of Globant S.A. and Chairman of its Board of Directors, was not only fully aware of the CCG engagement but had approved the ultimatum that Scannapieco delivered.

156. In this call, Globant had finally disclosed the truth: that the Project had to be started from scratch, and would take almost another *two years* and *another $5 million*.  This admission obviously demonstrated that Globant's repeated commitment to the fixed fee nature of the contract, and its repeated assurances about meeting the October 31, 2019 go-live, were pure lies.

157.   In its work on the Project, Globant (and its predecessor-in-interest, PointSource) materially breached the Project contracts and the MSDA's express warranty by, among other things:

- failing to implement and deliver a new ERP system to support CCG's business processes and meet CCG's functional requirements;

- failing to adhere to the Project implementation schedule and the "strictly required" obligation to meet the go-live deadline, as

reflected by, among things, the MSDA's "time is of the essence" clause;

- failing to adhere to the fixed fee budget to complete the Project;

- failing to exercise due professional care in the performance of its Services;

- failing to "maintain the same Developer Project Manager throughout the term of such [applicable] Statement of Work;"

- failing to maintain a Developer Project Manager with the "necessary skill, experience, and qualifications, to perform in such capacity;"

- failing to "use its best efforts to meet the Milestone Dates specified in the Statement of Work without any extension or Fee increase;"

- failing to "deliver each Deliverable and install all Software on or prior to the Milestone Date therefor in accordance with the delivery criteria set forth in the Statement of Work therefor;"

- failing to perform Acceptance Testing "to ensure the Software Deliverable, including all Software and Documentation, conforms to the requirements of th[e] Agreement, including the applicable Specifications;"

- failing to perform Integration Testing;

- failing to provide the contractually required "credit toward Customer's Fees in the amount of $125,000;"

- failing to "promptly deliver to [CCG] all Work Product generated by [Globant] under such Statement of Work (whether complete or incomplete);"

- failing to "provide such cooperation and assistance as requested by [CCG], at [Globant's] sole expense, in transitioning the related Services to an alternate service provider;"

- failing to refund to CCG "all amounts, if any, paid in advance for any Services or Work Product that have not been provided;"

- failing to remedy breaches on a "timely basis;"

- failing to adequately plan, manage, and supervise the performance of its Services;

- failing to appropriately identify, manage, mitigate, and escalate risks encountered in connection with its Services on the Project;

- failing to develop and prepare an adequate Project plan and appropriate business process design documentation, including functional and technical specifications during the critical design phase of the Project;

- failing to assign a competent solution architect to the Project;

- failing to assign appropriately skilled, experienced, knowledgeable, and competent personnel to the Project team;

- failing to provide the necessary on-site support, and instead relying in large part on a team of unknown consultants working remotely from Belarus who were unfamiliar with the Project;

- failing to apply or adhere to a standard implementation methodology and adequate and appropriate project management practices and protocols; and

- failing to perform the Services in accordance with "best industry standards and practices for similar services[.]"

158. Globant also engaged in a deliberate and calculated scheme to conceal these and other performance failures from CCG.  Globant knowingly and/or recklessly made false representations about, among other things, the Project's timeframe and costs, and failed to disclose that the proposed design of the ERP system would not be able to meet CCG's business requirements or appropriately scale to accommodate CCG's expanding business operations.

- 67 -

159. As set forth below, Globant concealed critical problems with the Project, including PointSource's defective design, and continued to accept and demand fees for working on an ERP system it knew full well was not viable.

160. Throughout the Project, PointSource, and thereafter Globant, failed to apply and adhere to a standard implementation methodology and adequate and appropriate project management practices and protocols.  The result was deficient work product, missed deadlines and repeated delays, and excessive implementation costs, all of which inflicted severe damage on CCG.

### (i)      The Proposed ERP Design Was Ill-Conceived, Not Validated, and Undocumented

161. A critical part of any ERP implementation is the design, during which functional consultants identify the company's existing business processes and then formulate a design for the future business processes in the context of a new ERP software solution.  On an ERP project being run pursuant to the Agile implementation methodology, the team must prepare business requirement documentation, referred to as "Epics."  The Epics are then used to create additional design documentation, referred to as "User Stories" that are supposed to capture and define the users' goals for the required business processes.  The User Stories comprise the functional requirements of the new ERP system.  After the User Stories are defined, "Acceptance/Test criteria" is documented to ensure that the software is programmed accurately and in conformity with the User Stories.

162. Another crucial focus of the design phase is to identify, map, and prepare specifications for the required interfaces between software applications that comprise the new ERP system.  Design documents for interfaces are relied upon by the programmers on the technical team to write software code to build the interfaces.  This documentation is critical to the successful implementation of any ERP system where information needs to pass data to and receive data from different software systems.

163. Incomplete and improper identification, definition, and mapping of business processes and interfaces results in an ERP system that is improperly coded and configured, and that will therefore be unable to perform necessary business functions.

164. PointSource was responsible for the design of the ERP system.  Yet the design documents that PointSource prepared were deficient and incomplete, and specifications for critical system components were missing entirely.

165. In addition, the ERP system design that PointSource proposed to CCG -- a partially customized solution that would integrate with, among other components, third-party software applications licensed from SalesForce.com, Inc. and FinancialForce.com through software called Jitterbit -- was unable to function as intended because the integrations between the various software systems were not properly mapped or coded.   SalesForce.com, FinancialForce, and Jitterbit were

fundamentally ill-suited to CCG's business, and CCG wasted hundreds of thousands of dollars on software licenses and additional consultants (from Nubik, Inc.) based on PointSource's ill-conceived system design.  PointSource consultants knew as early as March 2017 that these recommendations were incorrect and misguided, and that the design was in fact flawed, but never disclosed that to CCG.

166. As a result of these and other performance failures, the new ERP system could not properly access and transfer data to, from, and among the various software applications.  As one example, the grading screen discussed above -- which was the only software deliverable that PointSource even provided -- had to be removed from production because it could not communicate properly with, and access data from, CCG's legacy system.

167. To date, notwithstanding that CCG has spent hundreds of thousands of dollars in license fees to Salesforce.com, Inc. and FinancialForce.com, neither PointSource nor Globant has been able to formulate and execute on an appropriate integration approach to allow CCG to use this third-party software as part of a new ERP system.

168. In addition to PointSource's failure to properly document the system design, its design approach was severely flawed.  The appropriate approach on an ERP implementation is to design from the top down, using process flows to

identify business processes and objects, as opposed to designing from the bottom up, at the database level of tables and fields.  Objects refer to the various elements of a business process (*e.g.*, a purchase order, or invoice), whereas fields and tables are used to organize data elements within a database.

169. The reason why an "object first design" is preferable is because it is more holistic, as it enables the consulting team to more fully consider and take into account the functions of the new ERP system and its integration points with other software components.

170. PointSource's defective design created problems with the synchronization of the new ERP system with its related components, and is directly attributable to the PointSource consultants' lack of adequate and appropriate ERP implementation experience.

171. While PointSource's incompetence caused the defective design in the first place, it was Globant's unfair and deceptive trade practices that inflicted devastating damages on CCG.  Upon assuming PointSource's Project obligations, Globant conducted -- or should have conducted -- an assessment of the Project to determine Project risks, including the risks that might have jeopardized successful Project completion within the required timeframe and budget.  Even a cursory assessment by Globant would have indicated that the design was deficient, key

documentation was incomplete or in some cases non-existent, and system architecture was flawed.

172. Instead of disclosing these risks to CCG and proposing the necessary redesign along with a realistic and viable schedule and budget, Globant did the opposite. Globant chose to conceal PointSource's and its own performance failures and the problems on the Project, and represented to CCG that the Project could be completed by October 31, 2019 at a fixed cost of first almost $1.5 million, and then $1.8 million. Those representations were false, and Globant either knew they were false when it made them, or it made them with reckless disregard for whether they were true or false.

173. Only after the last payment on the fixed-fee contract was due -- more than two years after the Project began -- did Globant finally reveal to CCG that the Project had to be re-scoped and redesigned through the PDD process, which would take another 22 months and another $5 million in additional fees.

### (ii) The Consultant Team Was Unqualified and Incompetent

174. Contrary to PointSource's representations touting its purported skills and experience, the consultants it assigned to the Project did not have the appropriate and necessary skills and experience to manage, design, configure, and build an ERP implementation of the size and complexity of the Project.

175.  PointSource also failed to assign a consultant to the role of solution architect on the Project.  It is standard practice on complicated ERP projects to assign a senior consultant to act as the solution architect to ensure that the new ERP solution will be able to seamlessly integrate with the other software and technology components on which an organization depends.  Without a solution architect, PointSource and Globant consultants made decisions about overall system architecture that rendered the ERP system unusable.

176.  Additionally, after Globant acquired PointSource, the composition of the consultant team changed.  Most of Globant's resources worked remotely off-shore, and their unfamiliarity with the Project and CCG's business, coupled with the difference in time zones, further undermined progress.

177.  Moreover, throughout its work on the implementation, Globant constantly shuffled its personnel onto and off of the Project.  As described above, the revolving door of Globant consultants further disrupted the Project, resulting in failures of knowledge transfer, delays to critical Project tasks, and inferior work product, as various tasks were not performed and monitored by the same person, and inconsistent methods and approaches were applied.

178.  Internally, Globant acknowledged that its team lacked the appropriate skills and experience to deliver the Project.  For example, on March 7, 2019, in an email titled "Project Status Update," Globant project manager Adrienne Bryant

expressed concern to her colleagues Esteban Acosta Villafane and Ron Reed that:

"**We have lacked architectural direction since Sept**.  The addition of Andy is

helping a lot but **he was not an architect and is learning as he goes**."

179.  That Globant lacked consultants with the required skills and experience

to deliver the Project is no surprise in light of admissions Globant has made in this

litigation, in its responses to CCG's interrogatories.  Contrary to the false

representations Globant made to CCG to convince it to approve the assignment of

PointSource's contracts to Globant, Globant has now admitted that not one of the

dozens of consultants it assigned to the Project had previously worked on an ERP

project in the two years prior  to working on the Project.  Plaintiffs' Interrogatory

Number 7 requested that Globant, LLC identify all ERP projects worked on by

Globant, LLC consultants in the two years prior to the Project.  Globant, LLC

responded as follows:

> [b]ased on a review of data maintained in [Globant,
> LLC's] internal tool to manage project information…
> provided by [Globant, LLC's] Operations team, that of
> the employees identified in Interrogatory No. 4 that were
> ever employed by [Globant, LLC] or by other Globant
> subsidiary entities that worked on the Project, none of
> them worked on an ERP implementation in the two years
> prior to working on the Project, the CGC Online Form, or
> the NGC Imaging App [.][4]

---

[4] Globant, LLC's response to Interrogatory No. 4 identified 86 consultants who worked on the Project, the CGC Online Form, or the NGC Imaging App.

180.  In response to Plaintiffs' Interrogatory Number 8, which requested that Globant, LLC identify each "person's level of experience and knowledge of ERP implementations at the time he/she was assigned to work on any engagement or sales effort involving the Plaintiffs, including the Project, the CGC Online Form, and the NGC Imaging App[.]," Globant, LLC incorporated its response to Interrogatory Number 7.  That is, Globant, LLC admitted its consultants had no ERP experience at all.  Globant, LLC further responded:

> To the extent any developers, engineers, or project managers worked on ERP projects more than two years before working on the Project at issue but no earlier than January 1, 2015, [Globant, LLC] has not been able to identify any specific ERP projects worked on by those employees because it does not have any records for former PointSource employees.

181. Finally, Globant, LLC directed Plaintiffs to a group of 15 employee CV's for "additional facts responsive to this Interrogatory[.]"  Not a single employee among those fifteen identified any specific, relevant ERP implementation experience in their CV.

182. Globant, LLC cannot identify a single ERP project worked on by any of the 86 consultants who worked on the Project in the two years prior to the Project. Similarly, Globant, LLC has not identified a single consultant as having any specific experience or knowledge of ERP implementations at the time he or she was assigned to work on any engagement or sales effort involving Plaintiffs.

Globant's conduct in lying about its qualifications for the Project, taking on an

ERP project despite having no ERP experience, and continually assuring CCG that

the Project was on track even though Globant knew it had no ERP experience, was

an unfair, unconscionable, deceptive, and unfair act and practice by a vendor in the

conduct of trade and commerce relating to the provision of software

implementation services for a customer.

### (iii)   The Project Lacked Adequate and Appropriate Project Management

183. PointSource first, and Globant thereafter, was responsible for providing

project management, including providing advice on overall Project direction and

strategy, ensuring the efficient management and delivery of the Project, adhering to

an implementation methodology, timeline, and budget, and identifying, managing,

mitigating, and escalating Project risk.

184. Further, under Section 6.2 of the MSDA, PointSource and Globant were

required to provide a Project Manager who would "be responsible for overall

management and supervision of Developer's performance[,]" "be Customer's

primary point of contact for communications[,]" and have the "requisite authority,

and necessary skill, experience, and qualifications, to perform in such capacity[.]"

Recognizing that continuity was critical to successful project management, the

MSDA also required that the "Developer shall maintain the same Developer

Project Manager throughout the term of [the applicable] Statement of Work."

185. PointSource and Globant did not comply with these contractual obligations.  In fact, PointSource and Globant cycled through *five Project Managers* in three years, notwithstanding their contractual obligation to maintain the same Project Manager throughout the term.  Such frequent turnover in such a critical project role is inappropriate in an ERP implementation.  Nor did PointSource or Globant meet their obligations to appropriately identify, manage, mitigate, and escalate project risk.  These deficiencies described above were, or should have been, evident to Globant during its tenure on the Project.  At various times during the Project, Globant knew or should have known about critical risks that threatened to undermine the Project and that required the provision of skilled resources to validate that the proposed ERP solution, and its related components, were in fact appropriate for CCG's business and would enable CCG to achieve its objectives.  Fundamental standards and practices in the ERP implementation industry impose on a vendor, such as Globant, the duty to disclose such risks to the client.  But Globant failed to do so.

186. For example, Globant (i) knew about, or should have known about, the following risks; (ii) should have, but did not, alert CCG management to such risks; and (iii) should have, but did not, take steps to manage and mitigate such risks:

    a.  Globant failed to adequately and appropriately disclose to CCG, during the negotiations for SOW #3 or at any time during the Project,

that the proposed ERP solution had not been properly validated, and was in fact an inappropriate and flawed solution that would never be able to operate CCG's current business, much less scale to meet the expanded business that CCG had hoped to achieve through its ERP implementation initiative;

b. Globant failed to adequately and appropriately disclose to CCG, during the negotiations for SOW #3 or at any time during the Project, that Globant did not have the ability or intention to provide CCG with consultants, and with a sufficient number of consultants, with the necessary skills, experience, and expertise in the design, development, configuration, testing, and project management areas, among others, necessary to perform the ERP implementation for CCG;

c. Globant failed to adequately and appropriately disclose to CCG that the consultants assigned to the Project deviated from, and failed to adhere to, an adequate and appropriate implementation methodology, adequate and appropriate project management practices, and ERP implementation best practices; and

d. Globant failed to adequately and appropriately disclose to CCG that it had not performed the necessary quality assurance of the ERP system it was designing and implementing.

- 78 -

187. In addition, Globant failed to disclose to CCG numerous critical facts about the Project, including its true status and the likelihood of on-time completion.  For example, by November 2018, at the latest, Globant internally realized that a drastic shift in the Project plan was required to meet Project deadlines, but Globant deliberately concealed this information from CCG.  For example, on January 10, 2019, Globant consultant Adrienne Bryant wrote to Gabriel Dominguez and Javier Rodriguez, copying others, as follows:

> Gabby/Javy, The project plan we presented to the client in November was the plan in order to deliver by Sept. This was just recently shared with me and I have no confirmation that the client has agreed to this plan. However, if we are going to hit the September deadline, we need to begin working like this immediately for a few reasons.
>
> 1. The plan shows us completing NGC Receiving and NGC Grading in November.  NGC Verification in December, and NGC Encapsulation, NGC Status Change, and NGC Conservation in Jan. while also starting Receiving for all companies in Jan.  **We have not completed any of the above to this date**.
>
> 2. The project plan also included the following assumptions:
>
> - We would review and align in detail all the requirements needed to have all the companies online in the new ERP, ensuring the approval of the Acceptance Criteria within a limited timeframe due [to] the tight deadline.
>
> - Each one of the user stories and the acceptance criteria will be reviewed and approved by CCG.

- The production roll out will be done all at once, since there won't be a backwards compatibility process between the new ERP and ProIV.

- Designs are going to be aligned with the designs already in place, and the functionality is going to be a replica for the functionality in ProIV.

In my opinion, **there has been no communication to the project team or to CCG's leads on this project**, Max and Sam, that we are now working this way. Without that, it is hard to put this plan into action.  **The longer we wait to put this into action, the more of a risk we run in not hitting that September deadline, which I am already extremely skeptical of.**

In addition, the ambiguity in how to move forward is causing potential delays in work.  For example, we have bugs coming in about backwards compatibility w/ ProIV that we need to address.  We have PMG Grading screens we were in the middle of designs on that are now on hold so we don't end up causing more development work later.  We need to be setting up meetings w/ CCG to discuss scope and requirements for Receiving that we can nail down, and begin mapping the current design to the other companies in preparation for the dev team wrapping up conservation.

**We have a status meeting with the client this afternoon in which I would like to tell them that we are implementing this plan instead of blowing smoke. I would also like to communicate all of this to the project team.**

188. Later that same day, Bryant led a status meeting with CCG.  At no time during that meeting, or in the many months thereafter, did Bryant, or anyone else from Globant, disclose to CCG any concerns about the Project timeline, the risks

associated with "ambiguity" on the Project, or the fact that Globant had been following a Project plan that had been fundamentally revised without CCG's knowledge or approval.

189. Within two months, Bryant's doubts as to whether Globant had the ability to deliver the Project had crystallized into virtual certainty. On March 7, 2019, Bryant expressed her concerns to her Globant superiors, Rob Reed and Esteban Villafane:

> **I honestly do not believe that we will hit the October deadline, and I believe any prediction as to when it will be complete is a shot in the dark** unless all product definition docs are detailed, signed off on and reviewed by the development team for their input on estimations.

190. Neither Bryant, nor anyone else from Globant, shared these concerns with, or identified these risks to, CCG.

191. Notwithstanding Globant's duty and obligation to disclose risks on the Project, its consultants not only remained silent in the face of severe risks, but deliberately concealed critical Project risks and their significance, and made affirmative misrepresentations that there were no such risks, and to gloss over such risks.

192. Globant withheld such information from CCG, made misrepresentations to CCG, and affirmatively misled CCG to further its own interests in continuing to collect fees under the fixed price contract to which it was

not entitled (because its work on the Project was of no value), and to extract additional fees above and beyond those permitted under the fixed price contract (to which it was also not entitled), all at great expense and damage to CCG.

193.  As a direct result of Globant's fraudulent, deceptive, and unfair scheme, CCG paid Globant and its predecessor-in-interest, PointSource, close to $5 million for a project that was initially estimated to cost $1.8 million -- a 450% price increase -- that yielded no value and that set CCG many years behind in its mission-critical initiative to upgrade its computer systems.  After three years of dealing with PointSource and Globant, millions of dollars in costs, and an extraordinary diversion of resources and focus, CCG must still rely on its outmoded legacy system.  When CCG tried to impress upon Globant the criticality of the Project to CCG's strategic growth plans, Globant's response was to tell CCG it had to pay $5 million more, and wait almost two more years, for a project that Globant needed to start from scratch.

194. In addition to the nearly $5 million in fees it has wasted, CCG has incurred, and will continue to incur, millions of dollars in additional out-of-pocket damages, including payments made to third-party vendors and other external consultants.

195. CCG has suffered tens of millions of dollars in damages related to business opportunities that it lost or that were foreclosed as a result of Globant's misconduct, as well as other indirect damages.

**D.** **Globant's Refusal to Transition Customer-Owned Work Product**

196. As part of its fraudulent extortion scheme, Globant is also wrongfully withholding from CCG work product that belongs to CCG.  Globant is holding such work product hostage in an unlawful attempt to pry still more fees out of CCG.

197.  On or about January 15, 2018, CCG entered into an agreement with Globant to provide, among other services, maintenance and support for the CGC Online Form and the NGC Imaging App that PointSource had previously developed for CCG.  The agreement, referred to as the CCG T&M Statement of Work #2 (the "CCG T&M SOW") and governed by the terms of the MSDA, provided for a one-year term from January 15, 2018 through December 31, 2018, and allowed for "a maximum extension of one (1) calendar month" to be "mutually arranged via email."  A copy of the CCG T&M SOW is attached hereto as Exhibit C.

198. The CCG T&M SOW further estimated monthly fees of $26,920.

199.  In or about May 2019, following the expiration of the contract term, CCG requested that Globant transition the CGC Online Form and the NGC

Imaging App to a replacement vendor, The Mx Group.  In accordance with Section 16.3(b)(i) of the MSDA, Globant was required to "promptly deliver all Work Product generated by Developer" upon termination of the CCG T&M SOW.

200. Instead of complying with CCG's request, and in flagrant breach of its contractual obligations, Globant has refused to relinquish the CGC Online Form, the NGC Imaging App, and other related work product to CCG's replacement vendor unless CCG remits an additional $15,972 in unauthorized "transition" fees and an additional $140,260.64 in unbilled and disputed charges for work that Globant purports to have performed, but never invoiced.  Globant also demanded that CCG pay an outstanding balance of $79,532.25, which was subject to set-off under the contract, before it would release the CGC Online Form and the NGC Imaging App.

201. Globant's demand for additional "transition" fees, which it has since agreed to "waive" if CCG delivers payment of $219,532.25, is a violation of Section 13.2 of the MSDA, which provided that CCG "may withhold from payment any amount disputed by [CCG] in good faith, pending resolution of the dispute" and that Globant "shall continue performing its obligations in accordance with [the MSDA] notwithstanding any such dispute or actual or alleged nonpayment that is the subject of the dispute, pending its resolution."

202. Further, Globant has refused to apply the $125,000 credit -- an amount it does not dispute it owes to CCG under Section 12.4 of the MSDA -- as a set off (under Section 13.4 of the MSDA) against any amounts allegedly owed to Globant under the CCG T&M SOW.

203. Despite CCG's attempt to resolve this dispute, Globant has refused to honor its clear contractual obligations and instead has dragged its feet and thwarted CCG's efforts to transition the CGC Online Form and the NGC Imaging App to an alternate vendor.

## COUNT I
### (Breach of Contract and Breach of Express Warranty
### As Against Globant, LLC)

204. CCG and Globant, LLC entered into and are parties to SOW #3 and all related agreements and Globant, LLC, as successor-in-interest to PointSource, legally assumed all of the obligations of PointSource as contained in the Project contracts that preceded Globant S.A.'s acquisition of PointSource.

205. CCG has performed, has substantially performed, or was excused from performing due to Globant, LLC's material contract breaches and/or the material breaches of its predecessor-in-interest, PointSource, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the Project contracts.  CCG is, and has been, entitled to Globant, LLC's performance of its obligations under the Project contracts.

206. Globant, LLC unilaterally and materially breached numerous provisions of the Project contracts and Globant, LLC is also unilaterally liable for the material breaches of the Project contracts by its predecessor-in-interest, PointSource.

207. Globant, LLC's material breaches of contract, both in connection with the contracts it entered into with CCG as well as the Project contracts entered into by its acquired company, PointSource, for which Globant, LLC bears successor-in-interest liability, include but are not limited to its failure to: (i) implement and deliver a new ERP system that met CCG's needs in connection with its business processes and functional requirements in violation of Section 4 of the MSDA and Section I.2 of SOW #3; (ii) adhere to the implementation schedule in SOW #3 and the "strictly required" time of the essence clause in Section 2.3 of the MSDA; (iii) adhere to the fixed fee budget as provided by SOW #3 and in violation of Section 12.2 of the MSDA; (iv) exercise due professional care in the performance of its Services in violation of Section 6 of the MSDA; (v) "maintain the same Developer Project Manager throughout the term of such [applicable] Statement of Work" in violation of Section 6.2(c) of the MSDA;" (vi) provide a Developer Project Manager with the "necessary skill, experience, and qualifications to perform in such capacity;" (vii) "use its best efforts to meet the Milestone Dates specified in the Statement of Work without any extension or Fee increase" in violation of Section 7.3 of the MSDA; (viii) "deliver each Deliverable and install all Software

on or prior to the Milestone Date therefor in accordance with the delivery criteria set forth in in [sic] the Statement of Work therefor" in violation of Section 9 of the MSDA; (ix) perform Acceptance Testing "to ensure the Software Deliverable, including all Software and Documentation, conforms to the requirements of this Agreement, including the applicable Specifications" in violation of Section 10.1(a) of the MSDA; (x) perform Integration Testing as required by Section 10.1(c) of the MSDA; (xi) "provide a credit towards Customer's Fees in the amount of $125,000" in violation of Section 12.4(a) of the MSDA; (xii) "promptly deliver to [CCG] all Work Product generated by [Globant, LLC] under such Statement of Work (whether complete or incomplete)" in violation of Section 16.3(b)(i)(A) of the MSDA; (xiii) "provide such cooperation and assistance as requested by [CCG], at [Globant, LLC's] sole expense, in transitioning the related Services to an alternate service provider" as required by Section 16.3(b)(i)(B) of the MSDA; (xiv) refund to CCG "all amounts, if any, paid in advance for any related Services or Work Product that have not been provided" in violation of Section 16.3(b)(i)(C) of the MSDA, including the $26,274 overcharge in Globant, LLC's October 2018 invoice; (xv) to remedy breaches on a timely basis as set forth in Section 17.3(b) of the MSDA; (xvi) adequately plan and supervise the performance of its Services; (xvii) appropriately identify, manage, and mitigate risks encountered in connection with its, or its predecessor's Services on the Project; (xviii) engage a competent

Solution Architect; (xix) develop and provide an adequate Project plan and appropriate business process design documentation, including functional and technical specifications during the design phase of the Project; and (xx) assign to the Project personnel with the adequate, appropriate, and necessary skills, experience, expertise, competence, and qualifications.

208. Globant, LLC's breaches were material to the Project contracts and not incidental in nature.

209. Globant, LLC additionally and expressly warranted in Section 17.2(a) of the MSDA that it would "perform all Services in a professional and workmanlike manner in accordance with best industry standards and practices for similar services, using personnel with the requisite skill, experience, and qualifications, and shall devote adequate resources to meet its obligations under th[e] Agreement."

210. Globant, LLC materially breached its express warranties to CCG by, among other things, (i) failing to assign a competent solution architect to the Project; (ii) failing to assign to the Project team personnel with the skills and experience necessary to deliver the Project; (iii) failing to provide on-site support; (iv) relying in large part on a team of unknown consultants working remotely from Belarus who were unfamiliar with the Project; (v) failing to engage in proper Project staffing by, among things, rolling its personnel onto and off of the Project;

(vi) failing to apply or adhere to an adequate and appropriate implementation methodology, adequate and appropriate program management practices and protocols, and ERP implementation best practices; (vii) failing to adequately and appropriately identify, manage, mitigate, and escalate project risk; (viii) failing to prepare the adequate and appropriate project documentation; (ix) failing to deliver all but a small portion of the new ERP system; (x) failing to comply with the fixed fee contract; and (xi) failing to meet Project deadlines.

211.  As a direct result of Globant, LLC's material breaches of contract and express warranties, CCG sustained in excess of $10 million dollars in contract damages and tens of millions more in consequential and other recoverable damages, and continues to be damaged, in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II
**(Violation Of Florida's Deceptive And Unfair Trade Practices Act
Fla. Stat. § 501.201 *et seq*. As Against Globant, LLC, Globant S.A.,
And The John Doe Defendants)**

212. Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat**.** § 501.201 *et seq***.** ("FDUTPA"), is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

213. Globant violated FDUTPA by engaging in unconscionable, deceptive, or unfair acts or practices in the conduct of its business in Florida by making false and misleading representations and engaging in omissions concerning material facts to CCG upon Globant's assumption of the Project contracts, during the negotiations for SOW #3 and subsequent amendments and change orders, and after the fixed fee contract was signed.

214. As detailed above, Globant fraudulently induced CCG to consent to the assignment of the Project contracts and to enter into SOW #3 and subsequent amendments and change orders.  Globant further engaged in a cover-up scheme to conceal the true state of the Project and withhold critical information concerning risks that threatened the Project to further its own interests in continuing to collect and attempting to extract additional fees from CCG, at great expense and damage to CCG.

215. Globant's deceptive and unfair trade practices include, but are not limited to, its conduct in: (1) misrepresenting to CCG its ability and intention to staff the Project with appropriately skilled and experienced consultants; (2) taking on an ERP project for which, as it well knew and believed, it was singularly unqualified, because, among other reasons, none of the 86 consultants it assigned to the Project had any ERP experience, as it has now admitted in its interrogatory responses; (3) failing to disclose to CCG the Globant team's "massive skills,

seniority, and knowledge gap," and a host of project management failures relating to staffing, implementation methodology, Project documentation, functional requirements gathering, and solution architecture, as Globant executives admitted internally, even as they continued to demand and accept fees from CCG, and repeatedly assured CCG that the Project was on track; (4) padding, inflating, and manipulating fee invoices it submitted to CCG, and misrepresenting the work that its consultants purportedly performed in connection with such invoices; (5) deliberately lowballing and underestimating what it knew was the actual cost to deliver the Project, in order to deceive CCG into paying additional fees and continuing to employ and rely on Globant to deliver the Project, while fully intending at a later date to demand even more fees from CCG; (6) issuing threats to CCG that it would abandon and cease working on the Project if its financial demands for more fees were not met, even though it had agreed to a fixed price contract; (7) seeking to support its extortionate demands for more fees, under threat of walking off the Project, by making assertions to CCG that it well knew and believed were false and contrary to its contractual obligations; (8) repeatedly failing to tell CCG the truth about the state of the Project, including with respect to the quality of the work it was performing and its ability to deliver the Project by the agreed-to date for the agreed-to price; (9) refusing to issue a $125,000 credit owed to CCG under the express terms of the MSDA; and (10) engaging in the

misconduct described above, including all of the above acts and omissions, in full

knowledge that a new ERP system was central to CCG's strategic plans and critical

to CCG's continued stability, growth, health, and well-being.

216. The foregoing deceptive scheme was implemented and/or approved by

agents of both Globant S.A. and Globant, LLC, including Alejandro Scannapieco

(former Chief Financial Officer who acted as an agent of both Globant S.A. and

Globant, LLC); Juan Urthiague (Globant S.A. CFO); Sol Noello (Globant S.A.

General Counsel); Timothy Ramsey (Globant, LLC Executive Vice

President/Managing Director of Sales and Client Services); David Acomb

(Globant, LLC Managing Director); Adrienne Bryant (Globant, LLC Project

Manager); and others.  As set forth above, any and all negotiations undertaken with

CCG,  any and all transactions and agreements with CCG, any and all financial

discussions with and billing to CCG, and any and all discussions with CCG

concerning disputes required the approval of, and were in fact approved by, a

group of Globant S.A. executives who made, were responsible for, and maintained

exclusive control over all significant business decisions by Globant, LLC,

including with respect to the Project.  No Globant, LLC employee possessed or

exercised the authority to make any significant decision concerning the Project

timeline, finances, costs, budget, or scope, all of which issues were ultimately

overseen, supervised, directed by, and decided by Globant S.A., as opposed to

Globant, LLC.  Executives from Globant S.A. were directly involved in making false statements, assurances and omissions to CCG executives concerning Project status, costs, and schedule, all in order to deceive CCG into continuing to rely on Globant and to pay Globant fees.

217. Globant's unscrupulous, unethical, unconscionable, deceptive, fraudulent, unfair, and misleading conduct constitutes deceptive and unfair trade practices pursuant to FDUTPA, as such conduct is likely to deceive a consumer acting reasonably in the same circumstances, just as such conduct deceived CCG.

218. As is set forth in detail in this complaint, Globant S.A. and Globant, LLC, were both directly involved in unfair and deceptive conduct directed toward CCG.  Globant S.A. executives maintained exclusive authority over all significant corporate decisions at Globant, LLC.  Among other things, Globant S.A. executives, including Scannapieco, Urthiague, and Noello, were aware of and approved Ramsey's and/or Scannapieco's extortionate threats to abandon the Project.  Further, Scannapieco, while Chief Financial Officer of Globant S.A., was made aware by of major problems on the Project by Globant, LLC consultants, but deliberately hid these problems from CCG.  Globant, LLC consultant Ramsey personally threatened CCG that Globant would abandon the Project if CCG did not pay it $1 million over-and-above the "fixed price" called for in the parties' contract (which was also approved of by Scannapieco).  Globant, LLC consultants Ramsey,

Hugill, Acomb, Raval, Bryant and others, were also aware of the serious delivery problems on the Project, but chose to hide those problems from CCG.

219. As a direct result of Globant's deceptive and unfair trade practices, CCG sustained actual damages in an amount to be determined at trial. Those damages include CCG's payment of fees to Globant, and other vendors, for an ERP system that Globant failed to deliver and thus was rendered valueless; the costs of assessing the defects of and any salvage value in the development work performed by Globant; the costs of implementing a new ERP system; the costs of continuing to rely on and maintain CCG's legacy computer system; CCG's other internal costs; and CCG's lost profits caused by lost business opportunities. CCG is also entitled to recover its attorneys' fees and costs pursuant to Fla. Stat. § 501.2105.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT III
### (Declaratory Judgment - 28 U.S.C. § 2201 As Against Globant, LLC)

220. As alleged above, beginning in or about May 2019, CCG has repeatedly requested that Globant transition the CGC Online Form and the NGC Imaging App to a replacement vendor, The Mx Group, pursuant to Section 16.3(b)(i)(B) of the MSDA.

221. The CGC Online Form and the NGC Imaging App comprise critical parts of CGC's and NGC's business operations and constitute Customer Materials and Work Product as those terms are defined in Section 1 of the MSDA.

222. Under Section 16.3(b)(i)(B) of the MSDA, Globant, LLC is required to "provide such cooperation and assistance as requested by [CCG], at [Globant, LLC's] sole expense, in transitioning the related Services to an alternate service provider[.]"

223. Globant has wrongly refused to transition the CGC Online Form and the NGC Imaging App unless CCG remits additional unbilled, unearned, and disputed fees in contravention of Sections 13.2(b) and 13.4 of the MSDA.

224. As alleged above, Globant has further refused to provide CCG with a credit towards its fees in the amount of $125,000 as expressly required by Section 12.4(a) of the MSDA.

225. Globant does not dispute that the $125,000 credit is owed to CCG, but has refused to comply with its contractual obligation to issue the credit.

226. Further, Globant refuses to acknowledge CCG's right of set-off as provided in Section 13.4 of the MSDA.

227. As alleged above, Globant issued an erroneous bill to CCG in October 2018 overcharging CCG $26,274.

228. Globant has not disputed the overpayment, but has refused to return the excess payment in contravention of Section 16.3.

229. Further, in demanding additional fees from CCG purportedly relating to SOW #3, Globant has failed to acknowledge CCG's right, under Section 13.1(a) of the MSDA, to hold back 10 percent of all fees invoiced by Globant until such time as CCG is "no longer reliant" on its legacy system (the "Holdback Date"). As a result, there exists an actual and continuing controversy between CCG on the one hand, and Globant on the other. The controversy is real and immediate and the parties have adverse legal interests. Although the terms of the MSDA are clear and unambiguous, Globant's conduct has placed CCG in doubt as to its rights under the MSDA.

230. As a result of Globant's conduct, CCG is suffering an actual and threatened injury that requires a declaration of the rights of the parties with respect to the transition of the Customer Materials and Work Product, the issuance of the $125,000 credit, the return of the $26,274 payment, and CCG's right to hold back 10 percent of all fees paid to Globant.

WHEREFORE, CCG respectfully requests a declaratory judgment declaring that: (1) CCG is entitled to the immediate transition of the CGC Online Form and the NGC Imaging App to an alternate service provider of its choosing without further expense to CCG in accordance with the terms of Section 16.3 of the

MSDA; (2) CCG is entitled to the immediate refund of $125,000 from Globant in accordance with the terms of Section 12.4(a) of the MSDA; (3) CCG is entitled to the immediate return of $26,274 reflecting an erroneous billing overcharge in Globant's October 2018 invoice that CCG paid; and (4) CCG is entitled to hold back 10 percent of all invoices issued prior to the Holdback Date as that term is defined in Section 13.1(a) of the MSDA.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, CCG respectfully requests that this Court enter judgments against Globant and provide the following relief:

a.  Actual, indirect, expectation, consequential, and compensatory damages in an amount to be determined at trial;

b.  Rescission of the Project contracts;

c.  Restitution of all amounts paid by CCG to Globant;

d.  Punitive and/or exemplary damages;

e.  Reasonable and necessary attorneys' fees;

f.  Statutory money damages;

g.  Declaratory judgment declaring that (1) CCG is entitled to the immediate transition of the CGC Online Form and the NGC Imaging

App to an alternate service provider of its choosing without further expense to CCG in accordance with the terms of Section 16.3 of the MSDA; (2) CCG is entitled to the immediate refund of $125,000 from Globant in accordance with the terms of Section 12.4(a) of the MSDA; (3) CCG is entitled to the immediate return of $26,274 reflecting an erroneous billing overcharge in Globant's October 2018 invoice that CCG paid; and (4) CCG is entitled to hold back 10 percent of all invoices issued prior to the Holdback Date as that term is defined in Section 13.1(a) of the MSDA;

h. Pre- and Post-judgment interest at the maximum rate allowed by law;

i. All costs of suit; and

j. All such further relief, both general and special, at law or in equity, to which CCG may show itself justly to be entitled or as this Court may deem appropriate.

Dated:  April 16, 2021

KASOWITZ BENSON TORRES LLP

By: /s/ *Mark P. Ressler*
Maria Ruiz (Florida Bar No. 182923)
Mark P. Ressler (Admitted *Pro Hac Vice*)
Thomas B. Kelly (Admitted *Pro Hac Vice*)

1441 Brickell Avenue
Suite 1420
Miami, Florida 33131

Telephone: (786) 587-1044
Email:  mruiz@kasowitz.com

-and-

1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Email:  mressler@kasowitz.com
        tkelly@kasowitz.com

*Attorneys for Plaintiffs Certified Collectibles Group, LLC, Numismatic Guaranty Corporation of America, Certified Guaranty Company LLC and Paper Money Guaranty, LLC*